ORAL ARGUMENT NOT YET SCHEDULED

**No. 14-1090 (consolidating 14-1091, 14-1092, 14-1113)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

HOWARD STIRK HOLDINGS, LLC
PROMETHEUS RADIO PROJECT
NATIONAL ASSOCIATION OF BROADCASTERS
NEXSTAR BROADCASTING, INC.
                                    *Petitioners*,

*v.*

FEDERAL COMMUNICATIONS COMMISSION, and
THE UNITED STATES OF AMERICA,
                                    *Respondents*.
_____

On Petition for Review of an Order
of the Federal Communications Commission
_____

**FINAL BRIEF FOR PROMETHEUS RADIO PROJECT**
_____

Angela J. Campbell
Andrew Jay Schwartzman
Eric G. Null
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 662-9535
*Counsel for Prometheus Radio Project*

August 27, 2015

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## (A)   Parties and Amici

Petitioners/Intervenors

Howard Stirk Holdings, LLC

National Association of Broadcasters

Nexstar Broadcasting, Inc.

Prometheus Radio Project

Intervenors

Benton Foundation

Common Cause

Media Alliance

Media Council Hawai`i

Minority Media and Telecommunications Council

Mission Broadcasting, Incorporated

National Association of Broadcast Employees and Technicians—Communications

Workers of America

National Organization for Women Foundation

Office of Communication, Inc. of the United Church of Christ

Amici Curiae

Cox Media Group

International Center for Law and Economics

**(B)    Rulings Under Review**

The decision of the Federal Communications Commission under review is *2014 Quadrennial Regulatory Review,* Further Notice of Proposed Rulemaking and Report and Order*,* 29 FCCRcd 4371 (2014).  Synopses of the decision were published in the Federal Register at 79 Fed. Reg. 28995 (May 29, 2014) and 79 Fed. Reg. 29009 (May 20, 2014).  The decision is reproduced in the Joint Appendix (JA1).

**(C)    Related Cases**

This case was previously heard before the United States Court of Appeals for the Third Circuit, which twice remanded it to the Federal Communications Commission.  *Prometheus Radio Project v. FCC,* 652 F.2d 431 (3d. Cir. 2011)(Docket 03-3388); *Prometheus Radio Project v. FCC*, 373 F.2d 372 (3d. Cir. 2004)(Docket 08-3078).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1 and Federal Rule of Appellate Procedure 26.1, Prometheus Radio Project submits this Corporate Disclosure Statement:

Prometheus Radio Project has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

Respectfully Submitted,

/s/ _____
Angela J. Campbell
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 662-9535

August 27, 2015

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... vi

GLOSSARY ......................................................................................... xi

JURISDICTION ..................................................................................... 1

STATEMENT OF ISSUES ...................................................................... 1

STATEMENT OF THE CASE .................................................................. 1

SUMMARY OF ARGUMENT ................................................................. 4

STANDING ............................................................................................ 5

STANDARD OF REVIEW ...................................................................... 6

ARGUMENT .......................................................................................... 6

I.      The Court should transfer the cases to the Third Circuit. ...............6

II.     The Commission failed to comply with the *Prometheus II* remand and
        to consider an important aspect of the problem............................12

        A.      Ownership diversity is a long-standing public interest goal. ..............12

                1.      Early attempts by the Commission to gather and analyze
                        ownership data. ........................................................13

                2.      *Prometheus I* remanded the *2002BR Order* for failure to
                        address the lack of ownership by minorities and women. ........14

                3.      The Commission took no action to improve its data
                        collection. .................................................................16

        B.      *Prometheus II* found the Commission again failed to consider
                the effect of the rules on ownership by women and minorities. .........18

        C.      The Commission again did not improve its data collection,
                contrary to the *Prometheus II* remand.................................19

                1.      The *2010QR NPRM* acknowledged the Commission's
                        data was insufficient and failed to propose a definition
                        for SDBs.....................................................................20

                2.      The Bureau report on Form 323 data did not provide the
                        analysis required by *Prometheus II*. ..........................21

        D.      The *Order* violated the *Prometheus II* remand. ...................22

        E.      The Commission's failure to address the impact of incentive
                auctions on ownership by minorities and women was arbitrary
                and capricious.......................................................................25

III.    The FCC's decision to attribute JSAs but not SSAs was arbitrary and
        capricious. ....................................................................................................26

        A.    The Commission made some contractual agreements
              attributable. .........................................................................................26

        B.    In the wake of *Prometheus I*, television broadcasters began to
              use new contractual agreements to evade the duopoly rule. ...............27

        C.    Many commenters urged the Commission to require disclosure
              and attribution of SSAs. .....................................................................29

        D.    The decision to attribute JSAs but not SSAs was arbitrary and
              capricious for failure to consider an important aspect of the
              problem. ...............................................................................................36

        E.    The Commission acted arbitrarily and capriciously in not
              requiring disclosure of SSAs. ..............................................................38

CONCLUSION ........................................................................................................39

# TABLE OF AUTHORITIES

## Cases

*AEP Texas N. Co. v. Surface Transp. Bd.*, 609 F.3d 432
(D.C. Cir. 2010)................................................................ 25

*Adarand Constructors v. Peña*, 515 U.S. 200 (1995)............................................. 13

*American Public Gas Association v. FPC*, 555 F.2d 852
(D.C. Cir. 1976)................................................................. 9

*Colorado River Water Conservation District v. United States*,
424 U.S. 800 (1976)............................................................. 8

*Core Communications. v. FCC*, 531 F.3d 849 (D.C. Cir. 2008)....................... 9, 12

*Eastern Air Lines v. CAB*, 354 F.2d 507 (D.C. Cir. 1965)....................................... 8

*Eschelon Telecom v. FCC*, 345 F.3d 682 (8th Cir. 2003)................................... 8, 9

*Liquor Salesmen's Union Local 2 v. NLRB*, 664 F.2d 1200
(D.C. Cir. 1976)................................................................ 11

*Metro Broad. v. FCC*, 497 U.S. 547 (1990)........................................... 12

*Monroe Communications v. FCC*, 840 F.2d 942
(D.C. Cir. 1988)................................................................. 9

*\*Motor Vehicles Mfrs. v. State Farm*, 463 U.S. 29 (1983).......................... 6, 12, 25

*Pacific Gas & Electric v. FPC*, 272 F.2d 510 (D.C. Cir. 1958)........................... 10

*\*Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004).. 2, 14, 15, 16, 28

*\*Prometheus Radio Project v. FCC*, 652 F.3d 431
(3d Cir. 2011)................................................. 1, 2, 3, 7, 10, 16, 18, 22, 23

*\*Public Service Commission v. FPC*, 472 F.2d 1270
(D.C. Cir. 1972)................................................................. 9

*Authorities upon which we chiefly rely are marked with asterisks.

*RTNDA v. FCC*, 229 F.3d 269 (D.C. Cir. 2000)...................................................... 12

*\*TRAC v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)................................................. 6, 12

**Statutes**

5 U.S.C. §706(1)............................................................................... 5, 6, 12

5 U.S.C. §706(2)(A)....................................................................................... 6

28 U.S.C. §1651......................................................................................... 1, 6

28 U.S.C. §2112(a)(5)............................................................................... 6, 8

28 U.S.C. §2342(1)......................................................................................... 1

47 U.S.C §402(a).............................................................................................. 1

Telecommunications Act of 1996, Pub. L. No. 104-104, §202(h),
110 Stat. 56(h)............................................................................... 1, 2, 13

**Administrative Materials**

*1998 Biennial Regulatory Review – Streamlining of Mass Media
Applications, Rules, and Processes*, Report and Order, 13 FCCRcd
23056 (1998)................................................................................... 13, 14

*2002 Biennial Regulatory Review – Review of the Commission's
Broadcast Ownership Rules and Other Rules Adopted Pursuant to
Section 202 of the Telecommunications Act of 1996, Report and
Order and Notice of Proposed Rulemaking*, 18 FCCRcd 13620
(2003)................................................................................... 2, 13, 14, 27

*2006 Quadrennial Regulatory Review – Review of the Commission's
Broadcast Ownership Rules and Other Rules Adopted Pursuant to
Section 202 of the Telecommunications Act of 1996, Report and
Order and Order on Reconsideration*, 23 FCCRcd 2010 (2008)................. 3, 13, 18

vii

*2010 Quadrennial Regulatory Review – Review of the Commission's
Broadcast Ownership Rules and Other Rules Adopted Pursuant to
Section 202 of the Telecommunications Act of 1996, Notice of
Proposed Rulemaking*, 26 FCCRcd 17489 (2011)........................... 4, 13, 20, 31, 39

*FCC Launches Examination of the Future of Media and Information
Needs of Communities in a Digital Age, Public Notice*, 25 FCCRcd
384 (2010)...................................................................................... 29

