**Nos. 14-1090, 14-1091, 14-1092, 14-1113**

In The
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

HOWARD STIRK HOLDINGS, LLC, *ET AL.*

PETITIONERS

V.

FEDERAL COMMUNICATIONS COMMISSION
AND
THE UNITED STATES OF AMERICA

RESPONDENTS

————————

ON PETITIONS FOR REVIEW OF AN ORDER OF, AND IN
THE ALTERNATIVE FOR A WRIT OF MANDAMUS TO,
THE FEDERAL COMMUNICATIONS COMMISSION

————————

## BRIEF FOR RESPONDENTS

————————

WILLIAM J. BAER
ASSISTANT ATTORNEY GENERAL

KRISTEN C. LIMARZI
ROBERT J. WIGGERS
ATTORNEYS

UNITED STATES DEPARTMENT
OF JUSTICE
WASHINGTON, D. C. 20530

JONATHAN B. SALLET
GENERAL COUNSEL

DAVID M. GOSSETT
DEPUTY GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

C. GREY PASH, JR.
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D. C. 20554
(202) 418-1740

## STATEMENT OF PARTIES, RULINGS AND RELATED CASES

1. ***Parties***

All parties appearing in this Court are listed in petitioners' briefs.

2. ***Rulings Under Review***

*In the Matter of 2014 Quadrennial Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, et al.*, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371 (2014) (JA 1)

3. ***Related Cases***

The order on review has not previously been before this Court or any other court. The order on review involves issues remanded by and over which the Third Circuit retained jurisdiction in *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011).

# TABLE OF CONTENTS

Introduction ................................................................................................1

Statement Of The Issues Presented For Review ....................................4

Jurisdiction ................................................................................................4

Statutes And Regulations .........................................................................6

Counterstatement ......................................................................................6

    A. Regulatory Background ....................................................................6

    B. The 2006 Quadrennial Review and the Diversity Order .............10

    C. The 2010 and 2014 Quadrennial Reviews ...................................12

        1. The Notice of Proposed Rulemaking ......................................12

        2. The Further Notice and Report and Order ..............................14

            (a) The Further Notice ..........................................................14

            (b) The Report and Order on TV Joint Sales Agreements ...20

Summary Of Argument..............................................................................22

Standard Of Review ..................................................................................27

Argument...................................................................................................28

I.    The Court Should Transfer The Petitions  To The Third Circuit.....................28

II.   The Further Notice Of Proposed Rulemaking Is Not A Judicially
      Reviewable Final Order....................................................................32

III. The Commission's Decision To Complete Review Of Its
      Ownership Rules Only After Refreshing The Record Was
      Reasonable And Does Not Mandate Vacatur Of Those Rules. ........35

IV. The Commission's Reasonable Conclusion That It Lacked
      Adequate Information To Act On Further Measures To
      Promote Media Ownership By Minorities And Women Does
      Not Violate The *Prometheus II* Remand..........................................41

V.  The Commission Acted Reasonably In Adopting The Television
    Joint Sales Agreement Rule................................................................43

    A.  The Rule Is Reasonable And Supported  By The Record............................44

    B.  The Commission Reasonably Determined Not To
        Attribute Shared Services Agreements At This Time.................................55

    C.  The Rule Does Not Violate Section 202(h) .................................................57

    D.  The Rule's Transition Period Is Reasonable.................................................59

Conclusion ..........................................................................................................64

Certificate Of Compliance

Statutory Addendum

ii

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)......................................32

*Achernar Broadcasting Co. v. FCC*, 62 F.3d 1441 (D.C. Cir. 1995).....................27

*Adarand Constructors v. Peña*, 515 U.S. 200 (1995).........................................18

*American Public Gas Ass'n v. FPC*, 555 F.2d 852 (D.C. Cir. 1976).......................29

*BDPCS, Inc. v. FCC*, 351 F.3d 1177 (D.C. Cir. 2003)............................................58

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................32

*Byrd v. Reno*, 180 F.3d 298 (D.C. Cir. 1999) .......................................................43

\* *Cellco Partnership v. FCC*, 357 F.3d 88 (D.C. Cir. 2004)................... 28, 38, 39, 40

*Cellular Mobile Sys. of Penn., Inc. v. FCC*, 782 F.2d 182 (D.C. Cir. 1985) ........................................................................................................59

*Chevron* U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ........................................................................................................63

*Ciba-Geigy Corp. v. United States EPA*, 801 F.2d 430 (D.C. Cir.1986) ...............33

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) ...................61

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798 (D.C. Cir. 2006)................................................................................32

*DIRECTV, Inc. v. FCC*, 110 F.3d 816 (D.C. Cir. 1997).........................................54

*Eastern Air Lines v. CAB*, 354 F.2d 507 (D.C. Cir. 1965) ............................... 30, 31

*Eldred v. Reno*, 239 F.3d 372 (D.C. Cir. 2001) .....................................................35

*FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775 (1978) ........................................................................................................6, 7

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002) ............ 39, 40

*Fox Television Stations, Inc. v. FCC*, 293 F.3d 537  (D.C. Cir. 2002) ...................39

*Glassroth v. Moore*, 347 F.3d 916 (11th Cir. 2003) ................................................35

*GTE Service Corp. v. FCC*, 782 F.2d 263 (D.C. Cir. 1986)....................................59

*In re Barr Labs., Inc.*, 930 F.2d 72 (D.C. Cir. 1991)..............................................41

\* *In re Core Communications, Inc.*, 455 F.3d 267 (D.C. Cir. 2006).........................57

\* *In re Murray Energy Corp.*, 788 F.3d 330 (D.C. Cir. 2015) ................ 24, 33, 35, 42

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545 (D.C. Cir. 1999) ...........................................................................................41

*Mobile Relay Associates v. FCC*, 457 F.3d 1 (D.C. Cir. 2006) ..............................54

*Nader v. FCC*, 520 F.2d 182 (D.C. Cir. 1975) ........................................59

*National Ass'n of Broadcasters v. FCC*, 740 F.2d 1190 (D.C. Cir. 1984) ...........................................................................................56

*National Ass'n of Broadcasters v. FCC*, 789 F.3d 165 (D.C. Cir. 2015) ................................................................................... 15, 37

*National Ass'n of Cas. & Sur. Agency v. Board of Gov. of Fed. Reserve Sys.*, 856 F.2d 282 (D.C. Cir. 1988) ....................................63

*National Broadcasting Co. v. United States*, 319 U.S. 190 (1943) ...........................6

*    *NetCoalition v. SEC*, 715 F.3d 342 (D.C. Cir. 2013) ...............................43

*Northern States Power Co. v. U.S. Dept. of Energy*, 128 F.3d 754 (D.C. Cir. 1997) ...............................................................................28

*Pacific Gas & Elec. Co. v. FPC*, 272 F.2d 510 (D.C. Cir. 1958)...........................29

*Prison Legal News v. Samuels*, 787 F.3d 1146 (D.C. Cir. 2015) ...........................35

*    *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004), *cert. denied*, 535 U.S. 1123 (2005) ...................... 9, 10, 20, 22, 23, 26, 31, 39, 43, 47, 62

*    *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011), *cert. denied*, 133 S.Ct. 63, 64, 73 (2012) ........................ 2, 11, 12, 23, 25, 28, 29, 30, 42

*Public Serv. Comm'n v. FPC*, 472 F.2d 1270 (D.C. Cir. 1972) ...........................29

*Reservation Tel. Coop. v. FCC*, 826 F.2d 1129 (D.C. Cir. 1987) ...........................63

*    *Sinclair Broadcast Group, Inc. v. FCC*, 284 F.3d 148 (D.C. Cir. 2002)................................................................................. 8, 9, 43, 47, 62

*    *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ...............................................................................40

*    *U.S. Cellular Corp. v. FCC*, 254 F.3d 78 (D.C. Cir. 2001)...................................56

*United States v. Storer Broadcasting Co.*, 351 U.S. 192 (1956) ...............................7

*Women Involved in Farm Econ. v. U.S. Dept. of Agric.*, 876 F.2d 994 (D.C. Cir. 1989) ...............................................................................61

*Your Home Visiting Nurse Servs. v. Shalala*, 525 U.S. 449 (1999) ........................28

## Statutes

5 U.S.C. § 706(2)(A) ..................................................................................27

28 U.S.C. § 2112(a)(3) ................................................................................5

28 U.S.C. § 2112(a)(5) ............................................................ 3, 5, 6, 23, 28

28 U.S.C. § 2342(1) ................................................................ 6, 24, 32, 35

28 U.S.C. § 2344 ........................................................................................5

47 U.S.C. § 154(j) ....................................................................................59

47 U.S.C. § 160 ........................................................................................38

47 U.S.C. § 160(c) ....................................................................................38

47 U.S.C. § 161 ............................................................................ 38, 39, 40

47 U.S.C. § 201(b) ....................................................................................39

47 U.S.C. § 402(a) ......................................................................................6

\*    47 U.S.C. § 405 ......................................................................................26

\*    47 U.S.C. § 405(a) ..................................................................................57

Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, §
    629, 118 Stat. 3 (2004)................................................................ 2, 8, 37

\*    STELA Reauthorization Act of 2014, Pub. L. No. 113-200, § 104, 128
Stat. 2059 (2014)................................................................................ 21, 60

\*    Telecommunications Act of 1996, Pub. L. No. 104-104,
§ 202(h), 110 Stat. 56 (1996), *amended*, Pub. L. No.
108-199, 118 Stat. 3 (2004) ................. 2, 3, 7, 8, 16, 22, 24, 25, 35, 37, 38, 40, 60

## Regulations

47 C.F.R. § 1.4(b)(1) ..................................................................................5

47 C.F.R. § 73.3555 ....................................................................................2

47 C.F.R. § 73.3555 Note 2(k)................................................................ 3, 20

## Administrative Decisions

\* *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 18 FCC Rcd 13620 (2003) .................................................................... 9, 22, 47, 49, 51, 53, 61

*2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 23 FCC Rcd 2010 (2008) ........................................................................................10

*Competitive Bidding Procedures for Broadcast Incentive Auction*, 29 FCC Rcd 15750 (2014) ......................................................................15

*In the Matter of Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, 27 FCC Rcd 12357 (2012) ...........................................................................37

*In the Matter of Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, 29 FCC Rcd 6567 (2014), *petitions for review denied, National Ass'n of Broadcasters v. FCC*, 789 F.3d 165 (D.C. Cir. 2015)........................................15

*In the Matter of Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, 14 FCC Rcd 12559 (1999) ................................................................. 44, 47

*In the Matter of Termination of Certain Proceedings as Dormant*, 27 FCC Rcd 11284 (CGB 2012)................................................................54

*Promoting Diversification of Ownership in the Broadcasting Services*, 23 FCC Rcd 5922 (2008)................................................................10

*Public Notice*, "Consumer & Governmental Affairs Bureau Seeks Comment On Termination Of Certain Proceedings As Dormant," 27 FCC Rcd 1613 (CGB 2012)................................................................54

*Review of the Commission's Regulations Governing Television Broadcasting*, 14 FCC Rcd 12903 (1999), *on reconsideration*, 16 FCC Rcd 1067 (2001) ......................................................... 8, 61

*Revision of Radio Rules and Policies*, 7 FCC Rcd 2755 (1992) ............................47

*Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations*, 50 FCC 2d 1046 (1975), *amended on reconsideration*, 53 FCC 2d 589 (1975)................................................................7

## Rules

Fed. R. App. Proc. 29(c)(5) Advisory Committee's Note on 2010
Amendments ........................................................................35

## Other Authorities

160 Cong. Rec. H8081-01 (2014) (remarks of Rep. Green) ...................................60

160 Cong. Rec. H8081-01 (2014) (remarks of Rep. Waxman).............................60

*\* Cases and other authorities principally relied upon are marked with asterisks.*

<h1 align="center">GLOSSARY</h1>

| | |
|---|---|
| 1996 Act | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) |
| *2002 Biennial Review Order* | *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 18 FCC Rcd 13620 (2003) |
| *2006 Quadrennial Review Order* | *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 23 FCC Rcd 2010 (2008) |
| *2010 NOI* | *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Inquiry, 25 FCC Rcd 6086 (2010) (JA 271) |
| *2010 NPRM* | *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking, 26 FCC Rcd 17489 (2011) (JA 274) |
| *Diversity Order* | *Promoting Diversification of Ownership in the Broadcasting Services*, 23 FCC Rcd 5922 (2008) |

<div align="center">i</div>

| | |
|---|---|
| *FNPRM & Order* | *In the Matter of 2014 Quadrennial Review – Review of The Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, et al.*, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371 (2014) (JA 1) |
| *Fox I* | *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, *modified on rehearing*, 293 F.3d 537 (D.C. Cir. 2002) |
| *Fox II* | *Fox Television Stations, Inc. v. FCC*, 293 F.3d 537 (D.C. Cir. 2002) |
| JSA | Joint Sales Agreement |
| LMA | Local Marketing Agreement |
| *Prometheus I* | *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) |
| *Prometheus II* | *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011) |
| SSA | Shared Services Agreement |
| *TV JSA NPRM* | *Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*, 19 FCC Rcd 15238 (2004) (JA 254) |

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

**NOS. 14-1090,** *ET AL.*

———————

HOWARD STIRK HOLDINGS, LLC, *ET AL.*

PETITIONERS

V.

FEDERAL COMMUNICATIONS COMMISSION
AND
THE UNITED STATES OF AMERICA

RESPONDENTS

———————

ON PETITIONS FOR REVIEW OF AN ORDER OF, AND IN
THE ALTERNATIVE FOR A WRIT OF MANDAMUS TO,
THE FEDERAL COMMUNICATIONS COMMISSION

———————

BRIEF FOR RESPONDENTS

———————

## INTRODUCTION

Section 202(h) of the Telecommunications Act of 1996, as amended, re-

quires the Federal Communications Commission to review its broadcast ownership

rules every four years, and to "repeal or modify" any of those rules that the Com-

mission "determines to be no longer in the public interest." Pub. L. No. 104-104,

§ 202(h), 110 Stat. 56, 111 (1996), *amended*, Pub. L. No. 108-199, § 629, 118 Stat.

- 2 -

3, 100 (2004).[1] In this case, the dynamic changes occurring in the media market-place – including the growth of broadband and the broadcast incentive auction scheduled to take place in 2016 – led the Commission to continue its examination of its ownership limits by incorporating the record generated during its ongoing 2010 Quadrennial proceeding into its newly initiated 2014 Quadrennial Review, and to adopt a *Further Notice of Proposed Rulemaking* seeking comment on a comprehensive set of tentative, proposed revisions of its broadcast ownership rules. The Commission thereby sought to ensure that its broadcast ownership rules would reflect the most complete and current evidence regarding the changing com-petitive pressures affecting the broadcast industry. The *Further Notice* also sought additional comment on efforts the Commission might undertake to foster owner-ship of broadcast properties by minorities and women in light of the remand of those issues to the agency in *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011), *cert. denied*, 133 S.Ct. 63, 64, 73 (2012) (*Prometheus II*).

Separately, in a *Report and Order* issued in the same document, the Com-mission adopted a rule governing the "attribution" of "joint sales agreements" be-tween television stations in the same local market. In the rule, the Commission

---

[1] These rules include the local television ownership rule, the local radio ownership rule, the newspaper/broadcast cross-ownership rule, the radio/television cross-ownership rule, and the dual network rule. *See FNPRM & Order* ¶9 (JA 4); 47 C.F.R. § 73.3555.

- 3 -

established – as it had previously for radio stations – that an agreement to sell, or "broker," more than 15 percent of a television station's weekly advertising time confers sufficient influence over that station to mandate that the "brokering" station be treated as owning the "brokered" station for purposes of determining compliance with the Commission's rules delineating acceptable levels of common ownership of television stations in the same local market. *See* 47 C.F.R. § 73.3555 Note 2(k).