*FCC Seeks Comment on Research Studies on Media Ownership*,
Public Notice, DA 07-3470.............................................................. 19

*Implementation of Section 309(j) of the Communications
Act—Competitive Bidding, Sixth Report and Order*,
11 FCCRcd 136 (1995)..................................................................... 13

*KHNL/KGMB License Subsidiary, LLC, Memorandum Opinion and
Order and Notice of Apparent Liability for Forfeiture*, 26 FCCRcd
16087 (MB 2011)............................................................................. 29

*Malara Broadcasting Group of Duluth Licensee, LLC, Letter*,
19 FCCRcd 24070 (MB 2004)........................................................... 28

*Piedmont Television of Springfield License, LLC, Letter*, 22 FCCRcd
13910 (MB 2007)............................................................................. 29

*Processing of Broadcast Television Applications Proposing Sharing
Arrangements and Contingent Interests, Public Notice*, 29 FCCRcd
2647 (MB 2014)............................................................................... 35, 38

*Promoting Diversification of Ownership in the Broadcasting Services,
Report and Order and Third Further Notice of Proposed Rulemaking*,
23 FCCRcd 5922 (2008)................................................................... 3, 16, 17

*Promoting Diversification of Ownership in the Broadcast Services,
Report and Order and Fourth Further Notice of Proposed Rulemaking*,
24 FCCRcd 5896 (2009)................................................................... 17

*Promoting Diversification of Ownership in the Broadcasting Services*,
*Memorandum Opinion and Order and Fifth Further Notice of Proposed
Rulemaking*, 24 FCCRcd 13040 (2009) ................................................. 17

*Promoting Diversification of Ownership in the Broadcasting Services*,
*Sixth Further Notice of Proposed Rulemaking*, 28 FCCRcd 461 (2013) .............. 17

*Promoting Diversification of Ownership in the Broadcasting Services*,
*Seventh Further Notice of Proposed Rulemaking*, 30 FCCRcd 1725
(2015) ................................................................................. 17, 24

*Report on Ownership of Commercial Broadcast Stations*,
27 FCC Rcd 13814 (MB 2012) ............................................................ 21

*Review of the Commission's Regulations Governing Attribution of
Broadcast and Cable/MDS Interests, Report and Order*, 14 FCCRcd
12559 (1999) ............................................................................ 27

*Review of the Commission's Regulations Governing Television
Broadcasting, Report and Order*, 14 FCCRcd 12903 (1999) ............................. 26

*Revision of Radio Rules and Policies, Report and Order*, 7 FCCRcd
2755 (1992) ............................................................................ 27

*Rules and Policies Concerning Attribution of Joint Sales Agreements
in Local Television Markets, Notice of Proposed Rulemaking*, 19
FCCRcd 15238 (2004) ................................................................... 27

*SagamoreHill of Corpus Christi Licenses, LLC, Letter*, 25 FCCRcd
2809 (MB 2010) ........................................................................ 29

*Statement of Policy on Minority Ownership of Broadcast Facilities,
Public Notice*, 68 F.C.C.2d 979 (1978) ................................................ 12

*Studies Indicate Need to Promote Wireless & Broadcast License
Ownership by Small, Women- and Minority-Owned Businesses,
Press Release*, 2000 WL 1808326 ...................................................... 14

*The Information Needs of Communities, Report*, 2011 WL 2286864 .............. 30, 39

*Standardized and Enhanced Disclosure Requirements for Television Broadcast Licensee Public Interest Obligations, Order on Reconsideration and Further Notice of Proposed Rulemaking*, 26 FCCRcd 15788 (2011) ................................................................... 30, 39

## Miscellaneous

16 Wright, Miller and Cooper, Federal Practice and Procedure, §3937.1 (3d ed. 2012) ............................................................................... 9

Phil Verveer, *How the Sidecar Business Model Works* (Mar. 6, 2014) ....................................................................................... 35

Staff Executive Summary, http://bit.ly/1aafp9M .................................................. 14

# GLOSSARY

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **BR** | Biennial Review |
| **Bureau** | Media Bureau |
| **FCC or Commission** | Federal Communications Commission |
| **CWA** | Communications Workers of America |
| **FNPRM** | Further Notice of Proposed Rulemaking |
| **FSSR** | Failed Station Solicitation Rule |
| **INOC** | Information Needs of Communities |
| **JA** | Joint Appendix |
| **JSA** | Joint Sales Agreement |
| **LCCHR** | Leadership Conference on Civil and Human Rights |
| **LMA** | Local Marketing Agreement |
| **MCH** | Media Council Hawai'i |
| **NOI** | Notice of Inquiry |
| **NPRM** | Notice of Proposed Rulemaking |

| | |
|---|---|
| ***Order*** | *2014 Quadrennial Regulatory Review,* Further Notice of Proposed Rulemaking and Report and Order, MB Dkt. 14-50, 29 FCCRcd 4371 (2014) |
| **Prometheus or Petitioner** | Prometheus Radio Project |
| ***Prometheus I*** | *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) |
| ***Prometheus II*** | *Prometheus Radio Project v. FCC*, 652 F.3d 431(3d Cir. 2011) |
| **QR** | Quadrennial Review |
| **SBA** | Small Business Administration |
| **SDB** | Socially and Economically Disadvantaged Businesses |
| **SSA** | Shared Services Agreement |
| **UCC** | Office of Communication, Inc. of United Church of Christ |

## JURISDICTION

The *Order* under review was issued, pursuant to a remand from the U.S. Court of Appeals for the Third Circuit, under the authority of §202(h) of the Telecommunications Act of 1996. This Court has jurisdiction pursuant to 47 U.S.C §402(a), 28 U.S.C. §1651, and 28 U.S.C. §2342(1). The Petition for Review Or, in the Partial Alternative, A Petition for Writ of Mandamus was timely filed. Relevant statutes and regulations are set forth in Addendum A.

## STATEMENT OF ISSUES

1. Whether these cases should be transferred to the United States Court of Appeals for the Third Circuit for enforcement of its remand in *Prometheus Radio Project v. FCC*, 652 F.3d 372 (3d Cir. 2011).

2. Whether the Commission's non-compliance with the *Prometheus Radio Project v. FCC*, 652 F.3d 372 (3d Cir. 2011) remand was agency action unreasonably delayed or so egregious as to warrant mandamus.

3. Whether the Commission's failure to attribute SSAs when it attributed JSAs, or its failure to require disclosure of SSAs, was arbitrary and capricious.

## STATEMENT OF THE CASE

The decision under review (*Order*) involves the FCC's actions in three different rulemaking dockets:

1

    1.  Docket 09-182, *2010 Quadrennial Review*, the FCC's review of its broadcast ownership rules conducted every four years pursuant to §202(h) of the Telecommunications Act of 1996;

    2.  Docket 07-294, *Promoting Diversification of Ownership in the Broadcasting Services*, a proceeding initiated after *Prometheus I* to consider proposals for increasing ownership opportunities for women and minorities; and

    3.  Docket 04-265, *Attribution of Joint Sales Agreements in Local Television Markets*, a proposal initiated after the 2002 Biennial Review to attribute TV JSAs.

These proceedings were combined for reasons dating back to *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004)(*Prometheus I*). There, the Third Circuit affirmed parts of the *2002 Biennial Review,* 18 FCCRcd 13620 (2002)(*2002BR Order*)(JA249), including the attribution of Joint Sales Agreements (JSAs) in *radio,* but reversed other parts. In particular, the court "remanded two of the Commission's decisions dealing with broadcast ownership by minorities and women, and issued a caution regarding a third." *Prometheus Radio Project v. FCC*, 652 F.3d 431, 465 (3d Cir. 2011)(*Prometheus II*)(citing *Prometheus I*). First, it "held that the 2003 Order had arbitrarily repealed the Commission's only rule—the failed station solicitation rule ("FSSR")—directed at enhancing minority ownership, while also failing to consider the effects of its other rules on minority and female ownership more broadly." *Id*. Second, it "concluded that the FCC failed to consider proposals to promote minority broadcast ownership...during the

2002 Biennial Review." *Id.* at 465. Finally, while it "rejected as premature 'Citizen Petitioners' contention that the Commission should have chosen 'socially and economically disadvantaged businesses' (SDBs)" instead of small businesses, it "expected a long-awaited SDB definition to be forthcoming." *Id.*

The Commission consolidated the remand proceeding with its 2006 Quadrennial Review (QR). In 2008, it adopted *2006 Quadrennial Review*, 23 FCCRcd 2010 (2008)(*2006QR Order*), retaining existing ownership limits for television and radio stations but modifying the newspaper/broadcast cross-ownership rule, and *Promoting Diversification of Ownership*, 23 FCCRcd 5922, 5950 (2008)(*Diversity Order*), defining "eligible entities" for certain preferences as "small businesses" using Small Business Administration (SBA) criteria.