As we explain below, these cases should be transferred to the U. S. Court of Appeals for the Third Circuit in the interests of justice pursuant to 28 U.S.C. § 2112(a)(5). If this Court nevertheless retains these cases, it should find (1) that it lacks jurisdiction to review the Commission's tentative conclusions in the *Further Notice*, including its decision to defer revising its ownership rules pending the creation of a refreshed and more accurate record; (2) that nothing in Section 202(h) requires vacatur of an ownership rule subject to quadrennial review when the agency has made no determination the rule no longer serves the public interest; and (3) that the agency's decision to seek further comment, but take no current action, on additional measures to promote ownership of broadcast properties by minorities and women did not violate the Third Circuit's remand of those issues in *Prome-*

- 4 -

*theus II*. The Court should also uphold as reasonable and supported by the evidence the Commission's decision to treat as commonly owned television stations in the same local market that enter into certain joint sales agreements.

### STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the petitions for review should be transferred to the United States Court of Appeals for the Third Circuit.

2. Whether the Court lacks jurisdiction of the petitions insofar as they seek review of a Notice of Proposed Rulemaking, rather than of a final order, of the FCC.

3. Whether section 202(h) mandates vacatur of the Commission's media ownership rules when the Commission decided to defer action on those rules pending a more complete and current record.

4. Whether the Commission's decision to seek further comment on proposals to promote ownership of broadcast properties by minorities and women violated the Third Circuit's remand in *Prometheus II* or otherwise warrants mandamus.

5. Whether the FCC's adoption of an attribution rule governing television joint sales agreements was reasonable and reasonably explained.

### JURISDICTION

The Commission's Further Notice of Proposed Rulemaking and Report and Order was released on April 15, 2014. *In the Matter of 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other*

*Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, et al.*, 29 FCC Rcd 4371 (2014) (JA 1) (*FNPRM & Order*). A synopsis of the Further Notice of Proposed Rulemaking was published in the Federal Register on May 20, 2014. 79 Fed. Reg. 29010 (May 20, 2014). A synopsis of the Report and Order was separately published in the Federal Register on the same day. 79 Fed. Reg. 28996 (May 20, 2014). The petitions for review were timely filed within 60 days of the applicable date established by 28 U.S.C. § 2344 and 47 C.F.R. § 1.4(b)(1).

The petitions in Nos. 14-1090 (Howard Stirk Holdings, LLC), 14-1091 (Nexstar Broadcasting, Inc.) and 14-1092 (National Association of Broadcasters) were filed in this Court. The petition for review or "in the partial alternative" for mandamus in No. 14-1133 (Prometheus Radio Project) was originally filed in the U.S. Court of Appeals for the Third Circuit. In accordance with the random selection procedures governing multi-circuit petitions for review of the same agency order, the Judicial Panel on Multidistrict Litigation designated this Court as the court of appeals "in which the record is to be filed." 28 U.S.C. § 2112(a)(3). Pursuant to 28 U.S.C. § 2112(a)(5), the Third Circuit transferred Prometheus's petition for review of the *FNPRM & Order* to this Court, which consolidated that petition with the three petitions that were filed in this Court.

Prometheus Radio Project and the Commission each asked this Court to transfer the consolidated petitions to the Third Circuit "in the interest of justice."

- 6 -

*See* 28 U.S.C. § 2112(a)(5). The Special Panel that considered those motions re-

ferred them to the merits panel. If the Court does not transfer the petitions, it

should dismiss them in part for lack of jurisdiction insofar as the petitions seek re-

view of the *Further Notice of Proposed Rulemaking*, because the *Further Notice* is

not a judicially reviewable "final order[]" of the Commission. *See* 47 U.S.C.

§ 402(a); 28 U.S.C. § 2342(1).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set out in the Statutory Addendum to

this brief.

## COUNTERSTATEMENT

### A. *Regulatory Background*

1.  "In setting its [broadcast] licensing policies," the FCC "has long acted on

the theory that diversification of mass media ownership serves the public interest

by promoting diversity of program and service viewpoints, as well as by prevent-

ing undue concentration of economic power." *FCC v. National Citizens Comm. for*

*Broadcasting*, 436 U.S. 775, 780 (1978) (*NCCB*). Throughout its history, the

agency has adopted various rules imposing restrictions on media ownership.

Thus, in its Chain Broadcasting Regulations, which the Supreme Court up-

held in *National Broadcasting Co. v. United States*, 319 U.S. 190, 206-08 (1943)

(*NBC*), the Commission (among other things) prohibited broadcast networks from

owning more than one station in a given community. The Commission later prom-ulgated rules – again upheld by the Supreme Court – limiting the total number of radio and TV stations a single person could own nationwide. *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 203-06 (1956). And in 1975, the Commission adopted a ban on common ownership of a daily newspaper and a broadcast station in the same local market. *Rules Relating to Multiple Ownership of Standard, FM, and Television Broadcast Stations*, 50 FCC 2d 1046 (1975), *amended on reconsideration*, 53 FCC 2d 589 (1975). The Supreme Court upheld the Commission's newspaper/broadcast cross-ownership prohibition in *NCCB* as a "reasonable means of promoting the public interest in diversified mass communications." *See* 436 U.S. at 796-802.

2. Section 202 of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996 Act), directed the Commission to modify its then-existing media ownership rules in various ways (for example, by "eliminating the restrictions on the number of television stations that a person or entity may … own … nationwide"). *Id.* § 202(c)(1), 110 Stat. 111. Section 202(h) of the 1996 Act also obligates the Commission to (1) "review its rules adopted pursuant to [section 202] and all of its ownership rules biennially," (2) "determine whether any of such rules are necessary in the public interest as the result of competition," and (3)

- 8 -

"repeal or modify any regulation it determines to be no longer in the public interest." 110 Stat. 111-12. Congress later amended the statute to require such review every four years rather than two, commencing in 2006. Consolidated Appropriations Act, Pub. L. No. 108-199, § 629, 118 Stat. 3, 100 (2004).

3.  In 1999, as part of the Commission's continuing examination of its broadcast ownership rules in light of the 1996 Act, the Commission adopted an order revising its local television ownership rule. *Review of the Commission's Regulations Governing Television Broadcasting*, 14 FCC Rcd 12903 (1999), *on reconsideration*, 16 FCC Rcd 1067 (2001). The revised local television ownership rule permitted common ownership of two television stations whose signals did not overlap, 14 FCC Rcd at 12926 ¶47, and enabled common ownership of two television stations with overlapping signals if "at least eight independently owned and operating full power commercial and noncommercial TV stations would remain post-merger, and the two merging stations are not both among the top four ranked stations in the market, as measured by audience share." 14 FCC Rcd at 12932-33 ¶64.

The Commission's 1999 revision of its local television ownership rule was reviewed by this Court in *Sinclair Broadcast Group, Inc. v. FCC*, 284 F.3d 148 (D.C. Cir. 2002). The Court ruled that the Commission had "adequately explained how the local ownership rule furthers diversity at the local level and is necessary in the 'public interest' under §202(h) of the 1996 Act." *Id*. at 160. But the Court

- 9 -

found that the Commission had "not provided any justification for counting fewer types of 'voices' in the local [television] ownership rule than it counted in its rule on cross-ownership of radio and television stations," *id*. at 162. It therefore remanded the rule for further consideration. *Id*. at 169.

4.  The Commission addressed the *Sinclair* remand as part of its 2002 biennial review, at the conclusion of which the agency issued a new order modifying certain of its media ownership rules.[2] Numerous parties, including consumer groups, broadcasters, and newspaper owners, filed petitions for judicial review of the *2002 Biennial Review Order* in multiple courts of appeals, which were consolidated in the Third Circuit.

That court "affirm[ed] much" of the challenged order. *Prometheus Radio Project v. FCC*, 373 F.3d 372, 435 (3d Cir. 2004), *cert. denied*, 535 U.S. 1123 (2005) (*Prometheus I*). Among other things, the court upheld the agency's determination that if two radio stations in the same market enter into a joint sales agreement under which one station – the "brokering" station – accepts a fee to sell more than 15 percent of the weekly advertising time of another station – the "brokered"

---

[2] *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 18 FCC Rcd 13620 (2003) (*2002 Biennial Review Order*).

station – the brokering station is treated as if it owns the brokered station for pur-

poses of assessing compliance with the FCC's media ownership limits. *Id.* at 429-

30.

At the same time, the Third Circuit remanded the specific ownership re-

strictions adopted by the Commission, directing the agency "to justify or modify its

approach to setting numerical limits." *Prometheus I*, 373 F.3d at 435. The court

also said that the agency on remand "should … consider" certain "proposals for en-

hancing ownership opportunities for women and minorities, which the Commis-

sion had deferred for future consideration." *Id.* at 435 n.82. The panel in

*Prometheus I* "retain[ed] jurisdiction" over "the Commission's action on remand."

*Id.* at 435.

### B. The 2006 Quadrennial Review and the Diversity Order

The FCC responded to the *Prometheus I* remand in two separate orders. In

the order concluding its 2006 quadrennial review, the Commission revised a num-

ber of its media ownership rules.[3] In another order adopted on the same day, the

agency took several steps designed to increase diversity in broadcast ownership.[4]

---

[3] *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, 23 FCC Rcd 2010 (2008) (*2006 Quadrennial Review Order*).

[4] *Promoting Diversification of Ownership in the Broadcasting Services*, 23 FCC Rcd 5922 (2008) (*Diversity Order*).

Many of the same parties that were petitioners in *Prometheus I* filed petitions for judicial review of the *2006 Quadrennial Review Order* and the *Diversity Order* in multiple courts of appeals. All the petitions challenging both orders were transferred to the Third Circuit, and consolidated.

In an opinion issued in July 2011, the Third Circuit held that the FCC failed to provide adequate notice and opportunity for comment before revising its longstanding ban on common ownership of a daily newspaper and a broadcast station in the same local market. *Prometheus II*, 652 F.3d at 445-54. The court therefore vacated and remanded the new rule "for failure to comply with the APA's notice and comment requirements." *Id.* at 453. The effect of this ruling was to reinstate the ban on newspaper-broadcast cross-ownership "until the FCC promulgates new cross-ownership regulations." *Id.* at 453 n.25.

Having vacated the revised newspaper-broadcast cross-ownership rule on account of inadequate notice, the Third Circuit declined to reach the broadcasters' and newspaper owners' substantive challenges to that rule. *Prometheus II*, 652 F.3d at 445. The court rejected all of the broadcasters' other challenges to various media ownership rules that the FCC had decided to retain in the *2006 Quadrennial Review Order*. *Id.* at 456-65.

With respect to the *Diversity Order*, the Third Circuit vacated and remanded the provisions of the order that relied on the FCC's definition of an "eligible entity" qualified to take advantage of Commission efforts to promote diversity in media ownership. *Prometheus II*, 652 F.3d at 465-72. The court held that the agency's definition of this term, which was entirely revenue-based, was arbitrary and capricious because the Commission "offered no data attempting to show a connection between the definition chosen and the goal of the measures adopted – increasing ownership" of broadcast stations by "minorities and women." *Id.* at 471. The court instructed the agency on remand to collect the necessary data to "justify or modify its approach to advancing broadcast ownership by minorities and women during its 2010 Quadrennial Review." *Id.* at 472.

The panel in *Prometheus II* specifically "retain[ed] jurisdiction over the remanded issues" arising out of both the 2006 Quadrennial Review and the *Diversity Order*. *Id.*

### C. The 2010 and 2014 Quadrennial Reviews

#### 1. The Notice of Proposed Rulemaking

The Third Circuit's decision addressing the 2006 Quadrennial Review was not released until July 2011. A few months after that decision, in December 2011,

- 13 -

the Commission released the *2010 NPRM*.[5] The NPRM addressed three subjects.

First, the Commission proposed various changes to the broadcast ownership rules –

including to the newspaper/broadcast station cross-ownership rule remanded by the

Third Circuit in *Prometheus II* – and sought comment on those proposed changes.

*2010 NPRM* ¶¶25-146 (JA 283-329). Second, the Commission sought comment on

the aspects of the Commission's 2008 *Diversity Order* that the Third Circuit had

remanded in *Prometheus II*, as well as other actions that the Commission might

take to increase the level of broadcast station ownership by minorities and women.

*Id.* ¶¶147-70 (JA 329-341). Finally, the Commission sought comment on various

issues regarding attribution of ownership; *i.e.*, the question under what circum-

stances one station should be considered to own another station based on its finan-

cial and contractual interests in that second licensee. In particular, the Commission

sought comment on whether and how to modify the broadcast attribution rules to

address certain programming or other sales and service sharing agreements be-

tween television stations. *Id.* ¶¶194-208 (JA 349-355). In doing so, the Commis-

sion specifically referred to a pending proceeding in which the agency had

tentatively concluded that it should attribute, for purposes of its ownership rules,

---

[5] *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Tele-communications Act of 1996*, MB Docket No. 09-182, Notice of Proposed Rule-making, 26 FCC Rcd 17489 (2011) (*2010 NPRM*) (JA 274).

- 14 -

certain "joint sales agreements" between television stations in the same local market. *2010 NPRM* ¶ 197, citing *Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*, 19 FCC Rcd 15238 (2004) (*TV JSA NPRM)* (JA 350).

### 2. The Further Notice and Report and Order

On April 15, 2014, the Commission released the *Further Notice of Proposed Rulemaking and Report and Order* that is before the Court in this case.

#### (a) The Further Notice

In the *Further Notice*, the Commission took steps to "build on" the "extensive record" developed in its "ongoing 2010 Quadrennial Review" by "incorporating the existing 2010 record into" the 2014 Quadrennial Review, "proposing rules that are formulated based on [the FCC's] evaluation of that existing record," and "seeking new and additional information and data on market conditions and competitive indicators as they exist today." *FNPRM & Order* ¶1 (JA 2).

Among other things, the Commission pointed out that the media marketplace was undergoing "dynamic changes," including the "proliferation of broadband Internet connections and other technological advances," *FNPRM & Order* ¶2 (JA 2), and noted that the "recent global financial crisis" had affected market participants in various ways, *id.* ¶3 (JA 2). The Commission also noted that the forthcoming incentive auction of broadcast spectrum "is likely to affect the broadcast television

industry in a number of respects," *FNPRM & Order* n.4 (JA 3), and sought comment on the impact of this auction, which it "anticipate[d] … will both free up significant spectrum for mobile broadband and result in an even healthier broadcast industry," potentially changing the landscape of broadcasting to which the media ownership rules would apply. *Id.* ¶3 (JA 2). *See In the Matter of Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, 29 FCC Rcd 6567 (2014), *petitions for review denied*, *National Ass'n of Broadcasters v. FCC*, 789 F.3d 165 (D.C. Cir. 2015).[6]

The Commission explained that its ultimate goal was to adopt media ownership rules "based on a comprehensive, refreshed record that reflects the most current evidence regarding the media marketplace." *FNPRM & Order* ¶1 (JA 2)[7] To facilitate further useful comment, the Commission addressed at length its current thinking on various issues raised in the now merged quadrennial reviews.

---

[6] The Commission currently expects the broadcast incentive auction to begin in early 2016. *See Competitive Bidding Procedures for Broadcast Incentive Auction*, 29 FCC Rcd 15750, 15754 ¶8 (2014).

[7] In a separate statement, the Commission's Chairman stated that he had instructed the agency's Media Bureau to complete the 2010 and 2014 Quadrennial Reviews by June 30, 2016. *FNPRM & Order*, 29 FCC Rcd at 4583 (JA 213). *See also Letter to Honorable John D. Rockefeller, et al., from FCC Chairman Tom Wheeler* (March 27, 2014) ("I intend to move forward with the new 2014 Quadrennial Review on an <u>accelerated</u> basis. Incorporating the record from the 2010 Review (which will remain open) with a new sense of urgency, I have concluded that the 2014 review should be completed in two years.") (JA 1023) (emphasis in original).

*__Ownership Limits__* The Commission set forth in detail its tentative conclusions with respect to each of its media ownership rules – "the local television ownership rule, the local radio ownership rule, the newspaper/broadcast cross-ownership rule, the radio/television cross-ownership rule, and the dual network rule." *Id.* ¶9 (JA 4) – along with further questions it believed needed to be resolved and further information that it believed to be necessary before it could make the final determinations required by Section 202(h): (1) whether the rules were necessary in the public interest, and (2) if not, whether they should be repealed or modified. *See FNPRM & Order* ¶¶ 15-241 (JA 7-107).