The orders were consolidated for review. The Third Circuit affirmed most of the rules, but remanded with respect to the diversity issues. In so doing, the court noted that "ownership diversity is an important aspect of the overall media ownership regulatory framework," and it "re-emphasize[d] that the actions required on remand *should be completed within the course of the Commission's 2010 Quadrennial Review* of its media ownership rules." *Prometheus II*, 652 F.3d at 472 (emphasis added).

On remand, however, the Commission failed to address the impact of its rules on ownership by women and minorities, did not adopt a definition of SDBs

that would promote ownership opportunities for minorities and women, and did not collect data necessary for its review of the rules.

In Docket 04-265, the Commission ruled that *television* JSAs would be attributable. *Order*, ¶340 (JA157). It did not, however, attribute or even require disclosure of Shared Service Agreements (SSAs), in which one station provides services, including local news programming, to another in-market station. The Commission failed to act despite having sought comment on SSAs and despite developing a substantial record showing that both SSAs and JSAs were being used to evade the local television limits. *2010QR NPRM*, ¶¶204-07 (JA354-55).

After this Court was selected by lottery as the venue in which the record would initially be filed, Prometheus moved to transfer the consolidated cases to the Third Circuit. By order dated September 11, 2014, a motions panel referred the matter to the merits panel. Prometheus then moved to deconsolidate its petition for writ of mandamus and transfer it to the Third Circuit. By order dated November 18, 2014, a motions panel also referred that motion to the merits panel.

## SUMMARY OF ARGUMENT

Prometheus argues that because a panel of the Third Circuit retained jurisdiction over the remand, the entire case, or at least the alternative request for mandamus, should be transferred to the Third Circuit.

4

Prometheus challenges the Commission's failure to analyze how its ownership rules affect racial and gender diversity in broadcast ownership and its failure to adopt rules promoting ownership opportunities for minorities and women. The Commission acknowledges that despite prior efforts, minorities and women own only a tiny percentage of stations. The Commission's failure to address this longstanding problem violates the *Prometheus II* mandate and constitutes action unreasonably delayed under 5 U.S.C. §706(1).

Prometheus also challenges the Commission's decision not to attribute agreements known as SSAs, while at the same time attributing similar agreements known as JSAs. The Commission found that JSAs gave the brokering station significant influence over the programming choices of the brokered station. But SSAs often give the brokering station full editorial control over local news programming on the brokered station. Both forms of sharing agreements are used to circumvent the duopoly rule. Thus, the Commission's decision to attribute JSAs while declining to attribute SSAs was arbitrary and capricious.

## STANDING

Prometheus' standing is self-evident from the record. Since 1998, Prometheus has assisted community groups in promoting diversity in ownership and viewpoint in the mass media. It has trained hundreds of people in applying for and operating broadcasting stations, many of whom aspire to careers in

5

broadcasting.  It actively participated in the 2010QR by filing comments as part of a coalition with UCC and others.  It is aggrieved by the Commission's failure to comply with the *Prometheus II* remand and the Commission's decisions limiting diversity in media ownership.

## STANDARD OF REVIEW

Challenges to final FCC actions are reviewed under the "arbitrary and capricious" standard of the APA.  5 U.S.C. §706(2)(A); *Motor Vehicles Mfrs. v. State Farm,* 463 U.S. 29, 43 (1983).  This Court may compel agency action that is "unlawfully withheld or unreasonably delayed."  5 U.S.C. §706(1).  This Court may also issue a writ where "the agency's delay is so egregious as to warrant mandamus."  28 U.S.C. §1651; *TRAC v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984).

## ARGUMENT

### I.    THE COURT SHOULD TRANSFER THE CASES TO THE THIRD CIRCUIT.

Prometheus seeks transfer to the Third Circuit pursuant to 28 U.S.C. §2112(a)(5), which provides that "[f]or the convenience of the parties in the interest of justice, the court in which the record is filed may thereafter transfer all the proceedings with respect to that order to any other court of appeals."  The Commission agrees that transferring these cases to the Third Circuit would serve "the interest of justice."  FCC Response, at 1 (July 2, 2014).

6

The Third Circuit clearly intended this case to return to the same panel.

Moreover, Prometheus' request for mandamus to enforce the remand presents an

issue the Third Circuit panel is uniquely qualified to consider.

In *Prometheus II*, the Third Circuit panel found that

> [d]espite our prior remand requiring the Commission to
> consider the effect of its rules on minority and female
> ownership, and anticipating a workable SDB definition
> well before this rulemaking was completed, the
> Commission has in large part punted yet again on this
> important issue.

*Id.* at 471.  Further, the court said that "actions required on remand should be

completed within the course of the Commission's 2010 Quadrennial Review of its

media ownership rules."  *Id.* at 472.  In its ordering clause, the Third Circuit

reiterated that the Commission must "justify or modify its approach to advancing

broadcast ownership by minorities and women during its 2010 Quadrennial

Review. *This panel retains jurisdiction over the remanded issues*."  *Id*. (emphasis

added).

In a subsequent order, the Third Circuit stated

> [i]n accordance with the Court's instructions in its
> opinion, upon return to this Court after completion of
> further proceedings on remand, the petitions for review
> will be assigned to Judges Scirica, Ambro, and Fuentes
> as the merits panel.

7

Order, Sept. 15, 2011 (Addendum B).  Thus, the Third Circuit panel retained control of the record and expressly anticipated that the same panel would review the FCC's action on remand.

In addition to the factors usually considered under §2112(a)(5), principles of comity strongly favor referral to a sister court to allow it to oversee its directives, particularly when they are as precise as they were in *Prometheus II*.  *See Eastern Air Lines v. CAB*, 354 F.2d 507, 510 (D.C. Cir. 1965).  Transfer is also favored to conserve judicial resources and to avoid "piecemeal litigation." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817-820 (1976); *cf. Eschelon Telecom v. FCC*, 345 F.3d 682, 682 n.1 (8th Cir. 2003)(pending mandamus petition in transferee circuit "reinforce[s]" the need for transfer).

Petitioner is not aware of any case involving transfer where a reviewing panel expressly retained jurisdiction over a remand.  However, this Court contemplated that such circumstance might arise under §2112(a)(5), indicating transfer would be appropriate

> [f]or a case where the same or inter-related proceeding was previously under review in a court of appeals, and is now brought for review of an order entered after remand...where continuance of the same appellate tribunal is necessary "to maintain continuity in the total proceeding."  The need for this doctrine is underscored by the consideration that an appellate court may retain exclusive jurisdiction, by remanding the record rather than the case....

*Public Service Commission v. FPC*, 472 F.2d 1270, 1272 (D.C. Cir. 1972).[1]  In

fact, in *Eschelon Telecom v. FCC*, the Eighth Circuit transferred petitions for

review of an FCC order to the D.C. Circuit because the FCC's order was entered,

in part, on remand from the D.C. Circuit.  345 F.3d at 682 (citing "*Arkansas*

*Midland R.R. v. Surface Transp. Bd.*, No. 00-1206, 2000 WL 1093266, at *1

(D.C.Cir.) (D.C. Circuit transferring a case to this Court because 'petitioner is now

seeking review of an order entered, in part, on remand from the Eighth Circuit.')").

"[I]n practice, it is better that enforcement be controlled by the court that is

responsible for the judgment [and] that understands the reasons for the judgment

and the limits of those reasons...." 16 Wright, Miller and Cooper, Federal Practice

and Procedure, §3937.1 (3d ed. 2012).

　　　The interests of justice require transfer for three other reasons.  First, the

Third Circuit mastered the history and facts underlying the FCC's review of its

ownership rules and directly manifested its expectation that its jurisdiction would

be maintained.  This Court has found that "the desirability of 'continuity in the

total proceeding' calls strongly for handling by the same reviewing tribunal."

*American Public Gas Association v. FPC*, 555 F.2d 852, 857 (D.C. Cir.

---

[1] This Court has often retained jurisdiction in cases involving remands.  *See, e.g.*,
*Core Communications v. FCC*, 531 F.3d 849 (D.C. Cir. 2008); *Monroe*
*Communications v. FCC*, 840 F.2d 942, 947 (D.C. Cir. 1988).

1976)(quoting *Public Service Commission*, 472 F.2d at 1272).  Where, as here,

Petitioner challenges an agency's treatment of issues stemming from a remand,

transfer to the court that issued the remand is the most practical way "to maintain

continuity in the total proceeding." *Pacific Gas & Electric v. FPC*, 272 F.2d 510,

511 (D.C. Cir. 1958).