- The Commission tentatively concluded that the local television ownership rule continued to remain necessary in the public interest, although it proposed certain modifications to the rule on which it sought comment. See FNPRM & Order ¶¶15-73 (JA 7-31).

- The Commission tentatively concluded that the local radio ownership rule should be retained without modification. It noted, however, that commenters had opposed elements of the rule, and sought further comment on that tentative conclusion. *Id.* ¶¶ 74-112 (JA 32-47).

- The Commission stated that it continued to believe that some restrictions should remain on newspaper/broadcast cross-ownership. *Id.* ¶115

(JA 49). The agency sought further comment on whether the newspaper/radio cross-ownership restriction should be retained, in view of its tentative conclusion that radio stations are no longer primary outlets that contribute to viewpoint diversity in local markets. *Id.* ¶¶144-149, 200-225 (JA 65-68, 90-101). It tentatively concluded that it should retain the newspaper/television cross-ownership rule, but sought comment on a number of modifications to limit the scope of or to clarify the operation of the rule. *See id.* ¶¶150-199 (JA 68-90).

- Finally, the Commission tentatively found that the dual network rule, which permits some common ownership of television networks but prohibits a merger between or among the top 4 networks (ABC, CBS, Fox, and NBC), continues to be necessary to promote competition and localism and should be retained. *Id.* ¶226 (JA 101).

***Ownership Diversity*** The Commission also addressed the Third Circuit's *Diversity Order* remand. *See FNPRM & Order* ¶¶242-319 (JA 108-148). The agency tentatively decided to reinstate its revenue-based standard to define "eligible entities." That standard, which was established by the Small Business Administration, would, the Commission tentatively concluded, promote diversity in media ownership, "whether or not the standard is effective in promoting ownership

- 18 -

of broadcast stations by women and minorities." *Id.* ¶267 (JA 119). The Commis-

sion "concede[d]" that it did "not have an evidentiary record demonstrating that

this standard specifically increases minority and female broadcast ownership," and

it "invite[d] commenters to supplement the record with any new data or analysis

that may bear on this issue." *Id.* "[E]ven in the absence of such evidence," the FCC

tentatively determined that "reinstatement of the revenue-based standard would

serve the public interest by promoting small-business participation in the broadcast

industry." *Id.* The Commission sought comment "on these tentative conclusions."

*Id.* ¶268 (JA 119).

The Commission also tentatively concluded that it did "not have sufficient

evidence at this time to satisfy the constitutional standards necessary to adopt" a

"race- or gender-conscious" standard for "eligible entity." *FNPRM & Order* ¶ 282

(JA 126).[8] Although the Commission had taken steps to improve its data collection

and had conducted or commissioned studies concerning minority ownership, it

concluded that the record was not adequate for it to make a final determination. *Id.*

¶¶291-98 (JA 131-135). The agency sought comment on its "preliminary analysis"

---

[8] The Commission noted that previous efforts by Congress and the Commission to
adopt policies to foster minority and female broadcast ownership were discontin-
ued following the Supreme Court's decision in *Adarand Constructors v. Peña*,
515 U.S. 200 (1995), and that it continued efforts to promote diversity of broad-
cast ownership through race- and gender-neutral initiatives. *FNPRM & Order*
¶¶246-47 (JA 110-111).

- 19 -

of this issue. *Id.* It stated that it "intend[ed] to follow the Third Circuit's direction" to "consider adopting" a new eligible entity standard "before completion of this proceeding" – but after receiving comments on the *Further Notice* – by "evaluat[ing] the feasibility of adopting a race-conscious eligibility standard based on an extensive analysis of the available evidence." *Id.* ¶ 283 (JA 127).

***Shared Services Agreements***  Finally, the Commission also proposed to define a category of agreements between broadcast stations involving the sharing of services or resources and to require the disclosure of such agreements. *FNPRM & Order* ¶320 (JA 148). Such shared service agreements (SSAs) would include, for example, "provisions for time brokerage, local news production, joint advertising sales, and various other station-related services." *Id.* ¶328 (JA 152). While commenters had raised "important issues about how and to what extent sharing agreements implicate our competition, localism, and diversity policy objectives," the Commission found that its consideration of these issues had been impeded "because so little is known about the content, scope and prevalence of sharing agreements." *Id.* The Commission thus proposed to adopt a definition of what constitutes an SSA and to require the public disclosure of those agreements so that the Commission and the public could understand their extent and "evaluate whether such interaction has an impact on programming or other station operations." *Id.* ¶335 (JA 154).

- 20 -

### *(b) The Report and Order on TV Joint Sales Agreements*

In the *Report & Order* on review, the FCC adopted a new attribution rule

governing joint sales agreements (JSAs) between television stations in the same

market. *FNPRM & Order* ¶¶340-372 (JA 157-175); *see* 47 C.F.R. § 73.3555 Note

2(k). Under the new rule, the FCC "will count television stations brokered under a

same-market television JSA that encompasses more than 15 percent of the weekly

advertising time for the brokered station toward the brokering station's permissible

ownership totals." *Id.* ¶340 (JA 157). In other words, if two television stations en-

ter into a contract whereby one television station (the brokering station) has the

right to sell more than15 percent of the weekly advertising time of a second station

(the brokered station), the first station is treated as owning the second for purposes

of determining compliance with the Commission's media ownership limits. This

rule mirrors the Commission's attribution rule for radio joint sales agreements,

which the Third Circuit upheld in *Prometheus I. See* 373 F.3d at 429-30.

"Consistent with the Commission's analysis supporting attribution of radio

JSAs," the agency found that "television JSAs involving a significant portion of

the brokered station's advertising time convey the incentive and potential for the

broker to influence program selection and station operations." *FNPRM & Order*

¶350 (JA 163). The Commission further observed: "[O]ur experience indicates that

television JSAs can be used to coordinate the operations of two ostensibly sepa-

rately owned entities." *Id.* ¶352 (JA 164). The agency explained that its rationale

for attributing television joint sales agreements was "to prevent the circumvention of [the FCC's] ownership limits." *Id.* ¶363 (JA 170). Importantly, the Commission did not ban joint sales agreements – depending on the details of the local television market and the size of the two stations, many joint sales agreements are entirely acceptable under the Commission's media ownership limits.[9]

　　　　To allow stations to adjust to the new television joint sales agreement attribution rule, the Commission adopted transition procedures for existing agreements: any station that would be in violation of the ownership limits once its existing joint sales agreements were taken into account would have two years from the effective date of the order "to terminate or amend those JSAs or otherwise come into compliance" with the ownership rules. *FNPRM & Order* ¶367 (JA 172). Subsequently, Congress extended the two-year transition period for an additional six months. STELA Reauthorization Act of 2014, § 104, Pub. L. No. 113-200, 128 Stat. 2059, 2064 (2014).

---

[9] The Commission also pointed out that parties believing that "application of our attribution rules to their particular circumstances would not serve the public interest always have the ability to seek a waiver" showing, for example, that a particular agreement "does not provide the brokering entity with the opportunity, ability, and incentive to exert significant influence over the programming or operations of the brokered station." *FNPRM & Order* ¶364 (JA 170). The Order directed the Media Bureau "to prioritize review of any applications for waiver necessitated by attribution of JSAs and to complete their review within 90 days of the record closing on such waiver petitions provided there are no circumstances requiring additional time for review." *Id.*

- 22 -

The Commission rejected arguments that it should permanently grandfather all existing joint sales agreements, concluding that such action would "allow arbitrary and inconsistent changes in the level of permissible common ownership." *Id.* It also pointed out that the two-year transition period was identical to the period it adopted – and that the Third Circuit approved – when the Commission promulgated the radio joint sales agreement rule in 2003. *Id.*; *see 2002 Biennial Review Order*, 18 FCC Rcd at 13746 ¶¶324-325; *Prometheus I*, 373 F.3d at 429-30.

## SUMMARY OF ARGUMENT

Section 202(h)'s quadrennial review provision requires the Commission to periodically determine whether any of its broadcast ownership rules are "necessary in the public interest as the result of competition," and to "repeal or modify any regulation it determines to be no longer in the public interest." In this case, because of rapidly changing developments in the media marketplace – including the uncertainty caused by the potential consequences of the upcoming "incentive auction" and the delay in the Commission's 2010 Quadrennial Review from the Third Circuit's lengthy consideration of the Commission's 2006 Quadrennial Review – the Commission found itself unable to make a final determination whether its ownership rules should be revised or modified on the evidence before it. The Commission therefore incorporated the record generated by the 2010 Quadrennial Review into its newly initiated 2014 Quadrennial Review, and sought comment on pro-

- 23 -

posals to revise its ownership rules – on an accelerated basis – by 2016. By re-freshing the record, the Commission sought to ground any revision of its owner-ship rules, including any proposals to promote diversity in ownership, on a full, complete, and current evidentiary foundation. In the meantime, the Commission did adopt, as it had with radio stations, a rule treating television stations that enter into certain joint sales agreements, for purposes of the Commission's ownership limits, as commonly owned. The Commission's TV joint sales agreement rule was reasonable and reasonably explained.

1. At the outset, we renew our request that these cases be transferred to the Third Circuit in the interests of justice pursuant to 28 U.S.C. § 2112(a)(5). The cases involve review of an order entered after remand from the Third Circuit in *Prometheus II*, a case in which that court expressly retained jurisdiction. This Court has recognized that in such circumstances, transfer to the court that re-manded the case is important to maintain continuity in the proceedings. Moreover, the Third Circuit has the most extensive and recent experience with the specific is-sues in controversy here as a result of its decisions in both the *Prometheus I* and *Prometheus II* litigation. And although the rule governing attribution of television joint sales agreements adopted in the order here has not been before that court, it upheld in *Prometheus I* the Commission's adoption of a rule governing attribution of radio joint sales agreements upon which the television rule was modeled.

- 24 -

2. If the cases are not transferred to the Third Circuit, they should be dismissed to the extent they seek review of the substance of the *Further Notice of Proposed Rulemaking*. This Court has jurisdiction under the Hobbs Act to review "final orders" of the FCC. 28 U.S.C. § 2342(1). The Court lacks jurisdiction to review tentative matters such as proposed rules, from which no legal consequences flow. *See, e.g.*, *In re Murray Energy Corp.*, 788 F.3d 330 (D.C. Cir. 2015). Petitioners, intervenors and amici claim that some or all of the Commission's ownership rules should be vacated as contrary to the public interest. Petitioner Prometheus complains of the Commission's failure to resolve issues concerning ownership of broadcast stations by women and minorities. But the Commission has taken no final action on any of those matters – it has simply put forward proposals and made tentative, not final, decisions. To the extent petitioners seek review of the substance of the *Further Notice*, they are barred by the Hobbs Act's final order requirement.

3. Industry petitioners' contention that Section 202(h) mandates vacatur of all of the broadcast ownership rules because the Commission did not complete the 2010 Quadrennial Review within four years is unsupported by Section 202(h). Nothing in the section's text requires the Commission to repeal or modify any rule before it has made a determination that the rule is no longer in the public interest.

- 25 -

The Commission has made no such determination here. And Section 202(h) is un-like other provisions of the Communications Act in which Congress, for example, has provided that a particular petition filed with the Commission "shall be deemed granted" if the agency does not act within a specified time period. The industry pe-titioners' challenge is really a complaint about Commission *delay* in concluding the 2010 Quadrennial Review. But they have not petitioned for a writ of manda-mus to compel the Commission to act, nor have petitioners made a showing that mandamus relief would be warranted.

4. Petitioner Prometheus's contention that the Commission's decision to seek further information on additional measures to promote ownership of broadcast properties by minorities and women violated the *Prometheus II* remand is without foundation. In *Prometheus II*, the court stated that the Commission should com-plete its actions regarding ownership diversity within the course of the 2010 Quad-rennial Review, but that review is still ongoing. And to the extent that Prometheus seeks mandamus on any other ground, it has not come close to making the showing of extraordinary circumstances necessary to warrant such relief.

5. Finally, the Commission reasonably adopted its rule attributing joint sales agreements between television stations in the same local market. The agency had proposed doing so in 2004, and had in fact attributed joint sales agreements be-

tween radio stations in 2003, a determination upheld by the Third Circuit in *Prometheus I*. It found here that attribution of such agreements between television stations, which have been in increasing use, would appropriately account for the potential for influence the agreements afford and would prevent circumvention of its local television ownership limits. The Commission recognized that while there could be benefits to joint sales agreements in some circumstances, those benefits did not alter its conclusion that such agreements can confer significant influence that warranted ownership attribution and that the rule was in the public interest.

Petitioners' claim that the Commission forfeited its authority to adopt the rule because it had "opted not to complete" the 2010 Quadrennial Review is baseless.  First, the argument was not made to the FCC and is thus barred by 47 U.S.C. § 405. Second, the Commission's attribution rules are separate from the agency's ownership rules subject to the (ongoing) 2010 Quadrennial Review. The issue of whether a particular type of agreement has sufficient potential to facilitate influence or control that it should be taken into account in applying the Commission's ownership limits is wholly different from the issue of what those limits should be. And the agency has broad discretion to determine the order in which it considers and resolves issues that, although related, are logically distinct.

- 27 -

Prometheus does not take issue with the Commission's adoption of the television joint sales agreement rule, but claims that the agency acted arbitrarily by deciding not to extend ownership attribution to a broader category of agreements known as shared services agreements. But Prometheus offers no basis to dispute the Commission's judgment that it needed more information about the content of such agreements and the frequency of their use before taking any final action.

The Commission's decision to provide a two-year transition period before existing joint sales agreements would have to be brought into compliance with the new rule was also reasonable. Petitioners' contention that the agency should have grandfathered existing agreements is foreclosed by Congress's adoption of legislation extending the transition period by six months. In any event, it was reasonable for the Commission to employ the same limited transition period for attribution of television joint sales agreements that it had – and which the Third Circuit had upheld – for radio joint sales agreements.

## STANDARD OF REVIEW

This Court reviews FCC orders "under the deferential standard mandated by section 706 of the Administrative Procedure Act, which provides that a court must uphold the Commission's decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Achernar Broadcasting Co. v. FCC*, 62 F.3d 1441, 1445 (D.C. Cir. 1995) (quoting 5 U.S.C. § 706(2)(A)). "Under this 'highly deferential' standard of review, the court presumes the validity of

- 28 -

agency action … and must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment." *Cellco Partnership v. FCC*, 357 F.3d 88, 93-94 (D.C. Cir. 2004).

Insofar as petitioner Prometheus seeks issuance of a writ of mandamus, claiming that the FCC has engaged in "unreasonabl[e]" or "egregious" delay (Prometheus Br. at 1), Prometheus must demonstrate that "its right to issuance of the writ is clear and indisputable." *Northern States Power Co. v. U.S. Dept. of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997); *see also Your Home Visiting Nurse Servs. v. Shalala*, 525 U.S. 449, 457 (1999) (same).

## ARGUMENT

### I.  THE COURT SHOULD TRANSFER THE PETITIONS TO THE THIRD CIRCUIT.

As respondents argued at the preliminary-motion stage, the Court should transfer the petitions for review, along with Prometheus's petition for writ of mandamus, to the Third Circuit pursuant to 28 U.S.C. § 2112(a)(5).[10] This case involves review of an order that was entered after a remand from the Third Circuit in *Prometheus II* – a case in which the Third Circuit specifically "retain[ed] jurisdiction." *See* 652 F.3d at 472. This Court has noted that the "need" to ensure review of an agency order on remand by the same court that issued the remand "is underscored

---

[10] The Court referred the transfer motions to the merits panel. *See Howard Stirk Holdings, LLC v. FCC*, Nos. 14-1090, *et al.* (Orders of Sept. 11, 2014, Nov. 18, 2014).

by the consideration that an appellate court may retain exclusive jurisdiction" over a case in which it orders a remand. *Public Serv. Comm'n v. FPC*, 472 F.2d 1270, 1272 (D.C. Cir. 1972).