Second, all of the issues in this case are closely intertwined with the Third

Circuit's earlier consideration of the Commission's ownership rules and in

particular, its "prior remand requiring the Commission to consider the effect of its

rules on minority and female ownership." *Prometheus II*, 652 F.3d at 471.  This is

true not only for the issues relating to SDBs and data collection, but also the SSA

and JSA questions.  JSAs and SSAs are used to evade the Commission's

ownership rules, a principal goal of which is ownership diversity.  *See* Section III,

*infra.*  Prometheus has explained that diversity suffers when "stations in financial

trouble enter into sharing arrangements [instead of seeking] a failing station

waiver" because "[s]haring arrangements eliminate the possibility of bringing in a

new voice, possibly even a minority- or woman-owned broadcaster...."  UCC

Reply Comments, at 10 (Apr. 17, 2012)(JA766).[2]

---

[2] All comments cited in this brief are in Docket 09-182 unless otherwise noted.

10

Finally, because Prometheus alleges that the Commission failed to comply with the Third Circuit's directive that it complete the actions required on remand during its 2010QR proceeding, that court is uniquely equipped to consider the agency's non-compliance. *Liquor Salesmen's Union Local 2 v. NLRB*, 664 F.2d 1200, 1205 (D.C. Cir. 1976)(under §2112(a)(5), courts consider "whether one circuit is more familiar with the same parties and issues or related issues than other courts").

Transfer will not cause material inconvenience to the parties or counsel. Most parties participated in *Prometheus I* and *Prometheus II* and most counsel have practiced in the Third Circuit. Electronic filing has eliminated the logistical barriers of filing pleadings in a different city, and Philadelphia is a short distance from Washington. If these cases are heard in the District of Columbia, it will impose an unnecessary burden on this Court of familiarizing itself with the history of this litigation to determine whether the Commission's actions violated the mandate of a different federal court.[3]

---

[3] Prometheus renews its alternative motion to deconsolidate and transfer its petition for writ of mandamus under the same reasoning.

## II.      THE COMMISSION FAILED TO COMPLY WITH THE *PROMETHEUS II* REMAND AND TO CONSIDER AN IMPORTANT ASPECT OF THE PROBLEM.

If this Court retains jurisdiction over the entire case, it should enforce the

Third Circuit's mandate as it does its own mandates.  *See, e.g., Core*

*Communications*, 531 F.3d at 857-59; *RTNDA v. FCC*, 229 F.3d 269, 271-72 (D.C.

Cir. 2000).  Alternatively, this Court could find the Commission's action was

unreasonably delayed under APA §706(1).  *TRAC*, 750 F.2d at 79.  In addition, this

Court could find the Commission's action arbitrary and capricious for "fail[ure] to

consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

### A.      Ownership diversity is a long-standing public interest goal.

The Commission has long recognized that the public interest is not served by

excluding minorities and women from owning broadcast stations.  In 1978, the

Commission recognized that "racial minorities continue to be inadequately

represented in the broadcast media" and that "[t]his situation is detrimental not

only to the minority audience but to all of the viewing and listening public."

*Minority Ownership of Broadcast Facilities*, 68 F.C.C.2d 979, 980-81 (1978).  The

Commission adopted several policies designed to increase broadcast ownership by

minorities, which the Supreme Court upheld using intermediate scrutiny.  *Metro*

*Broad. v. FCC*, 497 U.S. 547 (1990).

12

In *Adarand Constructors v. Peña*, 515 U.S. 200, 227 (1995), the Supreme

Court held that strict scrutiny applied to federal government classifications based

on race.  Following *Adarand*, the FCC suspended race-based preferences in

licensing until it could develop a record that would satisfy strict scrutiny.  *See, e.g.,*

*Implementation of Section 309(j)*, 11 FCCRcd 136, 136 (1995).

The next year, Congress passed the Telecommunications Act, which directed

the Commission to periodically review its broadcast ownership limits to determine

whether they continued to serve the public interest.  Telecommunications Act of

1996, Pub.L.No. 104-104, §202(h), 110 Stat. 56, 111-12 (1996).  In all reviews

conducted to date, the Commission has reaffirmed that the public interest is served

by diversity, competition, and localism and that an important aspect of ownership

diversity is race and gender.[4]

### 1.    Early attempts by the Commission to gather and analyze ownership data.

In the *1998BR Order*, the Commission amended ownership Form 323 to

require owners' race and gender information. In doing so, it recognized the need to

> determine accurately the current state of minority and
> female ownership of broadcast facilities, to determine the
> need for measures designed to promote ownership by

---

[4] *Order*, 29 FCCRcd at 4480 (2014) (JA110); *2010QR NPRM*, 26 FCCRcd
17489, 17544-55 (2011) (JA329-40); *2006QR Order*, 23 FCCRcd at 2017;
*2002BR Order*, 18 FCCRcd 13620, 13634-37 (2003); *1998BR Order*, 13
FCCRcd 23056, 23097-98 (1998).

> minorities and women, to chart the success of any such
> measures that we may adopt, and to fulfill [its] statutory
> mandate under Section 257 of the 1996 Act and Section
> 309(j) of the Communications Act of 1934 to promote
> opportunities for small businesses and businesses owned
> by women and minorities in the broadcasting industry.

13 FCCRcd 23056, 23095 (1998)(footnotes omitted).

In 2000, the Commission conducted a series of studies to "determine whether it has a compelling interest under the strict scrutiny standards to support programs promoting license ownership by women and minorities." Staff Executive Summary 2, http://bit.ly/1aafp9M. Chairman Kennard concluded that the studies "demonstrate[d] a compelling governmental interest in developing programs to promote women and minority ownership." Press Release (Dec. 12, 2000), 2000 WL 1808326.

In the *2002BR Order*, however, the Commission significantly relaxed the ownership limits without considering the impact of this change on ownership by minorities and women. 18 FCCRcd 13620, 13706-10 (2003).

> **2.** **Prometheus I remanded the 2002BR Order for
> failure to address the lack of ownership by
> minorities and women.**

On review, the Third Circuit found that the FCC's repeal of an aspect of the local television rule known as the failed station solicitation rule (FSSR) was arbitrary and capricious. *Prometheus I*, 373 F.3d at 420-21. The court explained that "the Commission created the FSSR to ensure that qualified minority

14

broadcasters had a fair chance to learn that certain financially troubled—and consequently more affordable—stations were for sale." *Id*. at 420. In repealing the FSSR, the Commission had not acknowledged that the purpose of the rule was to promote minority ownership, nor had it found the FSSR ineffective. *Id*. The court concluded that "[b]y failing to mention anything about the effect this change would have on potential minority station owners, the Commission has not provided a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored" and has "entirely failed to consider an important aspect of the problem." *Id*. at 420-421 (citations omitted). The court instructed the Commission to consider proposals for enhancing ownership opportunities for women and minorities *at the same time* it responded to the court's remand order. *Id.* at 421 n.59, 435 n.82.

The Third Circuit upheld the Commission's decision to define "eligible entities" as small businesses rather than SDBs, a category in which minority status is a factor. *Id.* at 428 n.70. The court acknowledged the Commission's finding that small businesses often include women and minority-owned stations, and that the then-current definition of SDBs was too uncertain to be the basis of its regulation. *Id.* But the court added that "*by the next quadrennial review* the Commission will have the benefit of a stable definition of SDBs, as well as several years of implementation experience, to help it reevaluate whether an SDB-based

15

waiver will better promote the Commission's diversity objectives." *Id.* (emphasis added).

In the remanded proceeding, which was combined with the 2006QR, the FCC commissioned studies on ownership by women and minorities. However, "as the Congressional Research Service…concluded, all the researchers (and the peer reviewers) agree that the FCC's databases on minority and female ownership are inaccurate and incomplete and their use for policy analysis would be fraught with risk." *Prometheus II*, 652 F.3d at 468 (quotation marks removed).[5]

### 3.     The Commission took no action to improve its data collection.

In the *Diversity Order*, 23 FCCRcd at 5954-55, the Commission acknowledged problems with its data collection and sought comment on how it could be improved. The Commission also took "several steps to increase participation in the broadcasting industry by new entrants and small businesses, including minority- and women-owned businesses, which historically have not been well-represented in the broadcasting industry." *Id.* at 5924. These steps included preferences for "eligible entities," defined as small businesses. *Id.* at 5926. The Commission rejected preferences for SDBs, although it did seek further

---

[5]  An investigation by the GAO also faulted the Commission's ownership data collection practices. *Order*, ¶251 n.738 (JA112).

comment on whether to use a racially-conscious definition of SDBs instead. *Id*. at 5945-46, 5950.

In May 2009, the FCC adopted improvements to the Form 323 data collection process. *Diversity Fourth FNPRM*, ¶¶12-26. It directed the Bureau to revise Form 323's electronic interface so that the ownership data "is incorporated into the database, is searchable, and can be aggregated and cross-referenced." *Id.* ¶12.