Moreover, "'where the same or [an] inter-related proceeding was previously under review in a court of appeals, and is now brought for review of an order entered after remand, or in a follow-up phase,'" this Court has found that "the desirability of 'continuity in the total proceeding' calls strongly for handling by the same reviewing tribunal." *American Public Gas Ass'n v. FPC*, 555 F.2d 852, 857 (D.C. Cir. 1976) (per curiam) (quoting *Public Serv. Comm'n v. FPC*, 472 F.2d at 1272). Where (as here) petitioners challenge an agency's treatment of issues stemming from a court remand, transfer of the case to the court that issued the remand is the most practical way "to maintain continuity in the total proceeding." *Pacific Gas & Elec. Co. v. FPC*, 272 F.2d 510, 511 (D.C. Cir. 1958).

Both Prometheus and the industry petitioners raise claims that directly relate to the Third Circuit's remand in *Prometheus II*. The industry petitioners argue, for example, that all of the "broadcast ownership rules disserve the public interest" and "should be vacated." Stirk Br. at 19, 40. The Third Circuit in *Prometheus II* vacated and remanded the Commission's prior attempt to modify one of those rules – the newspaper-broadcast cross-ownership rule – reinstated the original rule and denied petitioners'

challenges to the other rules.  Prometheus, on the other hand, contends that the Com-
mission "violated the *Prometheus II* remand" because of the manner in which the
*FNPRM & Order* dealt with minority and female ownership. Prometheus Br. at 22-25.
Prometheus also claims that the Commission's "failure to comply" with the Third
Circuit's remand of the *Diversity Order* "constitutes agency action unreasonably
delayed or unlawfully withheld under 5 U.S.C. § 706(1)." *Id.* at 5. Prometheus
seeks a writ of mandamus to compel the Commission to comply with that court's
mandate.  Prometheus Pet. Rev. at 6; Prometheus Br. at 1. *See  Prometheus II*, 652
F.3d at 472. The industry petitioners' claim (Stirk Br. at 12) that the diversity is-
sues are a "minor part" of the *Further Notice* is belied by the notice's extensive
discussion of those issues, which extends for 77 paragraphs and 40 pages in the
*Further Notice. FNPRM & Order* ¶¶242-319 (JA 108-148).

Because many of the issues in these consolidated cases are inextricably
linked to the *Prometheus II* remand, transfer of these cases to the Third Circuit
would best promote "the interest of justice and sound judicial administration." *East-
ern Air Lines v. CAB*, 354 F.2d 507, 510 (D.C. Cir. 1965).

Transfer of these cases to the Third Circuit is also warranted because that
court has the most extensive and most recent experience with the specific ownership
issues in controversy, acquired through its review of the Commission's 2002 and
2006 Quadrennial Review orders in *Prometheus I* and *Prometheus II*.  As this

- 31 -

Court has noted, "one factor that has considerable weight in the guidance of judicial discretion" as to whether a case should be transferred "is the desirability of transfer to a circuit whose judges are familiar with the background of the controversy through review of the same or related proceedings." *Eastern Air Lines*, 354 F.2d at 510.

The Third Circuit is particularly familiar with the issues that relate to industry petitioners' challenge to the FCC's decision in the *Report & Order* to attribute joint sales agreements involving television stations in the same local market. In *Prometheus I*, the Third Circuit considered and rejected broadcasters' challenges to the FCC's attribution of joint sales agreements involving radio stations in the same local market. *Prometheus I*, 373 F.3d at 429-30. The radio joint sales agreement rule and the TV joint sales agreement rule are essentially identical, and the Commission's decision to attribute joint sales agreements between television stations in the same local market is based on the same considerations that led it to attribute joint sales agreements between radio stations in the same local market. *FNPRM & Order* ¶356 (JA 166). Thus, although the joint sales agreement attribution rule for television stations has not previously been before the Third Circuit (Stirk Br. at 13), that court has gained a distinctive familiarity, through its review of the FCC's

radio joint sales agreement attribution rule, with the considerations that underlie attribution of ownership between broadcast entities that have entered into joint sales agreements. That familiarity is an additional consideration supporting transfer here.

## II. THE FURTHER NOTICE OF PROPOSED RULEMAKING IS NOT A JUDICIALLY REVIEWABLE FINAL ORDER.

If this Court does not transfer this proceeding to the Third Circuit, it should dismiss those aspects of the petitions for review that seek to challenge the substance of the Commission's *Further Notice of Proposed Rulemaking*. The Hobbs Act gives the courts of appeals exclusive jurisdiction to review "all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1). For an order to be final, two conditions must be satisfied: the order must not be "tentative" or "interlocutory" in nature, and it must be an action in which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). An agency "final order" "must generally 'mark the consummation of the agency's decisionmaking process' *and* either determine 'rights or obligations' or result in 'legal consequences.' " *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 800 (D.C. Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. at 178). These factors are interpreted pragmatically, *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967), to assure that courts neither "improperly

- 33 -

intrude[ ] into the agency's decisionmaking process" nor "squander[ ] judicial re-

sources" through piecemeal review. *Ciba-Geigy Corp. v. United States EPA*, 801

F.2d 430, 436 (D.C. Cir.1986). Relying on these established principles, this Court

has recently affirmed that "[w]e do not have authority to review proposed agency

rules." *In re Murray Energy, Corp.*, 788 F.3d at 334 ("a proposed rule is just a pro-

posal").

The *Further Notice* is not a judicially reviewable final order under these

well-settled standards. The notice does not purport to act to revise the Commis-

sion's ownership limits, to adopt additional measures to promote diverse owner-

ship of broadcast properties, or to limit the use of shared services agreements

generally. On the contrary, the Further Notice "seek[s] comment" on, among other

things, "the appropriateness of the broadcast ownership rules to today's evolving

marketplace," *FNPRM & Order* ¶ 6 (JA 3), "seek[s] comment" on further

measures "to promote the Commission's goal of encouraging small business par-

ticipation in the broadcast industry," *id.* ¶ 7 (JA 4), and "seek[s] comment" on "a

proposed definition of [shared service agreements] and a requirement that commer-

cial television stations be required to disclose these agreements to the public and

the Commission," *id*. ¶328 (JA 152). The conclusions and proposals put forth in

the *Further Notice* are by their terms "tentative." *See, e.g*., *FNPRM & Order* ¶15

(JA 7) (local television ownership); *id*. ¶74 (JA 32) (local radio ownership); *id*. ¶

114 (JA 48) (newspaper/broadcast cross-ownership); *id.* ¶210 (JA 95) (radio/television cross-ownership); id. ¶226 (JA 101) (dual network rule); *id.* ¶¶243-244 (JA 109) (diversity proposals); *id.* ¶¶330, 335 (shared services agreements) (JA 153, 154).

The industry petitioners contend that all of the Commission's broadcast ownership rules "cannot stand" and must be "vacate[d]" because the Commission has failed affirmatively to justify their retention. Stirk Br. at 22-23. Amici International Center for Law and Economics, *et al.* contend that the local television ownership rule is no longer consistent with the public interest and should be repealed. ICLE Br. at 9-14. Amici Cox Media Group argues that the newspaper/radio cross-ownership rule no longer serves the public interest and should be repealed. Cox Br. at 1-20. And petitioner Prometheus contends that the Commission should have required disclosure and attribution of all shared service agreements, not just joint sales agreements. Prometheus Br. at 36-39.

But the Commission has made no final determination on whether, or in what form, to retain any or all of its media ownership rules or to require disclosure or attribute shared services agreements. It has simply put forth proposals for comment, and made tentative, non-final, conclusions that it is continuing to review. Indeed, petitioners themselves describe the Commission's action as a "non-decision" and complain that the Commission "failed to make any decision." Stirk Br. at 21, 22.

Accordingly, to the extent petitioners and their amici seek to invite this Court to review the substance of the *Further Notice*, they are barred by the Hobbs Act's final order requirement, 28 U.S.C. § 2342(1), from doing so. *In re Murray Energy Corp.*, 788 F.3d at 334-35.[11]

### III. THE COMMISSION'S DECISION TO COMPLETE REVIEW OF ITS OWNERSHIP RULES ONLY AFTER REFRESHING THE RECORD WAS REASONABLE AND DOES NOT MANDATE VACATUR OF THOSE RULES.

Relying on Section 202(h), the industry petitioners contend that the Commission's failure to conclude the review of its broadcast ownership rules within the 2010 quadrennial "cycle" mandates vacatur of all of those rules. Stirk Br. at 15. Even if the Court concludes that it has jurisdiction to review this argument, it is supported by neither the facts of this case nor the language of the statute.

---

[11] The arguments of amici Cox and ICLE should be disregarded for an additional reason – they improperly attempt to expand the issues in this case beyond those raised by the petitioner and intervenor they support. Amici are generally not permitted to "expand the scope of an appeal to implicate issues that have not been presented by the parties to the appeal." *Eldred v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001); *see also Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 n.6 (D.C. Cir. 2015). The industry petitioners make the broad, general claim that the ownership rules "disserve the public interest" and "cannot stand" (Stirk Br. at 19, 22), but they do not mention either of the specific rules that are the focus of the ICLE and Cox amicus briefs. Amici should not be allowed to so function "as a means of evading the page limitations on a party's briefs." Fed. R. App. Proc. 29(c)(5) Advisory Committee's Note on 2010 Amendments (quoting *Glassroth v. Moore*, 347 F.3d 916, 919 (11th Cir. 2003)).

- 36 -

As the Commission explained, it incorporated the record generated in that proceeding into the 2014 Quadrennial Review in order to ensure that the review of its broadcast ownership rules would be "based on a comprehensive, refreshed record that reflects the most current evidence regarding the media marketplace." *FNPRM & Order* ¶1 (JA 2). In particular, the Commission noted, it needed to obtain "new and additional information and data on market conditions and competitive indicators as they exist today," *id.*, the "dynamic changes that are taking place in the media marketplace" and the "change[s] [in] the ways in which many consumers access entertainment, news, and information programming," *id.* ¶2 (JA 2), the ongoing but inconsistent effects of "the recent global financial crisis," *id.* ¶3 (JA 2), and "the impact of new technologies on the media marketplace," *id.* ¶3 (JA 3).

In addition, the Commission pointed to "[t]he forthcoming voluntary incentive auction of broadcast television spectrum," which it described as "critically important to the Commission's efforts to unleash the full transformative potential of broadband Internet" and as providing "broadcasters with a new and unique financial opportunity." *FNPRM & Order* ¶3 (JA 3).[12]

---

[12] As a result of the incentive auction, a substantial portion of the existing broadcast spectrum may be repurposed to provide mobile broadband service, and a substantial number of the nation's 8,400 television stations could exit the broad-

Section 202(h) provides that the Commission "shall review" its broadcast ownership rules "quadrennially" "as part of its regulatory reform review under Section 11 of the Communications Act of 1934." 110 Stat. 56, 111-12 (1996), amended by 118 Stat. 3, 100 (2004). As part of that proceeding, the Commission is to "determine whether any of such rules are necessary in the public interest as the result of competition." *Id*. The statute provides that *if* the Commission determines that any regulation is "no longer in the public interest," "[t]he Commission shall repeal or modify … it." *Id*.

By its terms, Section 202(h) does not permit – much less require – the repeal or modification of any rule subject to its quadrennial review requirement in the absence of an affirmative determination by the Commission that the rule under review is "no longer in the public interest." The Commission has made no such determination here. On the contrary, its review of its ownership rules remains ongoing. Unless and until the Commission decides that one or more of its broadcast ownership rules is no longer in the public interest, Section 202(h) places it under

---

cast business, thus dramatically changing the competitive broadcast media marketplace. *See In the Matter of Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, 27 FCC Rcd 12357, 12363-64 ¶¶14-16 (2012); *see also NAB v. FCC*, 789 F.3d at 169-70.

- 38 -

no obligation to repeal or modify those rules.[13] The assertion that Section 202(h)

authorizes the Court to vacate those rules is even further afield.

Section 202(h) is thus quite unlike Section 10 of the Communications Act,

47 U.S.C. § 160, which provides that a telecommunications carrier may petition

the Commission to forbear from applying "any regulation or any provision of [the]

Act" upon a showing, among other things, that forbearance would be in the public

interest. 47 U.S.C. § 160(c). Under Section 10, "[a]ny such petition *shall be

deemed granted if the Commission does not deny the petition* for failure to meet the

requirements for forbearance … within one year after the Commission receives it."

*Id.* (emphasis added).[14] Section 202(h) contains no similar provision that the Com-

mission's ownership rules would be automatically vacated if the Commission does

not make a determination within a specified period that those rules are "necessary

in the public interest." Instead, Congress created an independent obligation on the

Commission to repeal or modify its ownership rules only *after* the agency had

---

[13] Indeed, even if the Commission had determined that a particular ownership rule
was not in the public interest, it would be under no obligation to repeal or modify
that rule within a specified time, as this Court made clear in interpreting the simi-
larly worded provisions of Section 11 of the Communications Act, 47 U.S.C. §
161. *Cellco Partnership v. FCC*, 357 F.3d at 100 ("[i]f Congress had intended
that within each biennial year the Commission must not only review its rules and
determine which were no longer necessary, but also, where applicable, modify or
repeal them, it could have included a temporal restriction" in the latter provi-
sion).

[14] Under Section 10, the Commission has the authority to extend this one-year pe-
riod for no more than an additional 90 days. *Id.*

made an affirmative determination that the rule or rules in question are "no longer in the public interest."

The industry petitioners, relying on *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002)(*Fox I*), contend that Section 202(h) embeds a "presumption in favor of repealing or modifying the ownership rules." Stirk Br. 16. That is incorrect. The statement in *Fox I* was grounded on the determination that the term "necessary" in Section 202(h) means more than "useful," a ruling that was deleted on rehearing, *see Fox Television Stations, Inc. v. FCC*, 293 F.3d 537, 540 (D.C. Cir. 2002)(*Fox II*), and later disavowed. *See Cellco*, 357 F.3d at 98 (upholding the FCC's interpretation of the term "necessary" in Section 11 of the Communications Act, 47 U.S.C. § 161, to mean the same as "necessary in the public interest" in Section 201(b), 47 U.S.C. § 201(b)). *See also Prometheus I*, 373 F.3d at 390-95 (rejecting deregulatory presumption in favor of repealing or modifying rules under Section 202(h)).

The industry petitioners also chide the Commission for seeking an "exception in Section 202(h) for the Commission to 'refresh' the record." Stirk Br. at 18. Notably, they do not suggest what the Commission was supposed to do once it concluded that it had insufficient evidence to decide whether the rules should be retained in the public interest. But a decision to retain – or to repeal – the rules that was made without an adequate basis would be subject to reversal as arbitrary and

capricious for that reason alone. *See Fox I*, 280 F.3d at 1043-44. Section 202(h) is

not reasonably read to force a decision for which the Commission has no adequate

record support.

To the extent that the industry petitioners are challenging the Commission's

failure to complete the 2010 Quadrennial Review when it adopted the *FNPRM &*

*Order*, they are complaining about agency delay. But as this Court held in the re-

lated context of the Commission's biennial review of telecommunications regula-

tion under Section 11 of the Communications Act, 47 U.S.C. § 161, the proper

remedy where the claim is that the Commission has not acted within a reasonable

time "would be to seek issuance of a writ of mandamus to compel Commission ac-

tion." *Cellco*, 357 F.3d at 101, citing *Telecommunications Research & Action Cen-*

*ter v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984). As in that case, however, the

industry petitioners in this litigation have not filed a petition for a writ of manda-

mus to compel the agency to act.

Nor would mandamus be appropriate even if the industry petitioners had

sought it. To be sure, "where Congress has provided a timetable or other indication

of the speed with which it expects the agency to proceed in the enabling statute,

that statutory scheme may supply content for [the] rule of reason" that governs the

time agencies take to make decisions. *Telecommunications Research & Action*

*Center*, 750 F.2d at 80. Nonetheless, "mandamus[ ] does not necessarily follow a

finding of a [statutory] violation." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999), *see also In re Barr Labs., Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991). This Court has thus denied mandamus even when an agency has missed a specific statutory deadline by significantly more than the period that will have passed in this case in mid-2016, the Commission's planned completion date for the combined 2010-2014 quadrennial reviews. *See, e.g.*, *United Mine Workers*, 190 F.3d at 546, 551 (declining to issue the writ, notwithstanding that the agency missed an "express" statutory deadline by 8 years in "clear violation" of the statute).