In a series of FNPRMs, the Commission proposed to improve the completeness and accuracy of data. For example, the *Diversity Fourth FNRPM* proposed that noncommercial educational stations include race and gender information in their ownership reports; the *Diversity Fifth FNPRM* proposed to require certain "non-attributed" owners to file Form 323; and the *Diversity Sixth FNPRM* proposed to eliminate the use of interim Special Use FCC Registration Numbers. No proposals were adopted the five years prior to the release of the *Order*. Indeed, the Commission recently issued a *Diversity Seventh FNPRM*, 30 FCCRcd 1725 (2015), to address "continued difficulties with, and errors within, the Commission's broadcast ownership data."

17

**B.**    ***Prometheus II* found the Commission again failed to consider the effect of the rules on ownership by women and minorities.**

In reviewing the *Diversity Order* and the *2006QR Order*, the Third Circuit found that "[d]espite our prior remand requiring the Commission to consider the effect of its rules on minority and female ownership…the Commission has in large part punted yet again on this important issue." *Prometheus II*, 652 F.3d at 471. The court found that "ownership diversity is an important aspect of the overall media ownership regulatory framework" and "re-emphasize[d] that the actions required on remand should be completed *within the course of the Commission's 2010 Quadrennial Review* of its media ownership rules." *Id.* at 472 (emphasis added). The court also held that the definition of "eligible entity" as a small business "lack[ed] a sufficient analytical connection to the primary issue that [the] Order intended to address," *i.e.*, broadcast ownership by women and minorities. *Id.* at 471.

The Third Circuit observed that "the Commission referenced *no* data on television ownership by minorities or women and *no* data regarding commercial radio ownership by women." *Id.* at 470 (emphasis in original). The court found the Commission had "no accurate data to cite" and faced "significant challenges" promoting broadcast ownership by minorities and women. *Id.* at 470, 472. The court cautioned that

18

> [s]tating that the task is difficult in light of *Adarand* does not constitute 'considering' proposals using an SDB definition. The FCC's own failure to collect or analyze data...does not excuse[] its failure to consider the proposals presented over many years. If the Commission requires more and better data to complete the necessary *Adarand* studies, *it must get the data and conduct up-to-date studies*, as it began to do in 2000 before largely abandoning the endeavor.

*Id.* at 471 n.42 (emphasis added). The court expected the Commission would "act with diligence to synthesize and release existing data such that studies will be available for public review *in time for the completion of the 2010 Quadrennial Review*." *Id.* at 471 n.42 (emphasis added).

### C.   The Commission again did not improve its data collection, contrary to the *Prometheus II* remand.

In June 2010, the Commission proposed several ownership studies and sought suggestions for others. Public Notice, DA 07-3470 (2007)(JA268). Commenters expressed concern that despite "the Third Circuit's direction…*none* of the studies announced by the Media Bureau ask for any analysis of how an owner's gender impacts competition, diversity or localism." UCC Comments, at 2 (July 7, 2010)(JA488). Commenters further detailed methodological flaws and data deficiencies in the ownership studies, such as unrepresentative samples, inconsistent statistical models, and incomplete analysis. Free Press Comments, at 1-4 (July 7, 2010)(JA483-86). Commenters suggested additional studies and ways to improve the planned studies. UCC Comments, at 2 (July 7, 2010)(JA488). The

19

*2010QR NPRM* addressed only one study, Study 7, related to minority ownership, which was inconclusive. *2010 QR NPRM*, ¶193 (JA348-49).

> **1.    The *2010QR NPRM* acknowledged the Commission's data was insufficient and failed to propose a definition for SDBs.**

In summarizing Form 323 data, the *2010QR NPRM* acknowledged the data are "not complete and are likely insufficient either to address the concerns raised in *Prometheus II* or to support race- or gender-based actions by the Commission." *Id.* ¶158 (JA335). The Commission concluded "that making legally sound proposals would not be possible based on the record before us at this time." *Id.* (JA335). Instead, it would improve its data collection, commission studies, and conduct workshops "in preparation for the 2014 broadcast ownership review to establish with the requisite foundation and clarity what additional policies can be implemented promoting greater broadcast ownership diversity, including female and minority ownership." *Id.* (JA335).

Civil rights organizations were astounded by the Commission's stated intent to defy the court's order in *Prometheus II* to address ownership by minorities and women in the 2010QR. LCCHR, for example, called on the Commission to take immediate action to improve its data collection, to increase ownership opportunities for minorities and women, and to reject proposals to permit further media consolidation until it complied with the court mandate in *Prometheus II.*

20

LCCHR Comments, at 3-4 (Mar. 5, 2012)(JA578-79).  Similarly, UCC expressed

concern that "the FCC should not take any action to relax the ownership rules until

it has completed its analysis of the proposed changes on opportunities for

minorities and women to own broadcast stations and has complied fully with the

mandate of the Third Circuit."  UCC Comments, at 38 (Mar. 5, 2012)(JA644).

### 2. The Bureau report on Form 323 data did not provide the analysis required by *Prometheus II*.

On November 14, 2012, the Bureau released a report tabulating the Form

323 information from 2009 and 2011.  *Report on Ownership of Commercial*

*Broadcast Stations* (*Report*)(JA373).  While the *Report* confirmed that minorities

and women controlled only a tiny fraction of broadcast stations of all types, the

data was too incomplete to allow meaningful comparisons over time.  *Id.* ¶9

(JA376-87); UCC Comments, at 11-12 (Dec. 26, 2012)(JA781-82).

Commenters argued that the *Report* did not satisfy the *Prometheus II*

mandate because it provided no analysis of how relaxing the rules would affect

already low levels of ownership by minorities and women.  UCC Comments, at 8-

16 (Dec. 26, 2012)(JA778-86). Nor did the *Report* attempt to use the data to

analyze the effectiveness of the FCC's existing or past policies designed to

promote diverse ownership.  *Id.* at 14-16 (JA784-86).  Prior to the adoption of the

*Order*, commenters made numerous ex parte presentations pointing out that the

record was inadequate to meet the court's mandate.  *E.g.*, UCC Ex Parte, at 2 (Feb. 5, 2014)(JA829); LCCHR Ex Parte, at 1 (Jan. 17, 2014)(JA827).

### D.    The *Order* violated the *Prometheus II* remand.

The *Order* failed to comply with *Prometheus II* in at least three ways.  First, the Commission provided no analysis of how the rules affect ownership by minorities and women as required by *Prometheus II*, 542 F.3d at 471-72.  It merely summarized the data, showing that both minorities and women are vastly underrepresented.[6]

The Commission acknowledged that the *Report* was not a study and that it alone did not fulfill

> its statutory obligation to assess the public interest implications of its broadcast ownership rules.  Rather, the report contain[ed] valuable information about minority and female ownership…that [was] being taken into account in this proceeding.  This report and future reports like it, collectively, should provide a reliable factual underpinning for *future analysis* of [ownership] trends.

*Order*, ¶261 (emphasis added)(JA117).

Thus, the Commission both failed to comply with the *Prometheus II* remand *and* failed to address an important part of the statutorily-required determination of

---

[6] That report found that of 1,348 commercial television stations, 2.2% were controlled by minorities, 3.9% by Hispanic owners, and 6.8% by women.  Of 5,611 FM stations, minorities controlled 3.5%, Hispanics controlled 2.7%, and women controlled 5.8%.  Of the 3,830 AM stations, minorities controlled 6.2%, Hispanics controlled 4.5%, and women controlled 7.8%.  *Order*, ¶¶254-56 (JA114-15).

whether the ownership limits contribute to or detract from the public interest in having diverse owners of broadcast stations.

Second, the Third Circuit expected that the Commission would adopt a workable SDB definition in the 2010QR. *Prometheus II*, 542 F.3d at 471-72. Instead, the Commission "tentatively conclude[d] that [it] is not in a position at this time to adopt an SDB eligibility standard, which expressly would recognize the race and ethnicity of applicants, or any other race- or gender-targeted measures." *Order*, ¶244 (JA109). In addition, the Commission "tentatively conclude[d] that the revenue-based eligible entity standard should be reinstated" despite conceding the *record does not demonstrate* the standard increases ownership by minorities or women. *Id.* ¶243 (JA109).

Finally, the Third Circuit expected that "[i]f the Commission requires more and better data to complete the necessary *Adarand* studies, it must get the data and conduct up-to-date studies, as it began to do in 2000 before largely abandoning the endeavor." *Prometheus II*, 542 F.3d at 471 n.42. The court further required the Commission to get the data and conduct the studies as part of the 2010QR. *Id*. The Commission, however, did not conduct or even attempt to conduct *Adarand* studies.