Here, the Commission adequately explained its reasons for combining its 2010 and 2014 Quadrennial Reviews, *see* pp. 14-15 above, and the agency's Chairman has committed to complete the combined proceeding "on an accelerated basis" in 2016. *See* n. 7 above. Given those facts, and given the pendency of the forthcoming incentive auction – now scheduled for early 2016 – mandamus plainly would not be appropriate here, even had the industry petitioners sought it.

### IV. THE COMMISSION'S REASONABLE CONCLUSION THAT IT LACKED ADEQUATE INFORMATION TO ACT ON FURTHER MEASURES TO PROMOTE MEDIA OWNERSHIP BY MINORITIES AND WOMEN DOES NOT VIOLATE THE *PROMETHEUS II* REMAND.

As with the ownership rules, the Commission did not take any final action in the *FNPRM & Order* on further measures to promote broadcast ownership by mi-

norities and women. The Commission's discussion of these issues is contained entirely within the *Further Notice of Proposed Rulemaking*. *FNPRM & Order* ¶¶242-319 (JA 108-148). As the Commission explained, it "offer[ed] tentative conclusions in this FNPRM in response to the [Third Circuit's] remand and [sought] comment on whether we should reconsider any of those conclusions based on additional or new information in the context of the 2014 Quadrennial Review," but it took no final action. *Id.* ¶242 (JA 108). Thus, to the extent that Prometheus and intervenor MMTC raise APA challenges to the Commission's *Diversity Order* remand proposals, this Court lacks jurisdiction to consider their arguments. *Murray Energy*, 788 F.3d at 334-35.

Prometheus contends that, by failing to act on broadcast ownership by minorities and women, the Commission failed to comply with the Third Circuit's mandate in *Prometheus II*. Prometheus Br. at 12-25; *see* MMTC Br. at 14-18. But Prometheus does not come close to demonstrating such noncompliance.

The Third Circuit stated that "the actions required on remand [with respect to the ownership diversity issue] should be completed within the course of the Commission's 2010 Quadrennial Review of its media ownership rules." *Prometheus II*, 652 F.3d at 472. But because the Commission has not yet completed the 2010 review, there can be no claim that the Commission has violated the court's

- 43 -

mandate. Nor does any other consideration compel the Commission to act to pro-

mote minority ownership in the face of the agency's wholly reasonable conclusion

that it lacked an adequate record on which to act in the particularly sensitive area

of race and gender preferences.

Furthermore, even where a supportable claim is made that an agency has vi-

olated a court mandate on remand, "'[t]he remedy of mandamus is reserved for ex-

traordinary circumstances in which the petitioner demonstrates that his right to

issuance of the writ is clear and indisputable ….'" *NetCoalition v. SEC*, 715 F.3d

342, 354 (D.C. Cir. 2013), quoting *Byrd v. Reno*, 180 F.3d 298, 302 (D.C. Cir.

1999). Prometheus has not come close to satisfying that heavy burden in this case.

## V.  THE COMMISSION ACTED REASONABLY IN ADOPTING THE TELEVISION JOINT SALES AGREEMENT RULE.

Insofar as the Commission's decision to attribute certain joint sales agree-

ments between television stations in the same local market for purposes of its me-

dia ownership rules is concerned, the industry petitioners (joined by intervenor

Mission Broadcasting) complain of Commission action, not inaction. The agency's

decision to require attribution of certain TV joint sales agreements – like its prior

decisions to attribute radio joint sales agreements (upheld by the Third Circuit, *see*

*Prometheus I*, 373 F.3d at 429-30) and TV local marketing agreements (affirmed

by this Court, *see Sinclair*, 284 F.3d at 165-69) – was reasonable and supported by

the record.

- 44 -

### A. The Rule Is Reasonable And Supported By The Record.

The Commission's "attribution rules seek to identify those interests in licensees that confer on their holders a degree of 'influence or control such that the holders have a realistic potential to affect the programming decisions of licensees or other core operating functions.'" *FNPRM & Order* ¶343 (JA 159), quoting *1999 Attribution Order*, 14 FCC Rcd 12559, 12560 ¶1 (1999). Joint sales agreements typically authorize one ("brokering") station to sell advertising time for another ("brokered") station in return for a fee to the brokered station. *FNPRM & Order* ¶342 (JA 157). They also generally give the broker authority to "hire a sales force for the brokered station, set advertising prices, and make other decisions regarding the sale of advertising time." *Id.* In the *Report and Order*, the Commission concluded that "television JSAs, like radio JSAs … have the potential to convey significant influence over a station's operations such that they should be attributable." *Id.* ¶350 (JA 163). Because the broker controls the advertising revenue of the brokered station," joint sales agreements have the "potential … to convey sufficient influence over core operations of a station to raise significant competition concerns warranting attribution." *Id.* ¶320 (JA 148). Moreover, because the brokered station "typically receive[s] a monthly fee regardless of the advertising sales or audience share of the station," it has "less incentive to maintain or attain significant competitive standing in the market." *Id.* However, the Commission observed, "[w]hether a

JSA provides the brokered station a fixed fee or a percentage fee, the broker's revenues depend on its ability to sell the ad time for the brokered station, which depends in turn on the popularity of the brokered station's programming. The broker therefore has a strong incentive to influence the brokered station's programming decisions." *Id.* ¶350 (JA 163).

It is important to understand the difference between the attribution rules and the media ownership rules. The attribution rules determine when common control over multiple broadcast stations exists. The media ownership rules determine when common control is, or is not, permissible. To address the attribution rules without changing the media ownership rules is entirely logical because the joint sales agreement rule ensures that the media ownership rules are not, so long as they are in place, subject to the creation of exceptions that would swallow the rules before they can be reviewed on the merits, and potentially changed. To put it another way, revision of the attribution rule was necessary for the Commission to preserve the outcomes prescribed by the current rules while they remain under review.

The Commission found that there had been "an increase in the prevalence of television JSAs, and recently such agreements have received more attention in broadcast television transactions." *FNPRM & Order* ¶342 (JA 157). It pointed to one commenter's observation that "the lack of an attribution rule for television

JSAs has created 'a bona fide loophole that many broadcasters have happily ex-ploited.'"[15]  As the U. S. Department of Justice observed before the Commission, there has been a "pronounced trend toward one station controlling another station that is nominally owned by a separate entity" and "failure to account for the effects of such arrangements can create opportunities to circumvent FCC ownership limits and the goals those limits are intended to advance." [DOJ ex parte 11,2](JA 845, 836).

Although it is not clear from the industry petitioners' briefs, the agency did not bar joint sales agreements. Instead, it determined that where one television sta-tion acts under a joint sales agreement to broker more than 15 percent of the weekly advertising time of another station in the same local market, the brokered station should count towards the brokering station's ownership limits in that mar-ket. *Id.* ¶342 (JA 157). In other words, if the brokering station and the brokered sta-tion could be jointly owned under the Commission's local ownership rules, the brokering station can enter into a joint sales agreement with the brokered station without running afoul of the Commission's rules. Moreover, joint sales agreements that do not exceed the 15 percent weekly threshold can be entered into without con-sideration of the local ownership rule.

---

[15] *FNPRM & Order* n.1048 (JA 158), quoting TVNEWSCHECK, Dec. 12, 2012, http://www.tvnewscheck.com/article/64074/fcc-moving-the-wrong-way-on-jsas

The arguments that the Commission's decision is arbitrary and capricious (Stirk Br. at 23-39; Mission Br. at 6-17) are baseless. In the first place, the agency's decision to attribute TV joint sales agreements flowed naturally from its 2003 conclusion that identical agreements involving radio stations present identical opportunities for influence and control and should therefore be attributed. *See 2002 Biennial Review Order*, 18 FCC Rcd at 13743 ¶346. The Third Circuit affirmed the Commission's adoption of that attribution rule in *Prometheus I*, rejecting arguments that attribution of radio joint sales agreements was arbitrary and capricious. *See* 373 F.3d at 429-30.[16]

The industry petitioners dispute the Commission's conclusion (*FNPRM & Order* ¶356 (JA 166)) that radio joint sales agreements and television joint sales agreements are, for purposes of attribution, fundamentally the same. Stirk Br. at 33-34; Mission Br. at 13-14. But as the Commission explained, both types of sales agreements "allow an in-market, same-service competitor the right to sell advertising

---

[16] The Commission also has adopted attribution rules governing "local marketing agreements," both between radio stations and between television stations. These sharing agreements, similar to joint sales agreements, typically provide that the broker may sell advertising time and retain the advertising revenue for programming it provides to the brokered station. The Commission first enacted this rule for radio stations, but extended it to television stations in 1999. *See Revision of Radio Rules and Policies*, 7 FCC Rcd 2755, 2788-89 ¶¶64-67 (1992); *1999 Attribution Order*, 14 FCC Rcd at 12612 ¶122. In *Sinclair*, this Court held that the Commission's decision to attribute television local marketing agreements – and to grandfather them only for a limited time – was reasonable and consistent with the 1996 Act. *Sinclair*, 284 F.3d at 165-69. *See generally FNPRM & Order* ¶¶343-44 (JA 159).

time on an independently owned station and give rise to the same types of incen-

tives and opportunities to influence the programming and operations of the bro-

kered station." *FNPRM & Order* ¶356 (JA 166). Indeed, intervenor Mission

provides a stark example of the opportunity for influence a joint sales agreement

can provide. It maintains no separate sales staff at its 18 television stations and has

turned over complete control of its advertising sales to Nexstar Broadcasting,

which is the licensee of competing television stations in those markets. Mission Br.

at 1.

     The industry petitioners point to the "far greater prevalence of network affilia-

tions among television stations," and assert that "unlike radio JSAs, television JSAs

do not rely on flat fees to brokers." Stirk Br. at 33. But the fact that TV stations can

be network affiliates does not eliminate the influence joint sales agreements can

have on programming, since, in addition to network programming, network affili-

ates also "provide local and/or syndicated programming." *FNPRM & Order* ¶354

(JA 165). "Thus, the fact that stations may air network programming does not pre-

vent the broker from influencing the selection of non-network programming." *Id*.

A brokering station also has the opportunity to "influence the brokered station's

decision whether or not to pre-empt network programming," as well as "the bro-

kered station's choice of network affiliation." *Id*. Likewise, while the payment of a

- 49 -

flat fee to a licensee might have an especially pernicious effect, by "depriv[ing] the licensee of a financial stake in its own station," a joint sales agreement provides a broker with "the ability and incentive to influence the brokered station" "[r]egardless of the fee structure." *Id.* at n.1096 (JA 166).

The industry petitioners also complain that it was "particularly arbitrary" for the Commission to employ the same 15 percent threshold for television joint sales agreements as it had used when adopting the radio joint sales agreement rule. Stirk Br. at 33 n.10. But the Commission explained that a "15 percent advertising time threshold will allow a station to broker a small amount of advertising time through a JSA with another station in the same market without triggering attribution, yet will fall short of providing the broker a significant incentive or ability to exert influence over the brokered station's programming or other core operating functions because it will not be selling the advertising time in substantial portion of the station's programming." *FNPRM & Order* ¶360 (JA 169). *See 2002 Biennial Review Order*, 18 FCC Rcd at 13745-46 ¶323. Moreover, the Commission pointed out that the attribution rule for local marketing agreements has also been set at 15 percent, and that setting the TV joint sales agreement level at the same 15 percent threshold eliminates any incentives that stations might have to evade the local marketing agreement attribution rules by entering into joint sales agreements because of a higher attribution threshold. *FNPRM & Order* ¶361 (JA 169).

- 50 -

Petitioners argue that the Commission pointed to no actual evidence that stations have ever used joint sales agreements to "confer operational influence" and that the rule thus is not supported by the record. Stirk Br. at 31. But the Commission need not specifically demonstrate that stations had exercised such control or influence in the past to justify its conclusion that a brokering station that meets the 15 percent threshold would have sufficient influence over the operations of the brokered station, as well as having the incentive to exercise such influence.[17] The Commission's detailed analysis to reach that conclusion was entirely reasonable.

As the Commission explained, under a joint sales agreement, "the broker's revenues depend on its ability to sell the ad time for the brokered station, which depends in turn on the popularity of the brokered station's programming. The broker therefore has a strong incentive to influence the brokered station's programming decisions." *FNPRM & Order* ¶350 (JA 163). *See* [Hubbard TV JSA Reply] at 3 (JA 469) ("In commercial broadcasting, programming and sales are inextricably

---

[17] The Commission acknowledged that its decision to attribute certain TV joint sales agreements was "informed by our ongoing transaction review." *FNPRM & Order* ¶349 (JA 161). Furthermore, the Commission noted that "[s]ince the release of the *TV JSA NPRM*, the Commission has continued to review joint sales agreements, often in conjunction with applications for approval to transfer or assign a television station license." *Id.* and n.1072 (JA 161) (describing Commission's ongoing experience reviewing television joint sales agreements in transactions).

connected."). Thus, the Commission found, "JSAs provide incentives for joint op-eration that are similar to those created by common ownership." *Id*. ¶351 (JA 164). "A broker selling advertising time on two stations, one of which is owned by the broker, has incentives similar to those of an owner of two stations to coordinate ad-vertising activity between the two stations," rather than compete for advertising. *Id*. Accordingly, "[a] broker has a strong incentive to ensure that the brokered sta-tion provides programming – and an audience – that is complementary to that of-fered by its own station in order to maximize the attractiveness of the two stations to advertisers." *Id*. ¶354 (JA 165). In the end, as the Commission earlier explained in attributing radio joint sales agreements, such agreements "put pricing and output decisions in the hands of a single firm," which "sells packages of time for all sta-tions, eliminating competition in the market." *2002 Biennial Review Order*, 18 FCC Rcd at 13744 ¶319.

The industry petitioners also complain that the Commission "failed to con-sider extensive record evidence demonstrating the public interest benefits of JSAs." Stirk Br. at 28. Mission Br. at 6-10. That is incorrect. The Commission ex-pressly "recognize[d] that cooperation among stations may have public interest benefits under some circumstances, particularly in small to mid-sized markets." *FNPRM & Order* ¶358 (JA 167). It found, however, that "these potential benefits"

- 52 -

did not affect its "assessment of whether television JSAs confer significant influence such that they should be attributed." *Id*. It was reasonable for the Commission to conclude that the industry's claims of public interest benefits from cooperation among television stations in the same market were addressed more to the question whether the Commission should "liberaliz[e] … the local television ownership rules" – a focus of the *Further Notice* – "and not on the question of whether JSAs give the brokering station a degree of influence and control that rises to the level of attribution." *Id.* ¶349 (JA 162). That latter question was "the sole focus" of the Commission's attribution inquiry. *Id.*[18]

The industry petitioners contend that the Commission's decision to attribute TV joint sales agreements "is especially troublesome" because it constituted "an about-face" from its 1999 decision not to attribute either radio or TV joint sales agreements. Stirk Br. at 34. But in 2003 the Commission changed its mind with regard to attribution of radio joint sales agreements; and the Commission noted at that time that the only reason it was refraining from attributing TV joint sales

---

[18] The industry petitioners contend that the Commission's "definition of the relevant market is similarly unsupported and untenable" because a "multitude of media outlets offering news and entertainment today compete with free over-the-air television stations both for viewers and for local and national advertising." Stirk Br. at 35. But the definition of the market has nothing to do with the likelihood that a brokering station will have influence over its brokered partner. Instead, such a market definition challenge "bear[s] on the issue of liberalization of the local television ownership rules" and not on the attribution rule that was the subject of the *Report and Order*. *See FNPRM & Order* ¶349 (JA 162).