The *Order* "acknowledge[d] that previous shortcomings in the Form 323 data have impaired the ability of the Commission and interested parties to study

23

and analyze issues related to minority and female ownership," but claimed to have responded to criticisms by substantially revising Form 323.  *Order*, ¶251 (JA112).  In fact, none of the proposals in the *Diversity Fourth*, *Fifth*, and *Sixth FNPRMs* have been adopted.  Furthermore, in February 2015, the Commission released the *Diversity Seventh FNPRM*, reiterating its goal "of comprehensive, reliable data reflecting the race, gender, and ethnicity of the owners" and that "data must be capable of being read, verified, searched, aggregated, and cross-referenced electronically."  30 FCCRcd at 1726.  At the same time, it revealed that because 30% of filers used unreliable "Special Use" registration numbers, it was nearly impossible for the Commission to ensure that a single entity was not using multiple numbers or that multiple entities were not using the same number.  *Id.* at 1730.  As a result, one cannot have confidence in the *Report*.

Prometheus and other parties identified many other problems with the data.  For example, a large number of stations failed to file at all.  In 2009, approximately 58% of low power television stations, 27% of Class A television stations, 20% of AM stations, 18% of FM stations, and 14% of full-power television stations failed to file Form 323.  UCC Comments, at 12 (Dec. 26, 2012)(JA782).  And while the *Report* listed the total number and percentage of stations owned by minorities and women according to station type, it did not identify the call sign, location, or

market rank, making verification and analysis impossible.  UCC Comments, at 10

(Dec. 26, 2012)(JA780).

### E. The Commission's failure to address the impact of incentive auctions on ownership by minorities and women was arbitrary and capricious.

The Commission's failure to analyze the impact of its ownership rules on

minorities and women not only violated the *Prometheus II* remand, but also

constituted failure to "consider an important aspect of the problem."  *State Farm*,

463 U.S. at 43; *AEP Texas N. Co. v. Surface Transp. Bd.*, 609 F.3d 432, 441 (D.C.

Cir. 2010).  The Commission also failed to consider the impact of the upcoming

incentive auctions on diversity, competition, and ownership opportunities for

minorities and women.  The incentive auctions, which are expected to begin early

next year, are intended to encourage existing television broadcasters to give up or

agree to share their spectrum so that the FCC can repackage it and auction it for

broadband use.  Stations agreeing to go off the air will receive a portion of the

auction revenues.  Commenters explained that minorities and women tended to

own less financially successful stations, which are the most likely to be sold.

Moreover, with fewer television stations on the air after the auction, markets will

become even more concentrated, and barriers to entry will increase.  UCC

Comments, at 16-24 (Dec. 26, 2012)(JA786-94).  The *Order* acknowledged this

concern but offered no analysis or response.  ¶72 (JA31).

### III.   THE FCC'S DECISION TO ATTRIBUTE JSAS BUT NOT SSAS WAS ARBITRARY AND CAPRICIOUS.

Broadcast ownership rules, such as the duopoly rule, have long been used by the Commission to foster diversity and competition.  The original duopoly rule prohibited common ownership of television stations with overlapping signals.  In 1999, the Commission relaxed the rule to permit ownership of two stations in the same market so long as after the acquisition (1) at least eight independent owners would exist in the market (eight voices test), and (2) the combination did not include more than one top-four ranked station (top-4 prohibition).

The top-4 prohibition was "designed to ensure that the largest stations in the market do not combine and create potential competition concerns."  14 FCCRcd 12903, 12933 (1999).  The Commission also explained that because top-4 stations generally have local newscasts, and lower-ranked stations do not, mergers of lower-ranked stations posed "less concern over diversity of viewpoints in local news presentation, which is at the heart of our diversity goal."  *Id*.

### A.   The Commission made some contractual agreements attributable.

Broadcasters have historically sought to evade the ownership limits through contractual arrangements that allow them to exercise influence over stations that they could not outright acquire.  While these agreements can take different forms

26

and are known by different names, they all permit stations that would otherwise

compete to cooperate in program production, ad sales, and other functions.

The FCC sought to rein in previous attempts to evade ownership rules by

making such arrangements attributable.  In 1992, the FCC first attributed Local

Marketing Agreements (LMAs) where one radio station provided more than 15%

of another in-market station's programming and advertising. *Radio Rules,* 7

FCCRcd 2755, 2788-89 (1992); *Attribution Order*, 14 FCCRcd 12559, 12597,

12601 (1999)(adopting similar rule for television LMAs).

In the *2002BR Order*, the FCC extended its attribution rule to cover JSAs

where one radio station sold more than 15% of another in-market station's

advertising time.  18 FCCRcd at 13745-46.  Television JSAs were not attributed

because the *2002BR NPRM* had not sought comment on that issue.  But the FCC

soon after initiated a new proceeding to attribute television JSAs.  *Television JSAs*,

19 FCCRcd 15238 (2004).

### B.     In the wake of *Prometheus I*, television broadcasters began to use new contractual agreements to evade the duopoly rule.

In the *2002BR Order*, the Commission had relaxed the duopoly rule to

permit common ownership of two TV licenses in any market and up to three in

some markets, subject to the top-4 prohibition.  18 FCCRcd at 13691-92.  The

Third Circuit vacated and remanded the duopoly rule change because the

27

Commission failed to provide a rational explanation.  *Prometheus I*, 373 F.2d at 435.

After *Prometheus I*, which left the old duopoly rule in place, some television stations began entering into SSAs, a new type of contractual agreement.  Because stations may enter into SSAs without prior Commission approval, the Commission knows about such agreements only if they are disclosed in connection with an application to assign or transfer a license.

In 2004, for example, the buyer of Duluth television station KDLH filed an assignment application in which it disclosed that it planned to enter into an SSA with Granite Broadcasting.  Under the agreements, Granite would provide up to 15% of KDLH's programming, sell all of KDLH's available advertising time, and retain an option to purchase KDLH.  Other Duluth stations petitioned to deny the assignment, alleging that these agreements gave Granite *de facto* control over KDLH in violation of the duopoly rule.  The staff approved the assignment, and petitioners sought review by the full Commission.  *Malara*, 19 FCCRcd 24070, 24071 (MB 2004), *appl. for rev. pending*.  In the application for review, petitioners argued that the Bureau's decision was "a reversal of the Commission's prohibition of television duopolies in small markets such as Duluth, Minnesota, which has only four commercial television stations."  KQDS Acquisition Corp. Application for Review, at ii (Jan. 13, 2005).  To date, the Commission still has not acted on

this or similar applications for review of Bureau decisions in *SagamoreHill*, 25

FCCRcd 2809 (MB 2010) and *Piedmont*, 22 FCCRcd 13910 (MB 2007).

In 2009, Media Council Hawai`i (MCH) objected to a series of agreements

giving Raycom Media direct control over two top-4 stations in Honolulu and *de*

*facto* control over a third.  The Bureau denied the complaint for procedural

reasons, but agreed with MCH "insofar as it suggest[ed] that the net effect of the

transactions in this case – an extensive exchange of critical programming and

branding assets with an existing in-market, top-four, network affiliate – [was]

clearly at odds with the purpose and intent of the duopoly rule."  *KHNL/KGMB*, 26

FCCRcd 16087, 16095 (MB 2011), *appl. for rev. pending*.  For this reason, the

Bureau said the Commission planned to address this issue in the ongoing 2010QR.

*Id.*

### C.     Many commenters urged the Commission to require disclosure and attribution of SSAs.

The 2010QR began in October 2009.  Contemporaneously with the 2010QR,

the Commission had two other proceedings addressing some of the same issues.

The Future of Media proceeding, launched in January 2010, was intended to

"assess whether all Americans have access to vibrant, diverse sources of news and

information that will enable them to enrich their lives, their communities and our

democracy."  25 FCCRcd 384, 384 (2010).  Comments filed in this proceeding

identified 27 markets with SSAs and explained how SSAs had a negative affect on local news.  CWA Comments, Dkt. 10-25, at ii & App'x A (May 7, 2010).

This inquiry resulted in the FCC's *Information Needs of Communities Report*, 2011 WL 2286864 (*INOC Report*).  The *INOC Report* confirmed that many stations were outsourcing their news production or engaging in other forms of cooperative newsgathering.  *INOC Report*, at 96-97.  As a result, the Commission sought comment on whether stations with SSAs should be required to disclose them in their online public files.  *Enhanced Disclosure,* 26 FCC Rcd 15788, 15805-06 (2011).

Comments in response to the *2010QR NOI* cited the CWA Future of Media comments to show how SSAs were being used to evade the eight voices rule and the top-4 prohibition.  UCC Comments, at 8 (July 12, 2010)(JA535).  Free Press explained

> these types of agreements pose the same threats as traditional consolidation.  But, because they do not technically result in a transfer of license, the agreements appear to circumvent disclosure and attribution requirements triggered under the FCC's multiple ownership rules.