- 53 -

agreements was that it had not given adequate notice of that possibility. *2002 Bien-nial Review Order*, 18 FCC Rcd at 13745 n.688. On the Commission's "further exam-ination of the issue" in this proceeding, which followed express notice that the issue was under consideration (*TV JSA NPRM* ¶2 (JA 255)), the agency found that "televi-sion JSAs, like radio JSAs," "have the potential to convey significant influence over a station's operations such that they should be attributable." *FNPRM & Order* ¶ 350 (JA 163). It therefore found "that the Commission's previous view that television JSAs do not convey sufficient influence to warrant attribution was incorrect." *Id.*

Petitioners' contention that the Commission was required to supply a more detailed justification for its decision here because it was a change in policy involv-ing significant reliance interests, Stirk Br. at 34-35, is also mistaken. Television broadcasters have known since at least 2003 – when the Commission determined that radio joint sales agreements should be attributable – that the Commission might conclude that TV joint sales agreements should be attributable. And the Commis-sion made that possibility unmistakably clear in 2004 – by seeking comment "on whether or not to attribute TV JSAs," "tentatively conclud[ing] that [the Commis-sion] should." *TV JSA NPRM*, 19 FCC Rcd at 15242 ¶12 (JA 258). That NPRM

was never withdrawn or disavowed.[19] If there were any doubt that the 2004 NPRM's proposals continued under active consideration, it should have been dispelled by the *2010 NPRM* in this proceeding. There the Commission noted that it had tentatively concluded in the 2004 NPRM that it should adopt attribution rules for television joint sales agreements and that no decision had been issued in that proceeding. *2010 NPRM* ¶197 (JA 350).

Reliance interests carry little weight against a change in agency policy that is reasonable. *Mobile Relay Associates v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) ("if an agency's rule affects a regulated entity's investment made in reliance on the regulatory status quo before the rule's promulgation," the new rule "will be upheld if it is reasonable, i.e., if it is not arbitrary or capricious"). And a "change in policy is not arbitrary or capricious merely because it alters the current state of affairs." *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997). These principles are

---

[19] Intervenor Mission notes that the Commission's Consumer and Governmental Affairs Bureau had placed the *TV JSA NPRM* on a "list of 'stale' or 'moot' proceedings it had identified as 'candidate[s] for termination.'" Mission Br. at 17, citing *Public Notice*, "Consumer & Governmental Affairs Bureau Seeks Comment On Termination Of Certain Proceedings As Dormant," 27 FCC Rcd 1613 (CGB 2012). But the Bureau never decided to terminate the proceeding. Instead it later concluded, "upon further *sua sponte* evaluation," that "further action may be necessary in that proceeding." *Termination of Certain Proceedings*, 27 FCC Rcd 11284, 11286 ¶8 (CGB 2012).

- 55 -

particularly applicable when, as here, the affected parties have been on notice for a decade that the policy might change in precisely the way it did.[20]

### B. The Commission Reasonably Determined Not To Attribute Shared Services Agreements At This Time.

In contrast to the industry petitioners, Prometheus does not take issue with the Commission's decision to extend attribution to television joint sales agreements. Instead, Prometheus argues that it was arbitrary and capricious for the Commission to adopt an attribution rule governing television joint sales agreements but not to adopt a similar rule for all shared services agreements. Prometheus Br. at 26-39. To the extent the challenge is to the Commission's decision to address shared services agreements in the *Further Notice of Proposed Rulemaking*, rather than in the *Report and Order*, the challenge is barred by the final order rule. *See* pp. 32-33 above. The Commission explained that although comments in response to the *2010 NPRM* had "raised important issues about how and to what extent sharing agreements [such as SSAs] implicate our competition, localism, and diversity policy objectives," "[c]onsideration of these issues is impeded because so little is known

---

[20] Petitioners also point to the fact that while this proceeding was pending "the Commission has approved some 71 JSAs in 53 markets." Stirk Br. at 31. However, the Commission explained that those rulings, made by the agency's Media Bureau, were in the context of applications for television license assignments or transfers that included joint sales agreements at a time when there was no applicable rule. "[R]eliance on the Media Bureau's approval of transactions that included a JSA during a period when there was no television JSA attribution rule is misplaced." *FNPRM & Order* n.1072 (JA 162).

- 56 -

about the content, scope, and prevalence of sharing agreements." *FNPRM & Order* ¶327 (JA 152). The Commission thus sought further comment on requiring disclosure of such agreements as "a necessary first step in determining whether our public interest goals will be furthered through additional regulation of these agreements…." *Id.* ¶328 (JA 152).

To the extent Prometheus is challenging the final action taken with respect to shared services agreements, the argument is baseless. The Commission has traditionally taken an incremental approach in determining whether and how to attribute agreements between and among broadcasters. *See FNPRM & Order*, ¶¶343-44 (JA 159); *see also* n. 16 above. As this Court has repeatedly recognized, it is entirely reasonable for an agency to proceed in this fashion, "'one step at a time,'" when addressing complicated sets of issues. *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 86 (D.C. Cir. 2001), quoting *National Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1207 (D.C. Cir. 1984)); *see also id.* ("agencies need not address all problems 'in one fell swoop'").

Shared services agreements cover a broader range of activities than other agreements among broadcasters, including joint sales agreements, for which the Commission has required attribution. *See FNPRM & Order* ¶329 (JA 152). As the agency pointed out, "the Commission and the public lack information about the content or breadth of the agreements or the frequency of their use, inhibiting a

- 57 -

thorough analysis of the impact of these arrangements on our rules and policy

goals." *Id.* ¶320 (JA 149).[21] There is thus good reason to believe, as the Commis-

sion did, that further factual development was needed to assess the need for attribu-

tion of shared services agreements and, if necessary, the appropriate approach to

attribution of such agreements. Prometheus offers no basis to dispute the Commis-

sion's reasonable judgment.

### C.  The Rule Does Not Violate Section 202(h)

The industry petitioners maintain that the television joint sales agreement

rule violates Section 202(h) because it results in an expansion of the local televi-

sion ownership rules and "the Commission cannot expand the ownership rules

without making the findings required to retain the rules in the first place." Stirk Br.

at 24. *Accord* Mission Br. at 3-5.

The claim fails at the outset because it was never presented to the Commis-

sion, and petitioners are therefore statutorily barred from presenting it to this Court

for the first time on judicial review. 47 U.S.C. § 405(a). *See In re Core Communi-*

*cations, Inc.*, 455 F.3d 267, 276 (D.C. Cir. 2006) ("[E]ven when a petitioner has no

---

[21]The Commission noted that there is not currently a precise definition of what
  types of agreements between television stations should be the focus of regulatory
  concern. The Commission proposed a definition and sought comment in the *Fur-*
  *ther Notice* on whether that definition was too broad or too narrow. It also sought
  input on alternative definitions that could better serve the agency's purposes. *See*
  *FNPRM & Order* ¶¶329-334 (JA 152-154).

reason to raise an argument until the FCC issues an order that makes the issue relevant, the petitioner must file 'a petition for reconsideration' with the Commission before it may seek judicial review."); *see also BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1182 (D.C. Cir. 2003).

In any event, contrary to petitioners' claims, there is nothing that prevents the Commission from dealing with attribution rules separately from ownership limits. As the Commission explained, "attribution rules determine what interests are cognizable under the Commission's broadcast ownership rules; they are not ownership limits in themselves." *FNPRM & Order* ¶343 (JA 159). And as the Commission's Chairman pointed out, "attribution of TV JSAs does NOT change the number of TV stations a single entity may own in a market under the Local Television Ownership Rule. It just means that we won't tolerate any longer that licensees circumvent our rules." 29 FCC Rcd at 4582 (JA 212). The Commission noted that "the asserted public interest benefits of common ownership, operation or control of stations in the same local market are appropriately raised and considered in the context of setting the terms of the local television ownership rule." *FNPRM & Order* ¶349 (JA 162).

Petitioners claim that the "Commission forfeited the option to modify the local television ownership rule – directly or indirectly – when it opted not to complete the 2010 quadrennial review." Stirk Br. at 24. But nothing bars the

- 59 -

Commission from finding that it has sufficient information to resolve an issue of

attribution even though the agency finds that it lacks sufficient evidence to resolve

whether it should revise an associated ownership rule. The FCC generally has

broad discretion to control its proceedings, and to defer consideration of particular

issues to future proceedings when it thinks that doing so would be conducive to

"the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j); *see*

*GTE Service Corp. v. FCC*, 782 F.2d 263, 273-74 (D.C. Cir. 1986) (citing *Nader v.*

*FCC*, 520 F.2d 182, 195 (D.C. Cir. 1975) and *Cellular Mobile Sys. of Penn., Inc. v.*

*FCC*, 782 F.2d 182, 197 (D.C. Cir. 1985)). The Commission did not abuse its dis-

cretion here.

### D.  *The Rule's Transition Period Is Reasonable.*

The industry petitioners (Stirk Br. at 38-40) and intervenor Mission Broad-

casting (Mission Br. at 15-17) maintain that the Commission acted arbitrarily and

capriciously by not grandfathering existing TV joint sales agreements and instead

adopting a two-year transition period for stations "to terminate or amend" their ex-

isting joint sales agreements "or otherwise come into compliance with the local tel-

evision ownership rule." *FNPRM & Order* ¶367 (JA 172).

As the petitioners and intervenor themselves point out (Stirk Br. at 9 n.3;

Mission Br. at 15 n.6), after the release of the *Report and Order*, Congress ex-

tended the transition period for existing television joint sales agreements by six

months – to 2½ years instead of two years – but did nothing otherwise to revise or

- 60 -

amend the Commission's rule. *See* STELA Reauthorization Act of 2014 § 104, Pub. L. No. 113-200, 128 Stat. 2059, 2064.[22]

The predecessor to Section 104 was "heavily debated in the House during its consideration," 160 Cong. Rec. H8081-01 (2014) (remarks of Rep. Green), and was "the subject of extensive negotiations here in the House." 160 Cong. Rec. H8081-01 (2014) (remarks of Rep. Waxman). Congress did not permanently grandfather existing joint sales agreements; rather, it chose instead to leave existing joint sales agreements covered by the rule but to extend the transition period for those joint sales agreements by six months. That congressional ratification of the decision not to permanently grandfather existing joint sales agreements forecloses the challenge that the industry petitioners and Mission make here.[23]

---

[22]The new provision, entitled in the legislation as "Delayed application of JSA attribution rule," provides that "[a] party to a joint sales agreement (as defined in Note 2(k) to section 73.3555 of title 47, Code of Federal Regulations) that is in effect on the effective date of the amendment to Note 2(k)(2) to such section made by the Further Notice of Proposed Rulemaking and Report and Order adopted by the Commission on March 31, 2014 (FCC 14–28), shall not be considered to be in violation of the ownership limitations of such section by reason of the application of the rule in such Note 2(k)(2) (as so amended) to such agreement before the date that is 6 months after the end of the period specified by the Commission in such Report and Order for such a party to come into compliance with such ownership limitations."

[23] Indeed, it might reasonably be argued that Congress's action was a ratification of the television joint sales agreement rule generally, particularly with respect to the claim that the rule violates Section 202(h), but also as to claims that the television joint sales agreement rule is arbitrary and capricious. Congress was plainly aware of the Commission's action adopting the rule, had given it a serious degree

- 61 -

In any event, the Commission fully considered and reasonably rejected claims that it should permanently grandfather existing joint sales agreements. As the Commission explained, permanently grandfathering existing joint sales agreements would result in "arbitrary and inconsistent changes to the level of permissible common ownership on a market-by-market basis based not necessarily on where the public interest lies, but rather on the current existence or nonexistence of television JSAs in that market when the new attribution rules become effective." *FNPRM & Order* ¶367 (JA 172).

Moreover, as the Commission pointed out, the transition period it had adopted for television joint sales agreements was identical to the transition period it had provided for when it adopted the radio joint sales agreement rule in 2002. *See FNPRM & Order* ¶367 (JA 172), citing *2002 Biennial Review Order*, 18 FCC Rcd at 13746 ¶325. Similarly, when the Commission adopted a rule restricting local marketing agreements for television stations, it declined to provide permanent grandfathering rights to all licensees with existing agreements. *See TV Local Ownership Order*, 14 FCC Rcd 12903, 12961-62 ¶¶133-136. The Third Circuit upheld

---

of attention shortly after the rule's adoption, and exercised congressional power to revise it, but chose to do so only to the extent of adding an additional six months to the rule's transition period. In such circumstances, "Congress' explicit recognition … is entitled to some weight in determining whether that regulation is at least a reasonable interpretation of the statute." *Women Involved in Farm Econ. v. U.S. Dept. of Agric.*, 876 F.2d 994, 1003 (D.C. Cir. 1989), citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986).

- 62 -

the radio joint sales agreement transition period rule in the face of claims that the rule was arbitrary and capricious. *See Prometheus I*, 337 F.3d at 429-30. And this Court affirmed the decision with respect to local marketing agreements, rejecting both APA and Fifth Amendment takings challenges. *See Sinclair*, 284 F.3d at 165-67. The Commission appropriately relied on this precedent when determining how to proceed with the television joint sales agreement rule.

Nor are there reliance interests that compel the Commission to grandfather television joint sales agreements. *See* Stirk Br. at 38. The Commission expressly proposed to adopt restrictions on television joint sales agreements in the *TV JSA NPRM* in 2004. *See TV JSA NPRM* ¶2 (JA 255). The Commission specifically noted in that NPRM that it had not grandfathered radio joint sales agreements when it adopted the rule attributing such agreements, and sought comment on whether the same transition rule should apply if it adopted restrictions on television joint sales agreements. *See id.* ¶20 (JA 260). Broadcasters thus have been on notice for more than a decade that the Commission was considering attribution of TV joint sales agreements and adoption of a two-year transition period. Under the circumstances, there is no serious basis for the industry petitioners' claim that they possess reliance interests that the Commission was required to protect by permanently grandfathering existing agreements involving television joint sales agreements.

- 63 -

This Court has recognized that "grandfather rights are always in tension with the legislative rule to which they are an exception." *National Ass'n of Cas. & Sur. Agency v. Board of Gov. of Fed. Reserve Sys.*, 856 F.2d 282, 289 (D.C. Cir. 1988). The Commission's decision to adopt a two-year transition period here was a reasonable accommodation of conflicting considerations surrounding implementation of the new television joint sales agreement rule. As such, it is entitled to deference. *Reservation Tel. Coop. v. FCC*, 826 F.2d 1129, 1135 (D.C. Cir. 1987), citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984).

## CONCLUSION

For the foregoing reasons, the Court should transfer the petitions for review, and Prometheus's alternative petition for mandamus, to the United States Court of Appeals for the Third Circuit. In the alternative, the Court should dismiss the petitions in part insofar as they seek review of non-final agency action, deny the petitions for review insofar as they seek review of the Report and Order on joint sales agreements, and deny Prometheus's request for mandamus.

<div style="margin-left:50%">

Respectfully submitted,

</div>

| | |
|---|---|
| William J. Baer | Jonathan B. Sallet |
| Assistant Attorney General | General Counsel |
| | |
| Kristen C. Limarzi | David M. Gossett |
| Robert J. Wiggers | Deputy General Counsel |
| Attorneys | |
| | Jacob M. Lewis |
| United States Department | Associate General Counsel |
| of Justice | |
| Washington, D. C. 20530 | */s/ C. Grey Pash, Jr.* |
| | |
| | C. Grey Pash, Jr. |
| | Counsel |
| | |
| | Federal Communications Commission |
| | Washington, D. C. 20554 |
| | (202) 418-1740 |
| | Fax (202) 418-2819 |

August 27, 2015

### CERTIFICATE OF COMPLIANCE

Pursuant to the requirements of Fed. R. App. P. 32(a)(7)(B) and this Court's order of February 20, 2015, I hereby certify that the accompanying "Brief for Respondents" was prepared using a proportionally spaced 14 point typeface and contains **14,961** words as measured by the word count function of Microsoft Office Word 2013.

*/s/ C. Grey Pash, Jr.*
_____
C. Grey Pash, Jr.

August 27, 2015

# Statutory Addendum

47 USCA 154(j) ................................................................ 2
47 USCA 160 .................................................................. 2
47 USCA 161 .................................................................. 3
47 USCA 402(a) ............................................................. 4
47 USCA 405(a) ............................................................. 4
28 USCA 2342(1) ........................................................... 5
Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h),
110 Stat. 56, as amended, Consolidated Appropriations Act of
2004, Pub. L. No. 108-199, § 629, 118 Stat. 3 .................................... 5
STELA Reauthorization Act of 2014
§ 104, Pub. L. No. 113-200, 128 Stat. 2064 .................................. 6
47 C.F.R. 73.658 ........................................................... 6
47 C.F.R. 73.3555 ......................................................... 6

## 47 U.S.C.A. § 154(j)

### § 154. Federal Communications Commission

* * *

(j) Conduct of proceedings; hearings


The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice. No commissioner shall participate in any hearing or proceeding in which he has a pecuniary interest. Any party may appear before the Commission and be heard in person or by attorney. Every vote and official act of the Commission shall be entered of record, and its proceedings shall be public upon the request of any party interested. The Commission is authorized to withhold publication of records or proceedings containing secret information affecting the national defense.