Free Press Comments, at 10-11 (July 12, 2010)(JA491-92).  Even Hubbard Broadcasting expressed concern that the "practical effect of [SSAs] has been common control of both television stations."  Hubbard Comments, at 3 (July 12, 2010)(JA495).  It pointed out that some SSAs "included affiliates of the major

30

television networks, resulting in the formation of 'virtual duopolies' among two of the 'top four' rated stations in markets with a total of only four commercial television stations." *Id.*

The *2010QR NPRM* asked a series of questions about sharing agreements, including the following: whether SSAs are substantively equivalent to agreements already subject to the attribution rules; whether SSAs were or should be attributable; what standard should be used for attribution; whether instead of focusing on attributing certain named agreements (e.g., JSAs, LMAs, SSAs, LNS agreements), should the Commission adopt a broader regulatory scheme that encompassed all agreements related to programming and/or operation of broadcast stations; and what characteristics were most likely to confer a degree of "influence or control such that the holders have a realistic potential to affect the programming decisions of licensees or other core operating functions." 26 FCCRcd at 17569-70 (JA354-55).

Many commenters supported disclosure and attribution of SSAs. While the total number of SSAs was unknown, commenters cited a study finding that 83 television markets had at least one sharing arrangement. UCC Comments, at 2-3 (Mar. 5, 2012)(JA608-09)(citing Yanich, *Local TV News & Service Agreements* at 7 (Oct. 2011)(JA1002)). That study found that the implementation of SSAs and LMAs "had a profound effect on the local news broadcasts in the markets in which

31

they operated.  Specifically, the effect was evident in the distribution of stories across the stations and in the use of shared resources, such as the anchor, the reporter, the script and video/graphics for the story." *Id*. at 12 (JA618).

Commenters cited examples illustrating how SSAs reduced competition in local news, such as a station in Idaho Falls, ID, that controlled six stations from one building and produced news programs for different stations using the same studio and reporters but different anchors and graphics to give them a different look. *Id*. at 11 (JA617).  Free Press subsequently submitted a list of 118 local markets where one station controls another through an SSA.  Free Press Ex Parte Attachment (Dec. 5, 2013)(JA823).

UCC proposed seven factors, any one of which should result in attribution. These included when one station provides all or substantially all local news programming for another station; sells 15% or more of the other station's weekly advertising time; or reports to the SEC that the broadcaster controls the other station.  UCC Comments, at 16-19 (Mar. 5, 2012)(JA622-25).  Commenters explained that adopting the same 15% threshold in the SSA context was inappropriate because stations rarely devote a full 15% of their broadcast hours to local news.  *Id*. at 16 (JA622); Free Press Ex Parte Attachment, Covert Consolidation, at 39 (Dec. 3, 2013)(JA1021).  Commenters warned that if the Commission did not attribute sharing arrangements, there would be many more.

32

UCC Comments, at 3 (Mar. 5, 2012)(citing Jessel, *Now's the Time to Make Virtual Duopolies*, TVNewsCheck (Dec. 9, 2011)("What's the point of having a ban against two Big Four network affiliates in a small market merging through station-sale contract if they can do it with a bunch of management contracts?"))(JA609).

In fact, through mid-August 2013, 211 full-power stations changed hands in transactions valued at nearly $10.2 billion. Free Press Ex Parte Attachment, Covert Consolidation, at 10-11 (Dec. 3, 2013)(JA1013-14). Many transactions involved mergers or acquisitions between two group owners where the companies had stations in the same market and would be prohibited from owning the stations by the duopoly rule. To get around this problem, the purchaser would sell one of the stations to another buyer, sometimes a new company created by former employees, and then enter into an SSA in which the purchaser would operate both stations. Free Press Ex Parte Attachment, Covert Consolidation, at 23 (JA1015). Indeed, under SEC rules, the stations are typically reported as commonly owned. *Id.* at 29-31 (JA1017-19).[7]

---

[7] "[U]nder Generally Accepted Accounting Principles and SEC rules, there is no difference between Sinclair, Cunningham, Deerfield, Howard Stirk or most of the other companies that are named owners of Sinclair-operated stations; the law considers them to be one company. The SEC considers these companies to be Sinclair's Variable Interest Entities (VIEs), since Sinclair has the power to direct the sidecar companies' activities that most significantly impact its economic performance, and Sinclair is obligated to absorb the losses and receive the profits

33

These arrangements came to be known as "side-cars." As the Senior

Counselor to the Chairman explained,

> [t]he sidecar business model involves a dominant and
> weaker (or, to put it another way, an independent and a
> dependent) broadcaster in the same market. The broker
> exercises operational and financial influence over the
> brokered station and performs the basic functions of
> station operation. The model is used primarily in
> markets where one entity would not be allowed to hold
> more than one television license. Part of the model's
> utility thus involves overcoming a rule that is designed to
> promote competition, diversity, and localism.

> ****

> ...[These] sidecar arrangements undermine the values of
> competition (whether measured in terms of advertising
> prices, independence of programming, or rivalry for
> viewers) and diversity (because the two stations operate
> as one entity rather than two, thus raising barriers to entry
> to broadcast ownership for independent and potentially
> underrepresented groups).

> ...[T]he special financial arrangements integral to the
> sidecar model typically demonstrate beyond any doubt
> the dependence of the weaker station on the dominant
> station. The financial arrangements are designed to avoid
> triggering the Commission's attribution rules.

Phil Verveer, *How the Sidecar Business Model Works* (Mar. 6, 2014),

http://www.fcc.gov/blog/how-sidecar-business-model-works.

---

that are significant to these companies." Free Press Ex Parte Attachment, Covert
Consolidation, at 29 (JA1017).

The Department of Justice also raised concerns about side-car deals. In a lengthy ex parte submission, it described its enforcement experience analyzing JSAs, SSAs, and similar agreements. The DOJ found

> [s]uch arrangements often confer influence or control of one broadcast competitor over another. Failure to account for the effects of such arrangements can create opportunities to circumvent FCC ownership limits and the goals those limits are intended to advance. As a consequence, the Department believes it is appropriate for the Commission's ownership "attribution" rules to treat any two stations participating in a JSA (or agreement similar in substance to a JSA) as under common ownership.

DOJ Ex Parte, at 2 (Feb. 20, 2014)(JA836).

Not long after, the Bureau issued a public notice stating that because sharing arrangements could confer a degree of operational and financial influence depriving the second station of its economic incentive to control programming, the Bureau would "closely scrutinize any application that proposes that two (or more) stations in the same market [would] share facilities, employees, and/or services or to jointly acquire programming or sell advertising," and also "[e]nter into an option, right of first refusal, put/call arrangement, or other similar contingent interest, or a loan guarantee." 29 FCCRcd 2647, 2648 (MB 2014).

35

### D.   The decision to attribute JSAs but not SSAs was arbitrary and capricious for failure to consider an important aspect of the problem.

A few weeks after release of the Bureau's public notice, the full Commission modified its attribution rules to attribute JSAs where one television station sells more than 15% of the advertising on another station in the same market.  At the same time, the Commission declined to attribute SSAs or even require their disclosure.  *Order*, ¶320 (JA148-49).  In doing so, it failed to consider an important aspect of the problem.

The *Order* explained that the attribution rules were intended to identify those interests that confer a degree of "influence or control such that the holders have a realistic potential to affect the programming decisions of licensees or other core operating functions." *Id*. ¶343 (JA159).  The Commission found "that JSAs provide incentives for joint operation that are similar to those created by common ownership." *Id*. ¶351 (JA164).  The Commission also rejected claims that JSAs did not confer influence over selection of programming, noting that a JSA "broker has a strong incentive to ensure that the brokered station provides programming— and an audience—that is complementary to that offered by its own station in order to maximize the attractiveness of the two stations to advertisers." *Id*. ¶354 (JA165).

36

Similar to JSAs, SSAs affect programming on the brokered station and do so directly.  Often, SSAs result in all but two station employees being laid off at the brokered station and the brokering station providing all local news on the brokered station.  For example, in Syracuse, NY, 40 employees at WTVH were laid off after the station entered into sharing agreements, essentially closing the station's news department.  CWA Ex Parte, at 1-2 (Mar. 12, 2014).  In Scranton, PA, Nexstar's WBRE entered into an agreement with Mission's WYOU resulting in all but two staff being laid off at WYOU and the two stations sharing the same studio.  Free Press Comments, at 54 (Mar. 5, 2012)(JA573).

 If anything, SSAs confer greater influence over core operating functions than JSAs.  Typically, stations with these agreements share office space, personnel, support functions, studio and transmission facilities.  Employing only two people at the brokered station further increases the broker's influence.  While the contract may give the brokered station the right to reject programming in some circumstances, as a practical matter it cannot exercise that right because it lacks the resources to investigate and gather news on its own.