## 47 U.S.C.A. § 160

### § 160. Competition in provision of telecommunications service


(a) Regulatory flexibility

Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that--

**(1)** enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

**(2)** enforcement of such regulation or provision is not necessary for the protection of consumers; and

**(3)** forbearance from applying such provision or regulation is consistent with the public interest.

(b) Competitive effect to be weighed

In making the determination under subsection (a)(3) of this section, the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will

enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

(c) Petition for forbearance

Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) of this section within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a) of this section. The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

(d) Limitation

Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

(e) State enforcement after commission forbearance

A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a) of this section.

## 47 U.S.C.A. § 161

### § 161. Regulatory reform

(a) Biennial review of regulations

In every even-numbered year (beginning with 1998), the Commission--

**(1)** shall review all regulations issued under this chapter in effect at the time of the review that apply to the operations or activities of any provider of telecommunications service; and

**(2)** shall determine whether any such regulation is no longer necessary in the public interest as the result of meaningful economic competition between providers of such service.

(b) Effect of determination

The Commission shall repeal or modify any regulation it determines to be no longer necessary in the public interest.

## 47 U.S.C.A. § 402(a)

### § 402. Judicial review of Commission's orders and decisions

(a) Procedure

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

## 47 U.S.C.A. § 405(a)

### § 405. Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order

 (a) After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor,

denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: *Provided,* That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

## 28 U.S.C.A. § 2342(1)

### § 2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--

(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

## Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, as amended, Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3

(202)(h) FURTHER COMMISSION REVIEW.—The Commission shall review its rules adopted pursuant to this section and all of its ownership rules quadrennially as part of its regulatory reform review under section 11 of the Communications Act of 1934 and shall determine whether any of such rules are necessary in the public interest as the result of competition. The Commission shall repeal or modify any regulation it determines to be no longer in the public interest. This subsection does not apply to any rules relating to the 39 percent national audience reach limitation in subsection (c)(1)(B).

**STELA Reauthorization Act of 2014, § 104,
Pub. L. No. 113-200, 128 Stat. 2059, 2064 (2014)**

DELAYED APPLICATION OF JSA ATTRIBUTION RULE. A party to a joint sales agreement (as defined in Note 2(k) to section 73.3555 of title 47, Code of Federal Regulations) that is in effect on the effective date of the amendment to Note 2(k)(2) to such section made by the Further Notice of Proposed Rulemaking and Report and Order adopted by the Commission on March 31, 2014 (FCC 14–28), shall not be considered to be in violation of the ownership limitations of such section by reason of the application of the rule in such Note 2(k)(2) (as so amended) to such agreement before the date that is 6 months after the end of the period specified by the Commission in such Report and Order for such a party to come into compliance with such ownership limitations.

## 47 C.F.R. § 73.658

**Affiliation agreements and network program practices; territorial exclusivity in non-network program arrangements**

\* \* \*

(g) Dual network operation. A television broadcast station may affiliate with a person or entity that maintains two or more networks of television broadcast stations unless such dual or multiple networks are composed of two or more persons or entities that, on February 8, 1996, were "networks" as defined in § 73.3613(a)(1) of the Commission's regulations (that is, ABC, CBS, Fox, and NBC).

\* \* \*

(Authority: Sec. 5, 48 Stat. 1068 (47 U.S.C. 155))

## 47 C.F.R. § 73.3555

**Multiple ownership**

(a)(1) **Local radio ownership rule.** A person or single entity (or entities under common control) may have a cognizable interest in licenses for AM or FM radio broadcast stations in accordance with the following limits:

(i) In a radio market with 45 or more full-power, commercial and noncommercial

radio stations, not more than 8 commercial radio stations in total and not more than 5 commercial stations in the same service (AM or FM);

(ii) In a radio market with between 30 and 44 (inclusive) full-power, commercial and noncommercial radio stations, not more than 7 commercial radio stations in total and not more than 4 commercial stations in the same service (AM or FM);

(iii) In a radio market with between 15 and 29 (inclusive) full-power, commercial and noncommercial radio stations, not more than 6 commercial radio stations in total and not more than 4 commercial stations in the same service (AM or FM); and

(iv) In a radio market with 14 or fewer full-power, commercial and noncommercial radio stations, not more than 5 commercial radio stations in total and not more than 3 commercial stations in the same service (AM or FM); provided, however, that no person or single entity (or entities under common control) may have a cognizable interest in more than 50% of the full-power, commercial and noncommercial radio stations in such market unless the combination of stations comprises not more than one AM and one FM station.

(2) Overlap between two stations in different services is permissible if neither of those two stations overlaps a third station in the same service.

(b) **Local television multiple ownership rule.** An entity may directly or indirectly own, operate, or control two television stations licensed in the same Designated Market Area (DMA) (as determined by Nielsen Media Research or any successor entity) only under one or more of the following conditions:

(1) The Grade B contours of the stations (as determined by § 73.684) do not overlap; or

(i) At the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service; and

(ii) At least 8 independently owned and operating, full-power commercial and noncommercial TV stations would remain post-merger in the DMA in which the communities of license of the TV stations in question are located. Count only those stations the Grade B signal contours of which overlap with the Grade B signal contour of at least one of the stations in the proposed combination. In areas where there is no Nielsen DMA, count the TV stations present in an area that would be the functional equivalent of a TV market. Count only those TV stations the Grade B signal contours of which overlap with the Grade B signal contour of at least one of the stations in the proposed combination.

(2) [Reserved]

(c) **Radio-television cross-ownership rule.**

(1) This rule is triggered when:

(i) The predicted or measured 1 mV/m contour of an existing or proposed FM station (computed in accordance with § 73.313) encompasses the entire community of license of an existing or proposed commonly owned TV broadcast station(s), or the Grade A contour(s) of the TV broadcast station(s) (computed in accordance with § 73.684) encompasses the entire community of license of the FM station; or

(ii) The predicted or measured 2 mV/m groundwave contour of an existing or proposed AM station (computed in accordance with § 73.183 or § 73.386), encompasses the entire community of license of an existing or proposed commonly owned TV broadcast station(s), or the Grade A contour(s) of the TV broadcast station(s) (computed in accordance with § 73.684) encompass(es) the entire community of license of the AM station.

(2) An entity may directly or indirectly own, operate, or control up to two commercial TV stations (if permitted by paragraph (b) of this section, the local television multiple ownership rule) and 1 commercial radio station situated as described in paragraph (c)(1) of this section. An entity may not exceed these numbers, except as follows:

(i) If at least 20 independently owned media voices would remain in the market post-merger, an entity can directly or indirectly own, operate, or control up to:

(A) Two commercial TV and six commercial radio stations (to the extent permitted by paragraph (a) of this section, the local radio multiple ownership rule); or

(B) One commercial TV and seven commercial radio stations (to the extent that an entity would be permitted to own two commercial TV and six commercial radio stations under paragraph (c)(2)(i)(A) of this section, and to the extent permitted by paragraph (a) of this section, the local radio multiple ownership rule).

(ii) If at least 10 independently owned media voices would remain in the market post-merger, an entity can directly or indirectly own, operate, or control up to two commercial TV and four commercial radio stations (to the extent permitted by paragraph (a) of this section, the local radio multiple ownership rule).

(3) To determine how many media voices would remain in the market, count the following:

(i) TV stations: independently owned and operating full-power broadcast TV stations within the DMA of the TV station's (or stations') community (or communities) of license that have Grade B signal contours that overlap with the

Grade B signal contour(s) of the TV station(s) at issue;

(ii) Radio stations:

> (A)(1) Independently owned operating primary broadcast radio stations that are in the radio metro market (as defined by Arbitron or another nationally recognized audience rating service) of:
>
>> (i) The TV station's (or stations') community (or communities) of license; or
>>
>> (ii) The radio station's (or stations') community (or communities) of license; and
>>
>> (2) Independently owned out-of-market broadcast radio stations with a minimum share as reported by Arbitron or another nationally recognized audience rating service.
>
> (B) When a proposed combination involves stations in different radio markets, the voice requirement must be met in each market; the radio stations of different radio metro markets may not be counted together.
>
> (C) In areas where there is no radio metro market, count the radio stations present in an area that would be the functional equivalent of a radio market.

(iii) Newspapers: Newspapers that are published at least four days a week within the TV station's DMA in the dominant language of the market and that have a circulation exceeding 5% of the households in the DMA; and

(iv) One cable system: if cable television is generally available to households in the DMA. Cable television counts as only one voice in the DMA, regardless of how many individual cable systems operate in the DMA.

(d) **Daily newspaper cross-ownership rule.**

(1) No license for an AM, FM or TV broadcast station shall be granted to any party (including all parties under common control) if such party directly or indirectly owns, operates or controls a daily newspaper and the grant of such license will result in:

(i) The predicted or measured 2 mV/m contour of an AM station, computed in accordance with § 73.183 or § 73.186, encompassing the entire community in which such newspaper is published; or

(ii) The predicted 1 mV/m contour for an FM station, computed in accordance with § 73.313, encompassing the entire community in which such newspaper is

published; or

(iii) The Grade A contour of a TV station, computed in accordance with § 73.684, encompassing the entire community in which such newspaper is published.

(2) Paragraph (d)(1) of this section shall not apply in cases where the Commission makes a finding pursuant to Section 310(d) of the Communications Act that the public interest, convenience, and necessity would be served by permitting an entity that owns, operates or controls a daily newspaper to own, operate or control an AM, FM, or TV broadcast station whose relevant contour encompasses the entire community in which such newspaper is published as set forth in paragraph (d)(1) of this section.

(3) In making a finding under paragraph (d)(2) of this section, there shall be a presumption that it is not inconsistent with the public interest, convenience, and necessity for an entity to own, operate or control a daily newspaper in a top 20 Nielsen DMA and one commercial AM, FM or TV broadcast station whose relevant contour encompasses the entire community in which such newspaper is published as set forth in paragraph (d)(1) of this section, provided that, with respect to a combination including a commercial TV station,

(i) The station is not ranked among the top four TV stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service; and

(ii) At least 8 independently owned and operating major media voices would remain in the DMA in which the community of license of the TV station in question is located (for purposes of this provision major media voices include full-power TV broadcast stations and major newspapers).

(4) In making a finding under paragraph (d)(2) of this section, there shall be a presumption that it is inconsistent with the public interest, convenience, and necessity for an entity to own, operate or control a daily newspaper and an AM, FM or TV broadcast station whose relevant contour encompasses the entire community in which such newspaper is published as set forth in paragraph (d)(1) of this section in a DMA other than the top 20 Nielsen DMAs or in any circumstance not covered under paragraph (d)(3) of this section.

(5) In making a finding under paragraph (d)(2) of this section, the Commission shall consider:

(i) Whether the combined entity will significantly increase the amount of local news in the market;

(ii) Whether the newspaper and the broadcast outlets each will continue to employ its own staff and each will exercise its own independent news judgment;

(iii) The level of concentration in the Nielsen Designated Market Area (DMA); and

(iv) The financial condition of the newspaper or broadcast station, and if the newspaper or broadcast station is in financial distress, the proposed owner's commitment to invest significantly in newsroom operations.

(6) In order to overcome the negative presumption set forth in paragraph (d)(4) of this section with respect to the combination of a major newspaper and a television station, the applicant must show by clear and convincing evidence that the co-owned major newspaper and station will increase the diversity of independent news outlets and increase competition among independent news sources in the market, and the factors set forth above in paragraph (d)(5) of this section will inform this decision.

(7) The negative presumption set forth in paragraph (d)(4) of this section shall be reversed under the following two circumstances:

(i) The newspaper or broadcast station is failed or failing; or

(ii) The combination is with a broadcast station that was not offering local newscasts prior to the combination, and the station will initiate at least seven hours per week of local news programming after the combination.

(e) **National television multiple ownership rule.**

(1) No license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members, officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent.

(2) For purposes of this paragraph (e):

(i) National audience reach means the total number of television households in the Nielsen Designated Market Areas (DMAs) in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license. For purposes of making this calculation, UHF television stations shall be attributed with 50 percent of the television households in their DMA market.

(ii) No market shall be counted more than once in making this calculation.

(3) Divestiture. A person or entity that exceeds the thirty-nine (39) percent national audience reach limitation for television stations in paragraph (e)(1) of this section through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance with such limitation. This divestiture

requirement shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth.

(f) The ownership limits of this section are not applicable to noncommercial educational FM and noncommercial educational TV stations. However, the attribution standards set forth in the Notes to this section will be used to determine attribution for noncommercial educational FM and TV applicants, such as in evaluating mutually exclusive applications pursuant to subpart K of part 73.

**Note 1 to § 73.3555:** The words "cognizable interest" as used herein include any interest, direct or indirect, that allows a person or entity to own, operate or control, or that otherwise provides an attributable interest in, a broadcast station.

**Note 2 to § 73.3555:** In applying the provisions of this section, ownership and other interests in broadcast licensees, cable television systems and daily newspapers will be attributed to their holders and deemed cognizable pursuant to the following criteria:

a. Except as otherwise provided herein, partnership and direct ownership interests and any voting stock interest amounting to 5% or more of the outstanding voting stock of a corporate broadcast licensee, cable television system or daily newspaper will be cognizable;

b. Investment companies, as defined in 15 U.S.C. 80a–3, insurance companies and banks holding stock through their trust departments in trust accounts will be considered to have a cognizable interest only if they hold 20% or more of the outstanding voting stock of a corporate broadcast licensee, cable television system or daily newspaper, or if any of the officers or directors of the broadcast licensee, cable television system or daily newspaper are representatives of the investment company, insurance company or bank concerned. Holdings by a bank or insurance company will be aggregated if the bank or insurance company has any right to determine how the stock will be voted. Holdings by investment companies will be aggregated if under common management.

c. Attribution of ownership interests in a broadcast licensee, cable television system or daily newspaper that are held indirectly by any party through one or more intervening corporations will be determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain and application of the relevant attribution benchmark to the resulting product, except that wherever the ownership percentage for any link in the chain exceeds 50%, it shall not be included for purposes of this multiplication. For purposes of paragraph i. of this note, attribution of ownership interests in a broadcast licensee, cable television system or daily newspaper that are held indirectly by any party through one or more intervening organizations will be determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain and application of the relevant attribution benchmark to the resulting product, and the ownership percentage for any link in the chain that exceeds 50% shall be included for purposes of this multiplication. [For example, except for purposes of

paragraph (i) of this note, if A owns 10% of company X, which owns 60% of company Y, which owns 25% of "Licensee," then X's interest in "Licensee" would be 25% (the same as Y's interest because X's interest in Y exceeds 50%), and A's interest in "Licensee" would be 2.5% (0.1 x 0.25). Under the 5% attribution benchmark, X's interest in "Licensee" would be cognizable, while A's interest would not be cognizable. For purposes of paragraph i. of this note, X's interest in "Licensee" would be 15% (0.6 x 0.25) and A's interest in "Licensee" would be 1.5% (0.1 x 0.6 x 0.25). Neither interest would be attributed under paragraph i. of this note.]

d. Voting stock interests held in trust shall be attributed to any person who holds or shares the power to vote such stock, to any person who has the sole power to sell such stock, and to any person who has the right to revoke the trust at will or to replace the trustee at will. If the trustee has a familial, personal or extra-trust business relationship to the grantor or the beneficiary, the grantor or beneficiary, as appropriate, will be attributed with the stock interests held in trust. An otherwise qualified trust will be ineffective to insulate the grantor or beneficiary from attribution with the trust's assets unless all voting stock interests held by the grantor or beneficiary in the relevant broadcast licensee, cable television system or daily newspaper are subject to said trust.

e. Subject to paragraph i. of this note, holders of non-voting stock shall not be attributed an interest in the issuing entity. Subject to paragraph i. of this note, holders of debt and instruments such as warrants, convertible debentures, options or other non-voting interests with rights of conversion to voting interests shall not be attributed unless and until conversion is effected.

f. 1. A limited partnership interest shall be attributed to a limited partner unless that partner is not materially involved, directly or indirectly, in the management or operation of the media-related activities of the partnership and the licensee or system so certifies. An interest in a Limited Liability Company ("LLC") or Registered Limited Liability Partnership ("RLLP") shall be attributed to the interest holder unless that interest holder is not materially involved, directly or indirectly, in the management or operation of the media-related activities of the partnership and the licensee or system so certifies.