Third, like JSAs, the record shows that SSAs are being used to circumvent the duopoly rule.  This purpose is particularly clear where, as the Bureau has noted, SSAs are frequently accompanied by options to purchase, which can be exercised

37

in the event the Commission's ownership rules change.  Public Notice, 29 FCCRcd

at 2648.

Finally, many stations are parties to both JSAs and SSAs.  Because the

Commission is requiring stations with JSAs to come into compliance with the new

attribution rule by a certain date, *Order*, ¶366 (JA171-72), it is likely that many

will simply reduce the amount of time sold to 15% or less.  In that case, the

brokering station will be able to continue providing local news and selling

advertising for the brokered station during the most lucrative time periods,

typically local news.  Thus, in attempting to close a loophole in the duopoly rule by

attributing JSAs but not attributing SSAs, the FCC has failed to consider an

important aspect of the problem of stations evading the duopoly rule.

### E.   The Commission acted arbitrarily and capriciously in not requiring disclosure of SSAs.

The Commission's inaction is particularly arbitrary and capricious in light of

its recognition "that commenters have raised meaningful concerns about the

potential impact of sharing agreements on competition, diversity, and localism in

television markets."  *Order*, ¶335 (JA154).  Despite this, the Commission

explained it was not prepared to attribute SSAs at this time "because so little is

known about the content, scope, and prevalence of sharing agreements." *Order*,

¶328 (JA152).  In fact, as discussed above, the record created in the 2010QR and

other proceedings over a five year period is sufficient to support attribution.  In

38

addition, the Future of Media inquiry resulted in a report that informed the Commission about news sharing and SSAs. *INOC Report*, at 96-97. Finally, the Commission knows about SSAs from its review of license transactions spanning nearly a decade.

Assuming that the Commission is correct that the record is insufficient, its failure to obtain sufficient information by requiring disclosure of SSAs is arbitrary and capricious. The Commission has twice given notice that it might require disclosures of SSAs. *2010QR NPRM*, ¶205 (JA354), *Enhanced Disclosure NPRM*, 26 FCCRcd 15788, 15805-06 (2011). But instead of requiring disclosure in this *Order*, the FCC "tentatively conclude[d] that disclosure of SSAs as defined in this proceeding is necessary to inform the Commission and the public of joint operations and collaborations between independently owned commercial television stations." *Order*, ¶335 (JA154). For the Commission to merely seek comment again on whether to require disclosure constitutes both arbitrary decision making and unreasonable delay.

## CONCLUSION

WHEREFORE, Prometheus asks that the Court

(1)      transfer these consolidated cases, or in the alternative, Prometheus' petition for mandamus, to the U.S. Court of Appeals for the Third Circuit;

(2)     in the event that the Court declines to transfer all or part of the record to the Third Circuit, issue a writ of mandamus or, alternatively, reverse the *Order* and remand the record to the FCC with instructions to comply promptly with the terms of the remand of the Third Circuit in *Prometheus II*, including but not limited to, collecting accurate data on minority and female ownership, adopting a supportable definition of SDBs, and considering the effect of all of its rules and changes thereto, as well as its spectrum auctions, upon minority and female ownership;

(3)     reverse the Commission's decision with respect to SSAs insofar as the Commission failed to require that SSAs be attributable and that the terms of SSAs be immediately disclosed;

and

(4)     grant such other relief as may be proper.

Respectfully Submitted,

/s/_____
Angela J. Campbell
Andrew Jay Schwartzman
Eric G. Null
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
August 27, 2015                                    (202) 662-9535

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,687 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman size 14.

Respectfully Submitted,

/s/_____
Angela J. Campbell
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
August 27, 2015                              (202) 662-9535

# ADDENDUM A: STATUTORY AND REGULATORY PROVISIONS

## STATUTORY AND REGULATORY PROVISIONS

**5 U.S.C. §706**..................................................................................................1

**28 U.S.C. §1651**..............................................................................................2

**28 U.S.C. §2342**..............................................................................................3

**47 U.S.C. §257**................................................................................................4

**47 U.S.C. §303(r)**...........................................................................................5

**47 U.S.C. §309(a)**...........................................................................................6

**47 U.S.C. §402(a)**...........................................................................................7

**Telecommunications Act of 1996 Pub. L. No. 104-104, § 202(h),
110 Stat. 56 (1996), as amended**....................................................................8

## 5 U.S.C. §706

**Scope of review.**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

 (1) compel agency action unlawfully withheld or unreasonably delayed; and

 (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

  (B) contrary to constitutional right, power, privilege, or immunity;

  (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

  (D) without observance of procedure required by law;

  (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

  (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 28 U.S.C. §1651

**Writs**

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.

## 28 U.S.C. §2342

**Jurisdiction of court of appeals**

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

    (1) all final orders of the Federal Communication Commission made reviewable by section 402 (a) of title 47;

    (2) all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210 (e), 217a, and 499g (a) of title 7;

    (3) all rules, regulations, or final orders of—

        (A) the Secretary of Transportation issued pursuant to section 50501, 50502, 56101–56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

        (B) the Federal Maritime Commission issued pursuant to section 305, 41304, 41308, or 41309 or chapter 421section 305, 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

    (4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

    (5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

    (6) all final orders under section 812 of the Fair Housing Act; and

    (7) all final agency actions described in section 20114 (c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

## 47 U.S.C. §257

**Market entry barriers proceeding**

**(a)  Elimination of barriers**

Within 15 months after February 8, 1996, the Commission shall complete a proceeding for the purpose of identifying and eliminating, by regulations pursuant to its authority under this chapter (other than this section), market entry barriers for entrepreneurs and other small businesses in the provision and ownership of telecommunications services and information services, or in the provision of parts or services to providers of telecommunications services and information services.

**(b)  National policy**

In carrying out subsection (a) of this section, the Commission shall seek to promote the policies and purposes of this chapter favoring diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity.

**(c)  Periodic review**

Every 3 years following the completion of the proceeding required by subsection (a) of this section, the Commission shall review and report to Congress on—

(1) any regulations prescribed to eliminate barriers within its jurisdiction that are identified under subsection (a) of this section and that can be prescribed consistent with the public interest, convenience, and necessity; and

(2) the statutory barriers identified under subsection (a) of this section that the Commission recommends be eliminated, consistent with the public interest, convenience, and necessity.

## 47 U.S.C. §303(r)

**Powers and duties of Commission**

Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

\* \* \* \*

(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.

**47 U.S.C. §309(a)**

**Considerations in granting application**

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

## 47 U.S.C. §402(a)

**Judicial review of Commission's orders and decisions**

**(a) Procedure**

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

**Telecommunications Act of 1996  Pub. L. No. 104-104, §202(h), 110 Stat. 56(h)**
**(as amended by Consolidated Appropriations Act, 2004,**
**Pub. L. No. 108-199, §629, 118 Stat. 3)**

## Further Commission Review

The Commission shall review its rules adopted pursuant to this section and all of its ownership rules quadrennially as part of its regulatory reform review under section 11 of the Communications Act of 1934 and shall determine whether any of such rules are necessary in the public interest as the result of competition. The Commission shall repeal or modify any regulation it determines to be no longer in the public interest.

This subsection does not apply to any rules relating to the 39 percent national audience reach limitation in subsection (c)(1)(B).

# ADDENDUM B: ORDER, PROMETHEUS RADIO PROJECT V. FCC, SEPTEMBER 15, 2011

USCA Case #14-1090    Document #1570031    Filed: 08/27/2015    Page 66 of 67

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

**Nos. 08-3078, 08-4454, 08-4455, 08-4456, 08-4457, 08-4458, 08-4459, 08-4461,
08-4462, 08-4463, 08-4464, 08-4465, 08-4467, 08-4468, 08-4470, 08-4471, 08-4472
08-4475, 08-4477, 08-4478 & 08-4652**

PROMETHEUS RADIO PROJECT

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA

ORDER

On July 7, 2011, the Court vacated and remanded in part and affirmed in part the Federal Communications Commission's Order of December 18, 2007. In accordance with the Court's instructions in its opinion, upon return to this Court after completion of further proceedings on remand, the petitions for review will be assigned to Judges Scirica, Ambro, and Fuentes as the merits panel.

For the Court,

/s/ Marcia M. Waldron
Clerk

Dated:  September 15, 2011

CMD/cc: All Counsel of Record

## CERTIFICATE OF SERVICE

I, Angela Campbell, hereby certify that on August 27, 2015, I filed the

foregoing Brief for Prometheus Radio Project with the Clerk of the Court of

Appeals for the District of Columbia Circuit through the CM/ECF system and it

was served electronically through that system.


/s/ Angela J. Campbell
Angela J. Campbell
Institute for Public Representation