2. For a licensee or system that is a limited partnership to make the certification set forth in paragraph f. 1. of this note, it must verify that the partnership agreement or certificate of limited partnership, with respect to the particular limited partner exempt from attribution, establishes that the exempt limited partner has no material involvement, directly or indirectly, in the management or operation of the media activities of the partnership. For a licensee or system that is an LLC or RLLP to make the certification set forth in paragraph f. 1. of this note, it must verify that the organizational document, with respect to the particular interest holder exempt from attribution, establishes that the exempt interest holder has no material involvement, directly or indirectly, in the management or operation of the media activities of the LLC or RLLP. The criteria which would assume adequate insulation for purposes of this certification are described in the Memorandum Opinion and Order in MM Docket No. 83–46, FCC 85–252 (released June

24, 1985), as modified on reconsideration in the Memorandum Opinion and Order in MM Docket No. 83–46, FCC 86–410 (released November 28, 1986). Irrespective of the terms of the certificate of limited partnership or partnership agreement, or other organizational document in the case of an LLC or RLLP, however, no such certification shall be made if the individual or entity making the certification has actual knowledge of any material involvement of the limited partners, or other interest holders in the case of an LLC or RLLP, in the management or operation of the media-related businesses of the partnership or LLC or RLLP.

3. In the case of an LLC or RLLP, the licensee or system seeking insulation shall certify, in addition, that the relevant state statute authorizing LLCs permits an LLC member to insulate itself as required by our criteria.

g. Officers and directors of a broadcast licensee, cable television system or daily newspaper are considered to have a cognizable interest in the entity with which they are so associated. If any such entity engages in businesses in addition to its primary business of broadcasting, cable television service or newspaper publication, it may request the Commission to waive attribution for any officer or director whose duties and responsibilities are wholly unrelated to its primary business. The officers and directors of a parent company of a broadcast licensee, cable television system or daily newspaper, with an attributable interest in any such subsidiary entity, shall be deemed to have a cognizable interest in the subsidiary unless the duties and responsibilities of the officer or director involved are wholly unrelated to the broadcast licensee, cable television system or daily newspaper subsidiary, and a statement properly documenting this fact is submitted to the Commission. [This statement may be included on the appropriate Ownership Report.] The officers and directors of a sister corporation of a broadcast licensee, cable television system or daily newspaper shall not be attributed with ownership of these entities by virtue of such status.

h. Discrete ownership interests will be aggregated in determining whether or not an interest is cognizable under this section. An individual or entity will be deemed to have a cognizable investment if:

1. The sum of the interests held by or through "passive investors" is equal to or exceeds 20 percent; or

2. The sum of the interests other than those held by or through "passive investors" is equal to or exceeds 5 percent; or

3. The sum of the interests computed under paragraph h. 1. of this note plus the sum of the interests computed under paragraph h. 2. of this note is equal to or exceeds 20 percent.

i.1. Notwithstanding paragraphs e. and f. of this Note, the holder of an equity or debt interest or interests in a broadcast licensee, cable television system, daily newspaper, or

other media outlet subject to the broadcast multiple ownership or cross-ownership rules ("interest holder") shall have that interest attributed if:

A. The equity (including all stockholdings, whether voting or nonvoting, common or preferred) and debt interest or interests, in the aggregate, exceed 33 percent of the total asset value, defined as the aggregate of all equity plus all debt, of that media outlet; and

B.(i) The interest holder also holds an interest in a broadcast licensee, cable television system, newspaper, or other media outlet operating in the same market that is subject to the broadcast multiple ownership or cross-ownership rules and is attributable under paragraphs of this note other than this paragraph i.; or

(ii) The interest holder supplies over fifteen percent of the total weekly broadcast programming hours of the station in which the interest is held. For purposes of applying this paragraph, the term, "market," will be defined as it is defined under the specific multiple ownership rule or cross-ownership rule that is being applied, except that for television stations, the term "market," will be defined by reference to the definition contained in the local television multiple ownership rule contained in paragraph (b) of this section.

2. Notwithstanding paragraph i.1. of this Note, the interest holder may exceed the 33 percent threshold therein without triggering attribution where holding such interest would enable an eligible entity to acquire a broadcast station, provided that:

i. The combined equity and debt of the interest holder in the eligible entity is less than 50 percent, or

ii. The total debt of the interest holder in the eligible entity does not exceed 80 percent of the asset value of the station being acquired by the eligible entity and the interest holder does not hold any equity interest, option, or promise to acquire an equity interest in the eligible entity or any related entity. For purposes of this paragraph i.2, an "eligible entity" shall include any entity that qualifies as a small business under the Small Business Administration's size standards for its industry grouping, as set forth in 13 CFR 121.201, at the time the transaction is approved by the FCC, and holds:

A. 30 percent or more of the stock or partnership interests and more than 50 percent of the voting power of the corporation or partnership that will own the media outlet; or

B. 15 percent or more of the stock or partnership interests and more than 50 percent of the voting power of the corporation or partnership that will own the media outlet, provided that no other person or entity owns or controls more than 25 percent of the outstanding stock or partnership interests; or

C. More than 50 percent of the voting power of the corporation that will own the media outlet if such corporation is a publicly traded company.

j. "Time brokerage" (also known as "local marketing") is the sale by a licensee of discrete blocks of time to a "broker" that supplies the programming to fill that time and sells the commercial spot announcements in it.

1. Where two radio stations are both located in the same market, as defined for purposes of the local radio ownership rule contained in paragraph (a) of this section, and a party (including all parties under common control) with a cognizable interest in one such station brokers more than 15 percent of the broadcast time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraphs (a), (c), and (d) of this section. This limitation shall apply regardless of the source of the brokered programming supplied by the party to the brokered station.

2. Where two television stations are both located in the same market, as defined in the local television ownership rule contained in paragraph (b) of this section, and a party (including all parties under common control) with a cognizable interest in one such station brokers more than 15 percent of the broadcast time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraphs (b), (c), (d) and (e) of this section. This limitation shall apply regardless of the source of the brokered programming supplied by the party to the brokered station.

3. Every time brokerage agreement of the type described in this Note shall be undertaken only pursuant to a signed written agreement that shall contain a certification by the licensee or permittee of the brokered station verifying that it maintains ultimate control over the station's facilities including, specifically, control over station finances, personnel and programming, and by the brokering station that the agreement complies with the provisions of paragraphs (b), (c), and (d) of this section if the brokering station is a television station or with paragraphs (a), (c), and (d) of this section if the brokering station is a radio station.

k. "Joint Sales Agreement" is an agreement with a licensee of a "brokered station" that authorizes a "broker" to sell advertising time for the "brokered station."

1. Where two radio stations are both located in the same market, as defined for purposes of the local radio ownership rule contained in paragraph (a) of this section, and a party (including all parties under common control) with a cognizable interest in one such station sells more than 15 percent of the advertising time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraphs (a), (c), and (d) of this section.

2. Where two television stations are both located in the same market, as defined for purposes of the local television ownership rule contained in paragraph (b) of this section, and a party (including all parties under common control) with a cognizable interest in one

such station sells more than 15 percent of the advertising time per week of the other such station, that party shall be treated as if it has an interest in the brokered station subject to the limitations set forth in paragraphs (b), (c), (d), and (e) of this section.

3. Every joint sales agreement of the type described in this Note shall be undertaken only pursuant to a signed written agreement that shall contain a certification by the licensee or permittee of the brokered station verifying that it maintains ultimate control over the station's facilities, including, specifically, control over station finances, personnel and programming, and by the brokering station that the agreement complies with the limitations set forth in paragraphs (b), (c), and (d) of this section if the brokering station is a television station or with paragraphs (a), (c), and (d) of this section if the brokering station is a radio station.

**Note 3 to § 73.3555:** In cases where record and beneficial ownership of voting stock is not identical (e.g., bank nominees holding stock as record owners for the benefit of mutual funds, brokerage houses holding stock in street names for the benefit of customers, investment advisors holding stock in their own names for the benefit of clients, and insurance companies holding stock), the party having the right to determine how the stock will be voted will be considered to own it for purposes of these rules.

**Note 4 to § 73.3555:** Paragraphs (a) through (d) of this section will not be applied so as to require divestiture, by any licensee, of existing facilities, and will not apply to applications for assignment of license or transfer of control filed in accordance with § 73.3540(f) or § 73.3541(b), or to applications for assignment of license or transfer of control to heirs or legatees by will or intestacy, if no new or increased concentration of ownership would be created among commonly owned, operated or controlled media properties. Paragraphs (a) through (d) of this section will apply to all applications for new stations, to all other applications for assignment or transfer, to all applications for major changes to existing stations, and to applications for minor changes to existing stations that implement an approved change in an FM radio station's community of license or create new or increased concentration of ownership among commonly owned, operated or controlled media properties. Commonly owned, operated or controlled media properties that do not comply with paragraphs (a) through (d) of this section may not be assigned or transferred to a single person, group or entity, except as provided in this Note or in the Report and Order in Docket No. 02–277, released July 2, 2003 (FCC 02–127).

**Note 5 to § 73.3555:** Paragraphs (b) through (e) of this section will not be applied to cases involving television stations that are "satellite" operations. Such cases will be considered in accordance with the analysis set forth in the Report and Order in MM Docket No. 87–8, FCC 91–182 (released July 8, 1991), in order to determine whether common ownership, operation, or control of the stations in question would be in the public interest. An authorized and operating "satellite" television station, the Grade B contour of which overlaps that of a commonly owned, operated, or controlled "non-satellite" parent television broadcast station, or the Grade A contour of which completely encompasses the community of publication of a commonly owned, operated, or

controlled daily newspaper, or the community of license of a commonly owned, operated, or controlled AM or FM broadcast station, or the community of license of which is completely encompassed by the 2 mV/m contour of such AM broadcast station or the 1 mV/m contour of such FM broadcast station, may subsequently become a "non-satellite" station under the circumstances described in the aforementioned Report and Order in MM Docket No. 87–8. However, such commonly owned, operated, or controlled "non-satellite" television stations and AM or FM stations with the aforementioned community encompassment, may not be transferred or assigned to a single person, group, or entity except as provided in Note 4 of this section. Nor shall any application for assignment or transfer concerning such "non-satellite" stations be granted if the assignment or transfer would be to the same person, group or entity to which the commonly owned, operated, or controlled newspaper is proposed to be transferred, except as provided in Note 4 of this section.

**Note 6 to § 73.3555:** For purposes of this section a daily newspaper is one which is published four or more days per week, which is in the dominant language in the market, and which is circulated generally in the community of publication. A college newspaper is not considered as being circulated generally.

**Note 7 to § 73.3555:** The Commission will entertain applications to waive the restrictions in paragraph (b) and (c) of this section (the local television ownership rule and the radio/television cross-ownership rule) on a case-by-case basis. In each case, we will require a showing that the in-market buyer is the only entity ready, willing, and able to operate the station, that sale to an out-of-market applicant would result in an artificially depressed price, and that the waiver applicant does not already directly or indirectly own, operate, or control interest in two television stations within the relevant DMA. One way to satisfy these criteria would be to provide an affidavit from an independent broker affirming that active and serious efforts have been made to sell the permit, and that no reasonable offer from an entity outside the market has been received.

We will entertain waiver requests as follows:

1. If one of the broadcast stations involved is a "failed" station that has not been in operation due to financial distress for at least four consecutive months immediately prior to the application, or is a debtor in an involuntary bankruptcy or insolvency proceeding at the time of the application.

2. For paragraph (b) of this section only, if one of the television stations involved is a "failing" station that has an all-day audience share of no more than four per cent; the station has had negative cash flow for three consecutive years immediately prior to the application; and consolidation of the two stations would result in tangible and verifiable public interest benefits that outweigh any harm to competition and diversity.

3. For paragraph (b) of this section only, if the combination will result in the construction of an unbuilt station. The permittee of the unbuilt station must demonstrate that it has

made reasonable efforts to construct but has been unable to do so.

**Note 8 to § 73.3555:** Paragraph (a)(1) of this section will not apply to an application for an AM station license in the 535–1605 kHz band where grant of such application will result in the overlap of 5 mV/m groundwave contours of the proposed station and that of another AM station in the 535–1605 kHz band that is commonly owned, operated or controlled if the applicant shows that a significant reduction in interference to adjacent or co-channel stations would accompany such common ownership. Such AM overlap cases will be considered on a case-by-case basis to determine whether common ownership, operation or control of the stations in question would be in the public interest. Applicants in such cases must submit a contingent application of the major or minor facilities change needed to achieve the interference reduction along with the application which seeks to create the 5 mV/m overlap situation.

**Note 9 to § 73.3555:** Paragraph (a)(1) of this section will not apply to an application for an AM station license in the 1605–1705 kHz band where grant of such application will result in the overlap of the 5 mV/m groundwave contours of the proposed station and that of another AM station in the 535–1605 kHz band that is commonly owned, operated or controlled. Paragraphs (d)(1)(i) and (d)(1)(ii) of this section will not apply to an application for an AM station license in the 1605–1705 kHz band by an entity that owns, operates, controls or has a cognizable interest in AM radio stations in the 535–1605 kHz band.

**Note 10 to § 73.3555:** Authority for joint ownership granted pursuant to Note 9 will expire at 3 a.m. local time on the fifth anniversary for the date of issuance of a construction permit for an AM radio station in the 1605–1705 kHz band.

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| **Howard Stirk Holdings, LLC,** | ) |
| **Petitioner,** | ) |
| **v.** | ) **No. 14-1090 (and** |
| | ) **consolidated cases)** |
| **Federal Communications Commission** | ) |
| **and the United States of America,** | ) |
| **Respondents.** | ) |

**<u>CERTIFICATE OF SERVICE</u>**

I, C. Grey Pash, Jr., hereby certify that on August 27, 2015, I electronically filed the foregoing Final Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Helgi C. Walker
Ashley S. Boizelle
Lindsay S. See
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave., N.W.
Washington, DC 20036
*Counsel for:  NAB*

Jane E. Mago
Jerianne Timmerman
National Association of Broadcasters
1771 N Street, N.W.
Washington, DC 20036
*Counsel for:  NAB*

Robert J. Wiggers
Kristen C. Limarzi
U.S. Department of Justice
Antitrust Division, Room 3224
950 Pennsylvania Avenue, N.W.
Washington, DC  20530-0001
*Counsel for:  USA*

Angela J. Campbell
Andrew Jay Schwartzman
Eric G. Null
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
*Counsel for:  Free Press, et al.*

Colby M. May
Colby M. May, Esq. PC
P.O. Box 15473
Washington, DC 20003
*Counsel for:  Howard Stirk*
*Holdings, LLC*

David E. Honig
Kim M. Keenan
Minority Media & Telecom Council
3636 16th Street, NW
Suite B-366
Washington, DC 20010
*Counsel for:  Multicultural Media,*
 *Telecom and Internet Council*

Patrick F. Philbin
Kirkland & Ellis LLP
655 15th Street, NW
Suite 1200
Washington, DC 20005
*Counsel for:  Nexstar Broadcasting*
*Incorporated*

Eve K. Reed
Brett A. Shumate
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
*Counsel for:  Mission Broadcasting*
*Incorporated*

David E. Mills
Cooley LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
*Counsel for: Cox Media Group, Inc.*

William J. Kolasky, Jr., Esq.
Hughes Hubbard & Reed LLP
1775 I Street, NW
Suite 600
Washington, DC 20006
*Counsel for: International Center for*
*Law and Economics*

/s/ *C. Grey Pash, Jr.*