ORAL ARGUMENT NOT YET SCHEDULED

No. 14-1090
Consolidated with Nos. 14-1091, 14-1092, 14-1113

———————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

HOWARD STIRK HOLDINGS, LLC,

*Petitioner*,

*v.*

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents*.

———————————————

On Petitions For Review Of An Order
Of The Federal Communications Commission

———————————————

**FINAL OPENING BRIEF FOR PETITIONERS HOWARD
STIRK HOLDINGS, LLC, NATIONAL ASSOCIATION OF
BROADCASTERS, AND NEXSTAR BROADCASTING, INC.**

———————————————

Rick Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION
OF BROADCASTERS
1771 N Street, N.W.
Washington, D.C. 20036
Telephone: (202) 429-5430

Helgi C. Walker
   *Counsel of Record*
Ashley S. Boizelle
Lindsay S. See
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
*Counsel for National Association
of Broadcasters*

[*additional counsel listed on inside cover*]

Patrick F. Philbin
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Suite 1200
Washington, D.C. 20005
*Counsel for Nexstar*
*Broadcasting, Inc*.

Colby M. May
COLBY M. MAY, ESQ. P.C.
P.O. Box 15473
Washington, D.C. 20003
*Counsel for Howard Stirk*
*Holdings, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I.     Parties and Amici Curiae

Petitioners in these consolidated proceedings are Howard Stirk Holdings, LLC ("HSH"), the National Association of Broadcasters ("NAB"), and Nexstar Broadcasting, Inc. ("Nexstar") (jointly, "Broadcast Petitioners"), and Prometheus Radio Project ("Prometheus"). All petitioners but HSH have been granted status as intervenors for respondents.

Respondents are the Federal Communications Commission (the "Commission") and the United States of America.

Minority Media and Telecommunications Council is an intervenor for petitioner Prometheus, and Mission Broadcasting Inc. is an intervenor for the Broadcast Petitioners. Benton Foundation, Common Cause, Media Alliance, Media Council Hawai'i, the National Association of Broadcast Employees and Technicians-Communications Workers of America, the National Organization for Women Foundation, and the Office of Communication of the United Church of Christ, Inc. are intervenors for respondents.

Cox Media Group and the International Center for Law and Economics are *amici curiae* in support of the Broadcast Petitioners.

i

## II.    Ruling Under Review

The ruling under review is an order of the Commission captioned *2014 Quadrennial Regulatory Review—Review of the Commission's Broadcast Owner-ship Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommuni-cations Act of 1996; 2010 Quadrennial Regulatory Review—Review of the Com-mission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Sec-tion 202 of the Telecommunications Act of 1996; Promoting Diversification of Ownership in the Broadcasting Services; Rules and Policies Concerning Attribu-tion of Joint Sales Agreements in Local Television Markets*, Further Notice of Pro-posed Rulemaking and Report and Order, FCC No. 14-28, 2014 WL 1466887 (rel. Apr. 15, 2014) ("2014 Order"), JA1.  The order consists of a Further Notice of Proposed Rulemaking and a Report and Order adopting new rules addressing ar-rangements between broadcasters known as Joint Sales Agreements or JSAs.  Sep-arate synopses of both parts of the order were published in the Federal Register on May 20, 2014, at 79 Fed. Reg. 28996 and 79 Fed. Reg. 29010.  JA392; JA403. The 2014 Order appears in full at JA1.

## III.    Related Cases

This case was not previously before this Court or any other court.  This pro-ceeding consists of four petitions for review challenging the same agency order, which were consolidated with lead case No. 14-1090:

1.      *Howard Stirk Holdings, LLC v. FCC, et al.*, No. 14-1090

2.      *Nexstar Broadcasting, Inc. v. FCC, et al.*, No. 14-1091

3.      *National Association of Broadcasters v. FCC, et al.*, No. 14-1092

4.      *Prometheus Radio Project v. FCC, et al.*, No. 14-1113

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, the Broadcast Petitioners state as follows:

Howard Stirk Holdings, LLC is in the business of owning and operating television stations. It has no parent company, and no public company owns more than ten percent of its stock.

The National Association of Broadcasters is a nonprofit, incorporated association of radio and television stations. It has no parent company and has not issued any shares or debt securities to the public; thus no publicly held company owns ten percent or more of its stock. As a continuing association of numerous entities operated for the purpose of promoting the interests of its membership, the coalition is a trade association for purposes of D.C. Circuit Rule 26.1.

Nexstar Broadcasting, Inc. is a wholly owned subsidiary of Nexstar Finance Holdings, Inc. Nexstar Finance Holdings, Inc. is a wholly owned subsidiary of Nexstar Broadcasting Group, Inc., which is a publicly held corporation. No other publicly held company has more than ten percent or greater ownership interest in Nexstar Broadcasting Group, Inc.

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

STATEMENT OF JURISDICTION.........................................................................3

STATEMENT OF ISSUES ......................................................................................4

STATUTES AND REGULATIONS.........................................................................4

STATEMENT OF THE CASE .................................................................................5

    A.    The Commission's Failure To Complete The 2010 Quadrennial Review.....................................................................................................5

    B.    The JSA Rule..............................................................................................7

    C.    Prometheus' Motions ................................................................................9

STANDING .............................................................................................................10

STANDARD OF REVIEW .....................................................................................10

ARGUMENT ...........................................................................................................12

I.    This Court Should Retain Jurisdiction Over These Consolidated Cases ......12

II.    The Commission Violated Its Clear Statutory Mandate Regularly To Determine That The Broadcast Ownership Rules Are Still Necessary.........14

    A.    The Commission Violated Section 202(h)........................................15

    B.    The Broadcast Ownership Rules Disserve The Public Interest ..........19

    C.    The Broadcast Ownership Rules Cannot Stand .................................22

III.    The JSA Rule Exceeds The Commission's Statutory Authority And Is Arbitrary And Capricious ............................................................................23

    A.    The JSA Rule Is Inconsistent With Section 202(h) And The Commission's General Rulemaking Authority...................................24

# TABLE OF CONTENTS
*(continued)*

**Page**

    B.    The JSA Rule Is Arbitrary And Capricious On Multiple
        Grounds .................................................................................26

CONCLUSION .......................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

\* Authorities upon which we chiefly rely are marked with an asterisk.

## Cases

*ACLU v. FCC,*
  823 F.2d 1554 (D.C. Cir. 1987) .................................................. 11, 30

*ALLTEL Corp. v. FCC,*
  838 F.2d 551 (D.C. Cir. 1988) .......................................................40

*Am. Pub. Gas Ass'n v. FPC,*
  555 F.2d 852 (D.C. Cir. 1976) .......................................................13

*Am. Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008) .......................................................32

*AT&T v. FCC,*
  978 F.2d 727 (D.C. Cir. 1992) .......................................................23

*Butte Cnty. v. Hogen*
  613 F.3d 190 (D.C. Cir. 2010) .......................................................34

*Cablevision Sys. Corp. v. FCC,*
  597 F.3d 1306 (D.C. Cir. 2010) ......................................................37

*Cellco P'ship v. FCC,*
  357 F.3d 88 (D.C. Cir. 2004) ..................................................... 16, 17

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) .................................................................11

*Comcast Corp. v. FCC,*
  579 F.3d 1 (D.C. Cir. 2009) .........................................................37

*In re Core Commc'ns, Inc.,*
  531 F.3d 849 (D.C. Cir. 2008) .......................................................22

*Elec. Power Supply Ass'n v. FERC,*
  753 F.3d 216 (D.C. Cir. 2014) .......................................................37

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...................................................................35

*\*Fox Television Stations, Inc. v. FCC*,
  280 F.3d 1027 (D.C. Cir. 2002) ...........................5, 13, 17, 19, 22, 35

*Fox Television Stations, Inc. v. FCC*,
  293 F.3d 538 (D.C. Cir. 2002) .....................................................5, 22

*Geller v. FCC*,
  610 F.2d 973 (D.C. Cir. 1979) .....................................................24

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998) .....................................................................15

*Liquor Salesmen's Union v. NLRB*,
  664 F.2d 1200 (D.C. Cir. 1981) ...................................................12

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
  375 F.3d 1182 (D.C. Cir. 2004) ...................................................31

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm
  Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .....................................................................11

*NCCB v. FCC*,
  555 F.2d 938 (D.C. Cir. 1977) .....................................................13

*NRDC v. Reilly*,
  983 F.2d 259 (D.C. Cir. 1993) .....................................................16

*Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. NLRB*,
  46 F.3d 82 (D.C. Cir. 1995) .....................................................11, 18

*Petroleum Commc'ns, Inc. v. FCC*,
  22 F.3d 1164 (D.C. Cir. 1994) .....................................................30

*\*Prometheus Radio Project v. FCC*,
  373 F.3d 372 (3d Cir. 2004) .................................9, 16, 17, 21, 25

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Prometheus Radio Project v. FCC*,
    652 F.3d 431 (3d Cir. 2011) ........................................................................... 9, 21

*Pub. Serv. Comm'n for N.Y. v. FPC*,
    472 F.2d 1270 (D.C. Cir. 1972) ...................................................................13

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ...................................................................10

*Sinclair Broad. Grp., Inc. v. FCC*,
    284 F.3d 148 (D.C. Cir. 2002) ........................................................ 13, 21, 23

*Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) ................................................................ 26, 33

*Time Warner Entm't Co. v. FCC*,
    240 F.3d 1126 (D.C. Cir. 2001) ...................................................................32

*Tribune Co. v. FCC*,
    133 F.3d 61 (D.C. Cir. 1998) ...................................................................13

*U.S. Satellite Broad. Co. v. FCC*,
    740 F.2d 1177 (D.C. Cir. 1984) ...................................................................21

*United States v. Reynolds*,
    710 F.3d 434 (D.C. Cir. 2013) ...................................................................16

*WAIT Radio v. FCC*,
    418 F.2d 1153 (D.C. Cir. 1969) ...................................................................40

**Statutes**

5 U.S.C. § 551(13) ...................................................................4

28 U.S.C. § 2112(a)(5)................................................................ 10, 12

28 U.S.C. § 2342(1) ...................................................................4

28 U.S.C. § 2344 ...................................................................4

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

47 U.S.C. § 151 ...................................................................4

47 U.S.C. § 154(a) .............................................................4

47 U.S.C. § 303 ............................................................. 4, 25

47 U.S.C. § 307 ...................................................................4

47 U.S.C. § 309 ...................................................................4

47 U.S.C. § 310 ...................................................................4

47 U.S.C. § 402(a) .............................................................4

47 U.S.C. § 403 ...................................................................4

*Pub. L. No. 104-104, § 202(h), 110 Stat. 56 (1996) ................... 1, 3, 5, 11, 14, 19

Pub. L. No. 108-199, § 629, 118 Stat. 3 (2004) ....................................1, 5

Pub. L. No. 113-200, § 104, 128 Stat. 2059 (2014) ............................9

### Regulations

47 C.F.R. § 61.3(q) ...........................................................36

47 C.F.R. § 73.3555 .........................................................2, 5

47 C.F.R. § 73.658(g) ..........................................................5

### Other Authorities

*2002 Biennial Regulatory Review*, 18 F.C.C.R. 4726 (2003) .................................16

2014 Quadrennial Regulatory Review, 79 Fed. Reg. 28996 (May 20, 2014) .......... ii

2014 Quadrennial Regulatory Review, 79 Fed. Reg. 29010 (May 20, 2014) .......... ii

Dep't of Justice & FTC, Horizontal Merger Guidelines (2010) .............................36

x

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Review of the Comm'n's Regulations Governing Attribution of Broadcast
and Cable/MDS Interests*,
14 F.C.C. Rcd. 12559 (1999) .......................................................... 7, 34

S. Rep. No. 140-230 (1996 Conf. Rep.) .................................................16

U.S. Gov't Accountability Office, GAO-14-558, *Media Ownership:  FCC
Should Review the Effects of Broadcaster Agreements on Its Media Policy
Goals* (2014) ........................................................................................27

# GLOSSARY

| | |
|---|---|
| 1996 Act | Pub. L. No. 104-104, 110 Stat. (1996) |
| 2014 Order | *2014 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996; 2010 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996; Promoting Diversification of Ownership in the Broadcasting Services; Rules and Policies Concerning Attribution of Joint Sales Agreements in Local Television Markets*, Further Notice of Proposed Rulemaking and Report and Order, FCC No. 14-28, 2014 WL 1466887 (rel. Apr. 15, 2014), JA1. |
| Broadcast Petitioners | HSH, NAB, and Nexstar |
| Commission | Federal Communications Commission |
| HSH | Howard Stirk Holdings, LLC |
| JSA | Joint Sales Agreement |
| LMA | Local Marketing Agreement |
| NAB | National Association of Broadcasters |
| Nexstar | Nexstar Broadcasting, Inc. |
| Prometheus | Prometheus Radio Project |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Section 202(h) of the Telecommunications Act of 1996 provides that the Commission "shall review" its broadcast ownership rules, which limit common ownership of television and radio stations and newspapers, every four years. Pub. L. No. 104-104, 110 Stat. 56 ("1996 Act"), *as amended by* Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004). In such "quadrennial[]" reviews, the agency "shall determine" whether each rule remains "necessary in the public interest as the result of competition" and "repeal or modify" any rule not satisfying that standard. *Id.* § 202(h).

Despite these clear statutory commands, the Commission *still* has not completed its 2010 review. Instead, the Commission merged that proceeding with a new 2014 quadrennial review and announced that it will make the statutorily required determinations at some unidentified point in the future on a "refreshed" record. JA2. By rolling the unfinished 2010 review into the 2014 proceeding without making any decisions about the necessity of the rules, much less an assessment of the present state of competition, the Commission evaded its basic obligations under Section 202(h) and unlawfully retained the rules. The record demonstrates that the rules, first adopted beginning in the 1960s, have long since been overtaken by revolutionary changes in the media marketplace.

1

Although the Commission found the record insufficient to reach any conclusions about the existing broadcast ownership rules, it adopted a *new* ownership restriction on the basis of the *same* record.  Specifically, the Commission promulgated a rule restricting joint sales agreements ("JSAs") between television broadcasters (the "JSA Rule").  JSAs authorize a brokering station to sell advertising time on a brokered station.  The JSA Rule provides that same-market JSAs for more than 15 percent of a station's weekly advertising time will now count toward the ownership totals of the brokering station under the local television ownership rule, 47 C.F.R. § 73.3555(b), due to the purported "influence" that the brokering station "could" wield over the "program selection and station operations" of the brokered station, JA157, 163.

The JSA Rule violates the Commission's statutory obligations.  It effectively tightens the extant local television ownership rule—which this Court declared unlawful in 2002—in the absence of any determination of need for that rule.  To make matters worse, the Commission expressly refused to consider the public interest benefits of JSAs in promulgating the JSA Rule.  Declaring such evidence "not relevant," the Commission said it would consider those public interest issues later, in the 2014 quadrennial review.  While postponing the public interest analysis, the Commission nonetheless required that non-compliant JSAs be unwound within two years—thus effectively forcing broadcasters to dissolve their JSAs *be-*

2

*fore* the Commission ever considers whether such arrangements serve the public interest or whether the local television ownership rule itself is still justifiable.

Moreover, the JSA Rule suffers from multiple defects of reasoned decision-making. The Commission's conclusion that JSAs provide influence over the brokered station is unsupported by a single piece of evidence and breaks with past precedent without adequate explanation. Indeed, for all *other* types of shared service agreements, of which JSAs are a subset, the Commission found that it lacked sufficient information even to "formulate sound public policy." JA152. The agency had no more information with respect to JSAs but decided to act anyway, and then blinded itself to the reality that television stations today compete with a host of video providers, not just each other. Finally, notwithstanding a conspicuous lack of evidence of harm associated with JSAs (and, in fact, considerable evidence to the contrary), the 2014 Order refuses to grandfather existing JSAs.

Singling out television JSAs for such onerous treatment on a record too thin, by the Commission's own lights, to support reasoned policymaking in the same arena is the essence of arbitrary and capricious decision-making. This Court should vacate the JSA Rule and the unjustified broadcast ownership rules.

## STATEMENT OF JURISDICTION

The Commission released the 2014 Order on April 15, 2014, pursuant to its statutory duty to review the broadcast ownership rules, 1996 Act, § 202(h), and its

3

regulatory authority under 47 U.S.C. §§ 151, 154(a), 303, 307, 309, 310, and 403. The 2014 Order was published in the Federal Register on May 20, 2014. *See* JA392; JA403. Broadcast Petitioners filed timely petitions for review in this Court on May 30, 2014. *See* Nos. 14-1090, 14-1091, 14-1092. This Court has jurisdiction under 28 U.S.C. §§ 2342(1) and 2344, and 47 U.S.C. § 402(a). The portion of the 2014 Order containing the JSA Rule is a final order of the Commission. The Commission's refusal in the 2014 Order to act within the four-year period prescribed in Section 202(h) is subject to judicial review as failure to take required agency action. *See* 5 U.S.C. § 551(13).

## STATEMENT OF ISSUES

1.      Whether this Court should transfer these cases in whole or in part to the Third Circuit.

2.      Whether the 2014 Order violates Congress's command in Section 202(h) of the Telecommunications Act of 1996 that the Commission retain the broadcast ownership rules only after determining that they remain necessary in the public interest as the result of competition.

3.      Whether the JSA Rule exceeds the Commission's statutory authority, or is arbitrary or capricious, an abuse of discretion, or otherwise unlawful.

## STATUTES AND REGULATIONS

The text of relevant statutes and regulations is set forth in the Addendum.

4

## STATEMENT OF THE CASE

### A.    The Commission's Failure To Complete The 2010 Quadrennial Review

"In the Telecommunications Act of 1996 the Congress set in motion a process to deregulate the structure of the broadcast and cable television industries." *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1033 (D.C. Cir.) ("*Fox I*"), *modified on reh'g*, 293 F.3d 538 (D.C. Cir. 2002) ("*Fox II*").  The 1996 Act relaxed several restrictions on broadcast ownership, and directed the Commission to engage in periodic rulemakings to bring its regulatory regime into line with the ever-changing media landscape.

Specifically, Section 202(h) of the 1996 Act provides that the Commission "shall review" its broadcast ownership rules every four years,[1] "determine whether any of [those] rules are necessary in the public interest as the result of competition," and "repeal or modify any regulation it determines" is not.  1996 Act, § 202(h).  Thus, the Commission is legally obliged to offer an affirmative justification for each rule every four years and must "repeal or modify" any rule it cannot fully justify.

---

[1]    *See* § 629, 118 Stat. at 99-100 (changing biennial review to quadrennial). Section 202(h) applies to the local television ownership rule, local radio ownership rule, newspaper-broadcast cross-ownership rule, radio-television cross-ownership rule, and dual network rule.  *See* 47 C.F.R. §§ 73.3555; *id.* § 73.658(g).

5

Pursuant to Section 202(h), the Commission commenced its 2010 quadrennial review in 2009.  It held a series of public workshops and commissioned eleven peer-reviewed economic studies to create an extensive record upon which to base its review of the rules.  JA5.  The Commission also solicited comments multiple times "on a wide range of issues to help determine whether the current media ownership rules continue to serve the Commission's policy goals."  JA5.  This multiyear process generated a "high level of interest and participation" and an unusually "extensive record that continues to attract significant and substantive input well after the formal comment periods have ended."  JA2.

On March 31, 2014, the Commission adopted the order on review by a 3-2 vote.  The 2014 Order did *not* conclude the 2010 quadrennial review, although the Commission admitted it was "cognizant" of its statutory duty to do so.  JA2.  Rather than make the determinations that Section 202(h) requires, the Commission issued a Further Notice of Proposed Rulemaking initiating its *next* quadrennial review by "incorporating the existing 2010 record into [the 2014] proceeding" and seeking yet more information.  JA2.  The Commission did not reach conclusions with respect to any existing rule; instead, it announced that it would make those determinations and take any consequent action "in this 2014 proceeding."  JA2.

### B.     The JSA Rule

While the Commission generally found that it lacked sufficient information to take action under Section 202(h), it nevertheless imposed new restrictions on television JSAs.  JSAs are agreements between stations that authorize a brokering station to sell some or all of the advertising time on the brokered station—"subject to the licensee's preemptive right to reject the advertising."  JA157.  They are a subset of arrangements known as "sharing agreements" that permit broadcasters to share resources and thus save costs.

As to sharing agreements generally, the Commission found that "[i]n the absence of greater information" it could not "fully evaluate the potential public interest harms and benefits of varying arrangements, which [were] necessary for the Commission to formulate sound public policy."  JA152.  Because "so little is known" about sharing agreements, the Commission found, it could take no substantive action.  JA152.

Despite that insufficient record, the Commission decided that it could single out JSAs for new regulation.  Reversing course from a prior decision, *see Review of the Comm'n's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, 14 F.C.C. Rcd. 12559, 12612, ¶ 122 (1999), the Commission concluded that certain television JSAs should be "attributable," *i.e.*, that the brokering station

should be deemed to own the brokered station for purposes of the local television ownership rule.

The Commission premised the JSA Rule on the theory that a brokering station could have "the opportunity, ability, and incentive to exert significant influence over the brokered station." JA157. Thus, the Commission decided that a JSA will give rise to an attributable ownership interest if it permits one station to sell more than 15 percent of the weekly advertising time for another same-market station. JA157.

The record was replete with evidence confirming the public interest benefits of JSAs.[2] Especially in small to medium markets, JSAs produce cost savings that are vital for smaller broadcasters to compete with other video service providers. *See*, *e.g.*, JA898 (citing multiple studies); *see also* JA233. Comments detailed multiple instances in which JSAs permitted a station to retain or expand local news programming that otherwise would have been uneconomic. *See*, *e.g.*, JA769-71; JA539-42. In some cases, JSAs were critical in enabling a struggling station to survive. *See*, *e.g.*, JA456-57. The Commission refused to consider the public interest benefits of JSAs, finding such information "not relevant" to its decision, JA168 n.1105, and declaring that it would be considered solely in "determining

---

[2]    The Commission originally sought comment on JSAs in 2004 in a separate docket, *see* JA157 n.1035, which sat dormant for nearly a decade and was nearly terminated in 2012, *see* JA230 n.64.

where to set the applicable ownership limit" JA167-68—that is, in the Section 202(h) review the Commission had just delayed for several more years.

The Commission afforded parties to existing JSAs impacted by the new rule two years to "terminate or amend those JSAs or otherwise come into compliance." JA172.[3] It refused to grandfather existing JSAs and instead suggested that parties who believe their JSAs satisfy the public-interest standard "seek a waiver." JA170.

### C. Prometheus' Motions

Broadcast Petitioners each petitioned for review in this Court. Prometheus filed a petition for review in the Third Circuit, which was transferred here following a judicial lottery. *See* Consolidation Order, *In re 2014 Quadrennial Regulatory Review*, MCP No. 122 (J.P.M.L. June 4, 2014). Prometheus moved this Court to transfer the consolidated proceedings to the Third Circuit on the ground that the Third Circuit reviewed two prior Section 202(h) orders—*Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) ("*Prometheus I*"); and *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011) ("*Prometheus II*")—and purportedly retained jurisdiction over a piece of the 2008 quadrennial review order concerning minority ownership in *Prometheus II*. JA1036-39; *see* JA108-48. This Court car-

---

[3] Congress subsequently extended the compliance deadline from June to December 2016 in the STELA Reauthorization Act of 2014. *See* Pub. L. No. 113-200, § 104, 128 Stat. 2059, 2064 (2014).

ried the motion with the case.  Order, No. 14-1090 (Sept. 11, 2014).  Prometheus then filed another motion seeking to "deconsolidate" and transfer its alternative request for mandamus relief.  This Court referred that motion to the merits panel, too.  Order, No. 14-1090 (Nov. 18, 2014).

## STANDING

NAB is a non-profit trade association for television and radio broadcasters. It has standing because its members are broadcasters who are the object of the 2014 Order, subject to the broadcast ownership rules, and otherwise adversely affected and aggrieved by the 2014 Order.  *See Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

HSH and Nexstar have standing because they own and operate numerous television stations that are subject to the ownership rules and the JSA Rule and are otherwise adversely affected by them.  Nexstar is party to multiple JSAs affected by the 2014 Order.

All three Broadcast Petitioners participated in the proceedings below.

## STANDARD OF REVIEW

This Court may transfer the consolidated cases to another court only if transfer would serve the "convenience of the parties in the interest of justice."  28 U.S.C. § 2112(a)(5).

Section 202(h) imposes on the Commission an obligation to find, every four years, that its broadcast ownership rules remain "necessary in the public interest as the result of competition" and to repeal or modify any rule that is not. 1996 Act, § 202(h). Where statutory language is unambiguous, no deference is due. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). And deference is irrelevant where an agency fails to offer *any* interpretation of the relevant statute. *See Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. NLRB*, 46 F.3d 82, 93 (D.C. Cir. 1995).

Under the Administrative Procedure Act, this Court must ensure that the agency examined the relevant information and presented a satisfactory rationale for its action. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence." *Ibid.* The agency must also respond to "all significant comments." *ACLU v. FCC*, 823 F.2d 1554, 1581 (D.C. Cir. 1987) (per curiam).

11

# ARGUMENT

## I.    This Court Should Retain Jurisdiction Over These Consolidated Cases.

The Court should reject Prometheus' requests to transfer these cases to the Third Circuit or, alternatively, to "deconsolidate" Prometheus' request for mandamus relief.

*First*, the 28 U.S.C. § 2112(a)(5) factors, *see Liquor Salesmen's Union v. NLRB*, 664 F.2d 1200, 1205 (D.C. Cir. 1981), do not support transfer.[4]    The substantially aggrieved parties here are the Broadcast Petitioners.  Only the JSA Rule imposed new regulation, and that regulation directly affects their daily operations.  The Broadcast Petitioners chose this forum for their challenges, and two of the three challenge *only* the JSA Rule.  The JSA Rule, moreover, has nothing to do with prior Third Circuit proceedings.  It arose from a separate agency docket, was never before the Third Circuit, and was separately published in the Federal Register.

Prometheus, by contrast, advocated below for retention of the existing ownership rules and regulation of JSAs and thus substantially prevailed in the 2014 Order.  The minority ownership issue raised by Prometheus, which provides the only connection to prior Third Circuit cases, constitutes a minor part of the 2014

---

[4]    *See generally* JA1095-1120; JA1072-94; JA1050-71.

12

Order and an even smaller portion of the issues on review.  It makes no sense to transfer these cases based on that threadbare connection to the Third Circuit.

Moreover, the Third Circuit has no "expertise" that warrants transfer.  The 2014 Order is the product of a new quadrennial review distinct from the prior proceedings culminating in the 2008 Commission order reviewed by the Third Circuit.  And, as noted, the JSA Rule has *never* been before the Third Circuit.  In any event, the Third Circuit panel's familiarity with broadcast ownership does not justify transfer:  "[A] theory of specialization of tribunals" is "not what Congress has provided," and "[t]he contention based on specialization of particular judges is even more debatable."  *Pub. Serv. Comm'n for N.Y. v. FPC*, 472 F.2d 1270, 1272 (D.C. Cir. 1972) (per curiam).[5]  Given the recurring nature of the quadrennial review, granting Prometheus' motion would vest a single circuit with a virtual monopoly over all future ownership orders under Section 202(h).

All counsel and many of the parties—including NAB and respondents—are located in Washington, D.C.  *See Am. Pub. Gas Ass'n v. FPC*, 555 F.2d 852, 857 (D.C. Cir. 1976) (per curiam).  The consolidated cases are well underway in this

---

[5]    This Court's experience with the ownership rules is at least as extensive as the Third Circuit's.  *See, e.g., Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148 (D.C. Cir. 2002); *Fox I*, 280 F.3d at 1040-45; *Tribune Co. v. FCC*, 133 F.3d 61 (D.C. Cir. 1998); *NCCB v. FCC*, 555 F.2d 938 (D.C. Cir. 1977), *aff'd in part*, *rev'd in part*, 436 U.S. 775 (1978).

Circuit, and judicial efficiency counsels in favor of resolving the merits here and now.

*Second*, this Court should not "deconsolidate" Prometheus' request for mandamus relief from its petition for review.[6]  Courts consolidate—and by extension, deconsolidate—*cases*, not *issues*.  Prometheus has identified no case in which this Court has ever disaggregated review of agency action by issue or form of relief requested, much less transferred one of those issues to another court while proceeding with the rest of the litigation.  This Court is also equally capable as the Third Circuit of issuing mandamus relief, if necessary.

## II.    The Commission Violated Its Clear Statutory Mandate Regularly To Determine That The Broadcast Ownership Rules Are Still Necessary.

Section 202(h) charges the Commission with two nondiscretionary duties.  First, "[t]he Commission shall review" its broadcast ownership rules quadrennially "and *shall determine* whether any of such rules are necessary in the public interest as the result of competition."  1996 Act, § 202(h) (emphasis added).  Second, the Commission *must* "repeal or modify any regulation it determines to be no longer in the public interest."  *Id.*

Despite those clear commands, five-and-a-half years after it started the 2010 quadrennial review, the Commission *still* has not completed it.  Instead, while it acknowledged its "statutory obligation to review the broadcast ownership rules

---

[6]    *See generally* JA1132-38; JA1128-31; JA1121-27.

every four years," JA2, the Commission merely kicked the can down the road by merging the existing 2010 record into the new 2014 proceeding—without "determin[ing]" whether the ownership rules serve the public interest *now* and without "repeal[ing] or modify[ing]" rules that do not.  *See*, *e.g.*, JA7, 9-10, 13, 16, 18. The rules cannot continue to stand in light of the Commission's blatant disregard for the statutory process that Congress created precisely to prevent perpetual ownership restrictions.

### A.    The Commission Violated Section 202(h).

The plain language of Section 202(h) requires a final determination of necessity in each and every quadrennial review.  This reading comports with Congress's intent to ensure that the rules be evaluated on a recurring basis to keep them up to date with ever-changing competitive conditions.  If the Commission can simply delay making the determinations required by Section 202(h) until the time for commencing the next quadrennial review rolls around, and then declare the existing record stale, Section 202(h) will be rendered meaningless.

Section 202(h) directs not only that the Commission begin a review process every four years but that it "shall" make a determination in each cycle—that is, *complete* the cycle and *decide*—whether the rules should be repealed or modified. *See*, *e.g.*, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (explaining that the "mandatory 'shall'" "normally creates an obligation

15

impervious to … discretion"); *NRDC v. Reilly*, 983 F.2d 259, 266-67 (D.C. Cir. 1993) (holding that statute stating agency "'*shall* … promulgate standards under this section'" "most manifestly obligates [the agency] to" do so (citation omitted)). Where, as here, the meaning of a statute "is plain and unambiguous," this Court looks no further. *United States v. Reynolds*, 710 F.3d 434, 435 (D.C. Cir. 2013).

Congress's goals in enacting Section 202(h), however, confirm the plain meaning of the text. The quadrennial review process was intended "to ensure 'a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private development of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition.'" *Cellco P'ship v. FCC*, 357 F.3d 88, 91 (D.C. Cir. 2004) (quoting S. Rep. No. 140-230, at 113 (1996 Conf. Rep.)). The Commission has recognized as much, explaining that Section 202(h) established an "'ongoing mechanism to ensure that the Commission's regulatory framework would keep pace with the competitive changes in the marketplace.'" *Prometheus I*, 373 F.3d at 391 (quoting *2002 Biennial Regulatory Review*, 18 F.C.C.R. 4726, ¶ 16 (2003)).

Section 202(h)'s text and purpose thus distinguish the quadrennial review from typical rulemakings. Section 202(h) "carries with it a presumption in favor of repealing or modifying the ownership rules," which means that the Commission "may retain a rule *only if* it reasonably determines that the rule is 'necessary in the

16

public interest.'"  *Fox I*, 280 F.3d at 1048 (emphasis added); *see also Prometheus I*, 373 F.3d at 395 (holding that Section 202(h) imposes on the Commission an "obligation it would not otherwise have"); *Cellco*, 357 F.3d at 99 (stating that Section 202(h) duty "extends beyond [Commission's] normal monitoring responsibilities").

The Commission utterly failed to comply with the basic requirements of Section 202(h).  Rolling the 2010 quadrennial review into the new 2014 proceeding, while making only "tentative conclusions" to be considered four years (or more) later, is a systematic evasion of Section 202(h).  Worse still, it is not clear when, if ever, the Commission intends to complete the 2010 review.  When the 2014 Order was issued, it had been over *six* years since the Commission last completed a *quadrennial* review.  Now, it has been over *seven* years.  The only hint of a date for completion of the current review is some time after June 30, 2016, when the Media Bureau plans to submit its recommendations to the Commission. JA217.  Even if the Commission were to act immediately on the Media Bureau's recommendations—which is doubtful given the Commission's track record under Section 202(h)—it is "highly likely that nearly a *decade* will pass" before the Commission finally concludes its review for the 2010 cycle.  JA233.  Thus, the earliest point at which the Commission could finish one review will be long after

17

Congress intended for it to have completed two reviews and to have a third well underway.

The Commission does not explain why it ignores its statutory mandate. Indeed, in the 2014 Order, the Commission did not even *attempt* a contrary interpretation of Section 202(h) to justify its failure to comply with the statute's requirements. Even if the language of Section 202(h) were not clear—and it is, *see supra* pp. 15-16—this case would still be easily resolved: This Court cannot defer to nothing. *See Oil, Chem. & Atomic Workers*, 46 F.3d at 93 (no deference where agency "has offered no interpretation of [the relevant] statutory provision").

The most that can be gleaned from the 2014 Order is that the Commission delayed the required determinations so that it could regulate "based on a comprehensive, refreshed record that reflects the most current evidence regarding the media marketplace." JA2. Of course, there is no exception in Section 202(h) for the Commission to "refresh" the record. To the contrary, the statute presumes, by requiring regular quadrennial reviews, that the Commission will conclude those reviews based on information not completely up-to-the-minute; otherwise, the Commission would never finish *any* review. Even on its own terms, the rationale does not pass muster. The Commission itself explained that the 2010 review generated a "high level of interest and participation" and an "extensive record that continues to attract significant and substantive input *well after the formal comment*

18

*periods have ended*.” JA2 (emphasis added); *see also* JA5 (describing extensive record-building process, including public workshops, solicitation of new comments “on a wide range of issues,” and the commission and publication of peer-reviewed economic studies). It is implausible that this exhaustive record provided the Commission with insufficient information to fulfill its statutory mandate. Moreover, any staleness in the record is due to the Commission’s management of the proceeding; regulated entities should not bear the brunt of the Commission’s glacial pace.

That the Commission may have been concerned about its ability to make a reasoned determination to *retain* the rules based on the record is irrelevant. Congress already accounted for this possibility, directing the agency to “repeal or modify” any rules that the Commission cannot demonstrate are “necessary in the public interest.” 1996 Act, § 202(h). The “wait-and-see approach” the Commission adopted here “cannot be squared with [Section 202(h)’s] mandate *promptly*—that is, by revisiting the matter [quadrennially]—to ‘repeal or modify’ any rule that is not ‘necessary in the public interest.’” *Fox I*, 280 F.3d at 1042 (emphasis added).

## B.    The Broadcast Ownership Rules Disserve The Public Interest.

The Commission’s dereliction of duty is a blatant failure of process, but it is more than that: It forces broadcasters to continue operating subject to rules preventing them from capturing the efficiencies of combinations or joint operations

that could help them survive in the modern media marketplace.  The evidence that *was* before the Commission demonstrates that the broadcast ownership rules are no longer "necessary in the public interest as the result of competition" and in fact harm broadcasters' ability to serve their local markets.

The rules are relics of another era—and, in many cases, have not been updated in several decades.  As the Broadcast Petitioners explained during the 2010 review, dramatic changes in the communications landscape—in the number of purveyors of content, altered habits of media consumption, and changing patterns in local and national advertising—have fundamentally altered the nature of competition for broadcasters and eroded the rules' previous justifications.  *See*, *e.g.*, JA498-500 (presenting evidence undermining the assumption that common ownership of stations reduces access to information or harms competition and showing that broadcast-only restrictions are no longer warranted in light of the vast expansion of the market since the rules were adopted, including cable and satellite television, satellite radio and the "almost infinite resources of the Internet"); JA525-32 (describing market changes and challenges warranting modification of local television ownership rule).

The ban on common ownership of a newspaper and even a single broadcast station is a particularly good example of an antiquated rule that can no longer be justified.  First adopted in 1975—before the advent of alternative multichannel,

20

online, and mobile sources of news and entertainment—the rule is widely considered a relic in today's media marketplace and affirmatively harmful to the struggling newspaper industry. *See*, *e.g.*, JA511-15.   The Commission itself concluded in both the 2002 and 2006 reviews that the rule no longer serves the public interest. *See Prometheus II*, 652 F.3d at 453; *Prometheus I*, 303 F.3d at 402-03.  Even now, the Commission recognizes that "the nearly 40-year-old blanket prohibition on newspaper/broadcast cross-ownership is overly broad."  JA49.   Nevertheless, due presumably to the Commission's inability to make any affirmative case for the rule, the 2014 Order sidesteps the issue.  It thereby ensures that broadcasters will continue to labor under restrictions that the Commission *admits* are no longer warranted.   Similarly, the local television ownership rule has remained unchanged since 1999—even though this Court deemed it arbitrary and capricious and remanded it to the Commission *thirteen years* ago.  *See Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148, 169 (D.C. Cir. 2002).

The Commission's non-decision has real-world consequences:  It effectively retains anachronistic rules that burden broadcasters' ability to compete, while simultaneously allowing other media to consolidate without comparable restrictions. The Commission's failure to address these market realities would be problematic even if it had timely made the affirmative judgments that Section 202(h) requires. *See*, *e.g.*, *U.S. Satellite Broad. Co. v. FCC*, 740 F.2d 1177, 1188 (D.C. Cir. 1984)

(explaining that agency must respond "in a reasoned manner to significant comments").  Because the Commission here failed to make *any* decision in the face of significant evidence that the rules are obsolete, that failure is fatal.

### C.     The Broadcast Ownership Rules Cannot Stand.

As demonstrated above, the Commission's refusal to comply with Section 202(h) means that the broadcast ownership rules will remain operational, in their existing form, until at least sometime after June 2016.  If that action stands, the Commission will have accomplished exactly what Congress meant to prevent: keeping the ownership rules in place *without* demonstrating that they are still justified in light of competition.  The Commission's open defiance of the statute requires vacatur of the rules.

This Court has the power to order the Commission to vacate broadcast ownership rules "improperly retained."  Otherwise, Section 202(h)'s "presumption in favor of repealing or modifying the ownership rules" would "lose much of its bite." *Fox I*, 280 F.3d at 1048.  This Court has not hesitated to exercise this power where the Commission—even after its "best effort"—did not provide "any plausible reason for believing [an ownership rule was] necessary to further competition" and "failed to respond to the objections put before it." *Id.* at 1053.  As the Court has emphasized, "the Commission's failure to defend the [rule] indicates its inability to do so." *Fox II*, 293 F.3d at 541; *see also In re Core Commc'ns, Inc.*, 531

22

F.3d 849 (D.C. Cir. 2008) (issuing writ of mandamus after Commission delayed decision seven years); *Sinclair*, 284 F.3d at 171-72 (Sentelle, J., concurring and dissenting in part) (explaining that he would vacate, rather than remand, local television ownership rule where Commission "failed to justify [it] affirmatively").

Here, the Commission has not made any effort, let alone its "best effort," to explain the continued need for the broadcast ownership rules. Instead, the Commission issued an order that is an "administrative law shell game" designed to "avoid judicial review of the rule[s]" it fears "cannot withstand judicial scrutiny." *AT&T v. FCC*, 978 F.2d 727, 731-32 (D.C. Cir. 1992). This Court should answer the call to "restore sanity to [the] media ownership proceeding." JA232.

## III. The JSA Rule Exceeds The Commission's Statutory Authority And Is Arbitrary And Capricious.

Despite the Commission's belief that the record was insufficient to support the statutorily required determinations regarding the broadcast ownership rules, the Commission nonetheless found the record sufficient to determine that "a same-market television JSA that encompasses more than 15 percent of the weekly advertising time for the brokered station" should count toward ownership for purposes of the local television rule. JA157. The JSA Rule exceeds the Commission's statutory authority and is arbitrary and capricious.

### A.    The JSA Rule Is Inconsistent With Section 202(h) And The Commission's General Rulemaking Authority.

The requirement in Section 202(h) that the Commission justify its ownership rules as "necessary in the public interest as the result of competition" carries a corollary limitation:   the Commission cannot expand the ownership rules without making the findings required to retain the rules in the first place.   In adopting the JSA Rule, the Commission did just that.   The JSA Rule implements the local television ownership rule by defining which interests will count "toward the brokering's station's permissible ownership totals."   JA157.   By covering JSAs above the 15 percent threshold, this new attribution rule makes the existing local television ownership rule *stricter*, and will force many broadcasters previously in compliance with the local television ownership rule to dissolve their JSAs.

The Commission had no statutory authority to retain the local television ownership rule absent a predicate finding of continuing necessity, and use of the attribution rules as a backdoor route to circumvent Section 202(h) and tighten the local television ownership rule is unlawful.   The Commission forfeited the option to modify the local television rule—directly or indirectly—when it opted not to complete the 2010 quadrennial review.

Even if the Commission's failure to justify the local television ownership rule did not preclude modification of that rule, the Commission *certainly* cannot adopt new regulations without considering the public interest.   *See Geller v. FCC*,

610 F.2d 973, 980 (D.C. Cir. 1979) (per curiam) ("Commission's general rulemaking power is expressly confined to promulgation of regulations that serve the public interest"); *see also* 47 U.S.C. § 303; *cf. Prometheus I*, 373 F.3d at 395 (Section 202(h) requires Commission to provide "reasoned analysis" before promulgating new rules, just as when retaining or repealing existing rules).

Here, the Commission adopted the JSA Rule while expressly *refusing* to conduct a public interest analysis. The Commission acknowledged that JSAs "may have public interest benefits in some circumstances." JA168. But rather than analyzing those benefits, the Commission declared that they were "not relevant" to the JSA Rule, JA168 n.1105, and "should be assessed [only] in determining where to set the applicable ownership limit." JA168-69. In other words, the Commission pushed off the public interest analysis of JSAs to the next quadrennial review. Under the Commission's current schedule, by the time the agency gets around to considering the benefits of JSAs, if ever, it will most likely be too late for broadcasters subject to the JSA Rule to keep their current arrangements.

That approach is simply not permissible. Congress did not authorize the Commission to regulate first and assess the public interest later. The Commission's failure to assess the public interest *before* adopting the JSA Rule renders the rule unlawful for this additional reason.

25

### B.    The JSA Rule Is Arbitrary And Capricious On Multiple Grounds.

The JSA Rule is also arbitrary and capricious because, in multiple ways, the Commission failed to explain a "rational connection between the facts found and the choice made" and failed completely to "consider an important aspect of the problem." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014) (citation omitted).

> **1.    The Commission Provided No Rational Justification For Regulating JSAs Based On A Record It Deemed Insufficient To Assess The Underlying Ownership Rule Or To Regulate Sharing Arrangements Generally.**

For many of the same reasons that the Commission violated its statutory duties in adopting the JSA Rule, *see supra* Part III.A, the Commission's action fails to meet the basic requirement of reasoned decision-making.  As an initial matter, it was arbitrary and capricious for the Commission to *expand* the reach of its ownership limits when it had just decided that the evidentiary record was insufficient to support a finding that the *existing* rules were justified.  That is, a finding that there was not enough information to justify the local television ownership rule eliminated a necessary predicate for any rational conclusion that the JSA Rule, which has no purpose apart from the ownership rule, was justified by the evidence.

Further, the Commission erred by failing to provide any rational reason for deciding to single out JSAs for regulation after it (correctly) concluded that it lacked sufficient information even to address the merits of shared service agree-

ments, a category that includes JSAs.  JA148-49, 152.  The Commission found that it should further "study" shared service agreements before taking regulatory action. JA149.  The Commission did not point to anything in the record showing that it had *more* information, qualitatively or quantitatively, with respect to JSAs, than it did with respect to shared service agreements generally.[7]  Nonetheless, the Commission announced "that [it had] sufficient information to act with respect to the attribution of television JSAs," JA157, and proceeded to adopt new restrictions for that type of shared service agreement.  In so doing, the Commission created an unexplained inconsistency regarding the adequacy of the record that severely undermines the JSA Rule.  As the Government Accountability Office has observed, "without conducting a fact-based analysis of how agreements are being used, FCC cannot ensure its current and future policies on broadcast agreements serve the public interest."  U.S. Gov't Accountability Office, GAO-14-558, *Media Ownership: FCC Should Review the Effects of Broadcaster Agreements on Its Media Policy Goals* (2014).

---

[7]    The scant record for the JSA Rule stands in marked contrast to an earlier proceeding regarding television local marketing agreements.  *See* JA244-45 n.145, 246.  There, in addition to reviewing submitted comments, the Commission asked parties to provide specific factual information regarding existing agreements. JA237-38.  The Commission requested information on: the number and terms of outstanding contracts; the market characteristics of the partnering stations; whether the contracting parties reside in the same, adjacent, or nonadjacent markets; the degree of overlap between the partnering stations; and any public interest benefits or efficiencies.  The Commission received information on 114 agreements.  *See* JA246-47.

27

### 2. The Commission Failed To Consider Extensive Record Evidence Demonstrating The Public Interest Benefits of JSAs.

It was likewise arbitrary and capricious for the Commission to expand its ownership rules by treating certain television JSAs as attributable interests without considering the extensive record evidence showing the benefits of JSAs.  The record was replete with detailed submissions showing that JSAs *advance* the public interest.  Fundamentally, JSAs permit broadcast stations to cut costs by sharing advertising resources, thereby enabling television stations, especially in small or mid-sized markets, to invest in higher quality, more diverse programming that better serves local markets.  *See*, *e.g.*, JA898-921 (citing studies showing JSAs support local stations' ability to develop diverse content and make capital investments); JA830-34 (identifying numerous JSAs that enabled stations to increase local news); *see also* JA220; JA233.  Specifically, Nexstar's JSAs have "resulted in increased news coverage" in the Lubbock and Peoria markets, and in other markets enabled Nexstar "to launch 9:00 p.m. newscasts on Fox affiliates that previously had not broadcast local news."  JA540-41.  Similarly, savings from a JSA allowed WKPT-TV not just to save its local news programming but to expand it by seven hours a week.  JA456-57.

These economic benefits are a necessity in today's digital marketplace. They are critical for local television stations facing decreasing advertising revenue

at a time when Internet and cable television advertising revenue has skyrocketed. The evidence showed that "JSAs may rescue struggling stations by enabling smaller stations to stay on the air."  JA168 n.1105; *see also* JA451-66 (JSAs can mean the difference between a struggling local television station staying on the air or going dark).  The record also demonstrated that "operational efficiencies afforded by JSAs" were vital for allowing broadcasters "to maintain and even expand local news on many stations, even during a period of declining advertising revenue." JA768 & n.9.  The JSA Rule thus will actually "mean less news programming, less high-quality journalism, less diverse programming, [and] fewer upgrades to station facilities."  JA225.[8]

In addition, JSAs demonstrably facilitate minority ownership.  For example, Petitioner HSH is a party to a JSA with Sinclair Broadcast Group that has enabled the creation of one of the few African-American-owned full power broadcasters in the country.  HSH also planned to pursue new JSAs with Sinclair that would have created even more minority-owned stations.  JA223; *see also* JA856 (explaining that JSAs created "access to capital that would have otherwise been unavailable" to HSH).  The JSA Rule thus irrationally hinders one of the key goals motivating the

---

[8]   The JSA Rule will only make it harder for broadcasters to compete.  Multichannel video programming distributors, which are not subject to the broadcast ownership rules, increasingly use "local interconnects" that, like JSAs, sell local advertising on a marketwide basis.  Prohibiting television stations from participating in similar arrangements places them at an unjustified competitive disadvantage. JA895-96; JA898-921.

local television ownership rule itself—promoting diverse programming and minority ownership.  JA7-8; *see also* JA110-11.

The Commission ignored all of this evidence and instead shunted off any consideration of the benefits of JSAs to the long-delayed quadrennial review. Thus, on top of violating statutory duties, *see supra* Part III.A, it was plainly arbitrary for the Commission to adopt the JSA Rule while refusing to consider numerous, substantive comments about the benefits of JSAs and the proposed rule's adverse effects.  *See Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) ("where the record belies the agency's conclusion, we must undo its action"); *see also ACLU*, 823 F.2d at 1581.

The Commission's caprice is especially egregious since the agency required broadcasters to unwind affected JSAs within two years, yet the proceeding in which it may eventually consider the public interest aspect of JSAs will not be completed until some time after June 30, 2016—*after* the expiration of the two-year period specified in the 2014 Order.  Even though Congress extended the deadline to December 2016, the Commission's track record indicates that it is unlikely to make any determination about the local television ownership rule in time for affected broadcasters to retain their JSAs.  That is the *sine qua non* of arbitrary and capricious action.

### 3.   The Commission's Rationale That JSAs Confer Operational Influence Is Unsupported By Any Record Evidence And Untenable.

The JSA Rule is further fatally flawed because no record evidence supports the Commission's theory that television JSAs above the 15 percent threshold enable the brokering station "to exercise sufficient influence over the core operations of [the brokered] station to warrant attribution."  JA159-60.  Despite the fact that JSAs have been around since before 2004, and that since 2008 the Commission has approved some 71 JSAs in 53 markets, JA899, the Commission did not identify a "single example of a station in a JSA exercising undue influence over another station," or "a single instance where a JSA has allowed one station to influence *a single programming decision* of another station."  JA227.  The Commission's rationale is thus wholly "conclusory [and] unsupported."  *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).

For the most part, the Commission does not even pretend to have actual evidence on its side, insisting instead that it can base rules on its assessment of "the *incentive* and *ability* to influence or control the programming or other core operational decisions" of the brokered station without the need to identify "instances of actual harm or control."  JA163 & n.1081 (emphases added).  But the only case from this Court the Commission cites for that approach is inapposite, since the analysis of incentives in that case was supported by hard evidence—two studies

31

and a survey—not mere guesswork.  *See Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1139-41 (D.C. Cir. 2001).

Here, the record support the Commission identified is insubstantial.  The Department of Justice's submission (cited at JA161) noted only that JSAs can eliminate "competitive rivalry" between stations, but did not offer any example of one station in a JSA exerting undue influence over another.  JA845-46.  Importantly, because some JSAs "may not harm competition," the Department urged the Commission to adopt a "functional, flexible" "case-by-case" approach to JSA attribution, *not* a blanket ban.  JA846, 851.[9]

At bottom, the Commission relied on nothing but speculation about *possible* uses of JSAs to influence a brokered station's operations.  Thus, the Commission asserted that a brokering station "*can potentially* influence the brokered station's decision whether or not to pre-empt network programming, as well as its choice of non-network programs," or could "*potentially* influence the brokered station's choice of network affiliation."  JA165 (emphases added).  Although the Commission's predictive judgments may sometimes warrant deference, such judgments

---

[9]    The Commission noted that its staff's review of transactions that included JSAs identified 22 JSAs that covered 100 percent of a brokered station's advertising time.  JA158 n.1041.  Even the Commission did not suggest that this data provides evidence of actual influence over the brokered station.  In any event, because this informal study was never identified in the 2014 Order or otherwise disclosed, the Commission cannot rely on it.  *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236-38 (D.C. Cir. 2008).

"must be based on some logic and evidence, not sheer speculation." *Sorenson*, 755 F.3d at 708 (citation omitted). Here, the Commission did not cite a single piece of evidence showing actual influence by a broker to justify its speculation. *See* JA165 & nn.1088, 1089. Given the Commission's own recognition that JSAs have numerous public interest benefits, JA168, its wholly theoretical concern that JSAs could "potentially" be harmful cannot justify the restrictions it adopted.

The Commission's alternative rationale—in effect, that "what's good for radio JSAs must be good for television JSAs"—is also misplaced. The Commission cited no evidence to substantiate its assertion that "the fundamental nature of television JSAs and radio JSAs is the same." JA166. And without that evidence justifying parallel treatment, radio JSAs are irrelevant here.[10] The Commission also brushed aside, without explanation, important differences between the two types of arrangements, such as the far greater prevalence of network affiliations among television stations (which necessarily reduce any potential for a broker to influence programming) and differing fee structures. JA166. The evidence showed, for example, that unlike radio JSAs, television JSAs do not rely on flat fees to brokers. *See*, *e.g.*, JA884; JA891-93.

---

[10]    It was particularly arbitrary for the Commission to carry over, without explanation, the 15 percent threshold for attribution from the rule for radio JSAs, *see* JA157 n.1037, given that the Media Bureau had long approved television JSAs where the brokering station received up to 30 percent of advertising revenue. *See* JA891-93.

The Commission did not just disregard this evidence. It *acknowledged* that not a single commenter had identified a television JSA with a flat fee arrangement, but nevertheless refused to "exclude this *possibility* since such arrangements appear in radio JSAs" and the Commission had not "receive[d] information about fee arrangements in *every existing television JSA*." JA158 n.1042 (emphases added).

That has it backwards. Instead of basing its decision on the facts, the Commission relied on its *assumption* that radio and television JSAs were the same and refused to depart from that assumption until it was *disproved* by evidence regarding "every existing television JSA." That is not a permissible mode of decision-making. *See Butte Cnty. v. Hogen*, 613 F.3d 190, 195 (D.C. Cir. 2010) (setting aside agency action as "totally irrational" where agency appeared to have "already decided the issues" and declined to review evidence that "called into doubt [that] judgment").

The Commission's lack of factual support for its conclusions is especially troublesome because the decision to treat JSAs as attributable ownership interests marked an about-face from the agency's prior ruling that JSAs do *not* "convey a degree of influence or control" sufficient to warrant attribution. *Review of the Comm'n's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, 14 F.C.C. Rcd. 12559, 12612, ¶ 122 (1999). The Commission is not only required to show "good reason" for such a reversal, but must also provide "a more

34

detailed justification" than when it regulates in the first instance because "its prior [JSA] policy has engendered serious reliance interests" by broadcasters "that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Commission failed to supply any such justification.

### 4.    The Commission's Definition Of The Relevant Market Is Similarly Unsupported And Untenable.

The rationale for the JSA Rule is also flawed in a broader way. Like the local television ownership rule, the JSA Rule is based on the Commission's view that the relevant product market, for purposes of assessing competition and harm to consumers, is the local television broadcasting market. *See* JA9-10, 12-13, 161-63. That market definition has applied since the Commission first adopted the local television ownership rule in 1964 and is now hopelessly outdated. The Commission's failure to take into account the vast changes in the competitive landscape over the last 50 years was irrational. *Cf. Fox I*, 280 F.3d at 1044 (Commission must "defin[e] the relevant markets" and "assess[] the state of competition therein" under Section 202(h)).

As the record amply demonstrated, a multitude of media outlets offering news and entertainment today compete with free over-the-air television stations both for viewers and for local and national advertising. *See*, *e.g.*, JA501-10 & n.28 (citing studies finding significant substitutability between different media outlets and platforms for advertising); JA896-97 (discussing reports that local Internet and

cable television advertising grew at compound rates of 24.7 and 4.8 percent, respectively, from 2003-2012, while local broadcast television ad revenue had *negative* compound growth rate of 0.1 percent);     JA591-93 (documenting local cable systems' gains in share of local television market advertising).[11]   Indeed, the Commission itself has repeatedly acknowledged that television broadcasters face intense competition from various sources for viewers and advertisers.  JA2-3; *see also* JA272-73.

The evidence also showed that sharing arrangements do not harm competition between television broadcasters.  Far from it, they result in *lower* advertising prices.  *See* JA935-83 (providing economic analysis demonstrating that markets with sharing arrangements have advertising prices roughly 16 percent lower than other markets).  Local broadcast stations are unable to exercise market power, even in local advertising markets.  *Cf.* Dep't of Justice & FTC, Horizontal Merger Guidelines § 4.1 (2010) (defining product markets and market power in terms of a firm's ability to raise consumer prices); *see also* 47 C.F.R. § 61.3(q) (defining "market power" as "power to control prices").  On the contrary, the primary competition-related concern in today's digital, multichannel marketplace is the continued ability of local broadcasters to compete effectively with other media outlets

---

[11]   *See also*, *e.g.*, JA748-56; JA582-90; JA537; JA479-82; JA475-76.

and to offer the free, over-the-air entertainment and informational programming upon which Americans rely. *See* JA504-05; JA582.

The Commission neither addressed this record evidence nor offered any evidence to the contrary.[12]  Instead, it insisted that "competition from such video programming providers is currently of limited relevance."  JA11.  The Commission cannot seal itself in a time capsule from the 1960s. *See Comcast Corp. v. FCC*, 579 F.3d 1, 10 (D.C. Cir. 2009) (invalidating cable subscriber limit because "the Commission failed adequately to take account of the substantial competition cable operators face from non-cable video programming distributors"); *see also Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1316 (D.C. Cir. 2010) (Kavanaugh, J., dissenting) (detailing new sources of video competition since 1992).  Indeed, in 2007—the last time the Commission completed a Section 202(h) review—the iPhone was introduced and Netflix began streaming.

Simply put, it is no longer tenable to say that local television stations compete *only* with each other, as they did decades ago.  The Commission's failure to address the brave new competitive world faced by television broadcasters further undermines the JSA Rule.

---

[12]  Nor did it account for Commissioner Pai's dissenting observation that "local broadcasters face fierce competition for viewers and advertisers" and their revenue is declining, while cable television, online, and digital advertising are growing exponentially.  JA221; *see Elec. Power Supply Ass'n v. FERC*, 753 F.3d 216, 224 (D.C. Cir. 2014).

### 5.    The Commission Acted Arbitrarily By Refusing To Grandfather Existing, Previously Approved JSAs.

Finally, the Commission acted arbitrarily by refusing to grandfather previously approved JSAs, as it has traditionally done when expanding other ownership restrictions to avoid the disruption and losses attendant to divestiture.  *See* JA15-16, 47-49.  Instead, the Commission created a narrow two-year window for unwinding affected agreements.

The Commission's approach stands in stark contrast with its previous treatment of television local marketing agreements ("LMAs").  JA172.  When it decided to attribute those agreements, the Commission found it would be appropriate to grandfather those entered into prior to the adoption date of a further rulemaking notice on LMAs.  *See* JA240.  The Commission relied on the "need to avoid undue disruption of television LMAs that were entered into in good faith reliance on our previous rules at the time," observing that "these arrangements may in fact have resulted in significant public benefits."  JA242.  The Commission gave no reason for its differential treatment of JSAs.

Moreover, the Commission's two-year window for coming into compliance—which the Commission paints as *easing* dislocation—is utterly illogical, notwithstanding Congress's subsequent six-month extension of the two-year period.  As explained above, the Commission set that window to expire before the Media Bureau planned to provide its recommendations regarding the continuing ne-

38

cessity of the ownership restrictions, meaning that the agency *intended* for broad-casters to unwind JSAs that could later be deemed permissible.

The Commission's two justifications for this approach are unavailing. *First*, the Commission observed that it provided a two-year term for the termination of radio JSAs in 2003. JA172. But that is irrelevant both because of the Commission's failure to justify treating television JSAs the same as radio JSAs, *see supra* pp. 33-34, and because the two-year window for radio JSAs was itself a departure from the Commission's typical course. JA15-16 & n.78 (stating that "[e]ven in limited circumstances, compulsory divestiture is disruptive to the marketplace and is a hardship for individual owners," and citing previous conclusions that divestiture should apply only in the most "egregious" cases). The Commission cannot buttress a conclusory and arbitrary determination by pointing to an earlier, equally arbitrary decision, particularly given its acknowledgment in this very Order that divestitures should be avoided.

*Second*, the Commission suggested that broadcasters assumed the risk of disruption because they have "long been on notice" that it might regulate JSAs. JA172. A proceeding that had been moribund for almost ten years, however, hardly provided broadcasters notice of imminent regulation, especially since Commission staff consistently *approved* television JSAs for a decade following its 2004

proposal.  Any purported "notice" was insufficient to warn broadcasters that something like the JSA Rule was impending.  *See supra* pp. 8 n.2, 30, 33 n.10.

* * *

The Commission's effort to salvage the JSA Rule by proposing to grant waivers based on the "totality of the circumstances" and "the public interest" is unavailing.  JA170-71.  It is too late in the day to consider the public interest at the *back end* of the regulatory process solely as a standard for individualized relief when that standard should have applied at the *front end* before imposing the JSA Rule.  In any event, the Commission cannot save an improper regulation "by tacking on a waiver procedure."  *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988); *see also WAIT Radio v. FCC*, 418 F.2d 1153, 1158 (D.C. Cir. 1969) ("The very essence of waiver is the assumed validity of the general rule.").

## CONCLUSION

For the foregoing reasons, the 2014 Order and the unlawfully perpetuated broadcast ownership rules, as well as the JSA Rule, should be vacated.

Date: August 27, 2015                              Respectfully submitted,


                                                   /s/ Helgi C. Walker
        Rick Kaplan                                Helgi C. Walker
        Jerianne Timmerman                             *Counsel of Record*
        NATIONAL ASSOCIATION                       Ashley S. Boizelle
        OF BROADCASTERS                            Lindsay S. See
        1771 N Street, N.W.                        GIBSON, DUNN & CRUTCHER LLP
        Washington, D.C. 20036                     1050 Connecticut Ave., N.W.
        Telephone: (202) 429-5430                  Washington, D.C. 20036
                                                   Telephone: (202) 955-8500
        Patrick F. Philbin                         Facsimile: (202) 467-0539
        KIRKLAND & ELLIS LLP                       *Counsel for National Association*
        655 Fifteenth St., N.W.                    *of Broadcasters*
        Suite 1200
        Washington, D.C. 20005
        *Counsel for Nexstar*
        *Broadcasting, Inc*.


        Colby M. May
        COLBY M. MAY, ESQ. P.C.
        P.O. Box 15473
        Washington, D.C. 20003
        *Counsel for Howard Stirk*
        *Holdings, LLC*

41

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's February 20, 2015 briefing schedule because this brief contains 8,993 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

/s/ Helgi C. Walker
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

# Addendum

# TABLE OF CONTENTS

<u>Page</u>

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56.................................. Add. 1

Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118 Stat. 3 ..................................................................................................... Add. 2

STELA Reauthorization Act of 2014, Pub. L. No. 113-200, 128 Stat. 2059 ...................................................................................................... Add. 3

47 U.S.C. § 303 ................................................................................................ Add. 4

28 U.S.C. § 2112 .............................................................................................. Add. 11

47 C.F.R. § 73.3555 ......................................................................................... Add. 14

47 C.F.R. § 73.658 ........................................................................................... Add. 19

**Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56**

\* \* \*

**SEC. 202.  BROADCAST OWNERSHIP.**

\* \* \*

   (h) FURTHER COMMISSION REVIEW.—The Commission shall review its rules adopted pursuant to this section and all of its ownership rules biennially as part of its regulatory reform review under section 11 of the Communications Act of 1934 and shall determine whether any of such rules are necessary in the public interest as the result of competition. The Commission shall repeal or modify any regulation it determines to be no longer in the public interest.

\* \* \*

**Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118 Stat. 3**

\*   \*   \*

SEC. 629. The Telecommunications Act of 1996 is amended as follows—

(1) in section 202(c)(1)(B) by striking "35 percent" and inserting "39 percent";

(2) in section 202(c) by adding the following new paragraphs at the end:

"(3) DIVESTITURE.—A person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B) through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance with such limitation. This divestiture requirement shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth.

"(4) FORBEARANCE.—Section 10 of the Communications Act of 1934 (47 U.S.C. 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B);"; and

(3) in section 202(h) by striking "biennially" and inserting "quadrennially" and by adding the following new flush sentence at the end:

"This subsection does not apply to any rules relating to the 39 percent national audience reach limitation in subsection (c)(1)(B).".

\*   \*   \*

**STELA Reauthorization Act of 2014, Pub. L. No. 113-200, 128 Stat. 2059**

\*   \*   \*

**SEC. 104.  DELAYED APPLICATION OF JSA ATTRIBUTION RULE.**

A party to a joint sales agreement (as defined in Note 2(k) to section 73.3555 of title 47, Code of Federal Regulations) that is in effect on the effective date of the amendment to Note 2(k)(2) to such section made by the Further Notice of Proposed Rulemaking and Report and Order adopted by the Commission on March 31, 2014 (FCC 14–28), shall not be considered to be in violation of the ownership limitations of such section by reason of the application of the rule in such Note 2(k)(2) (as so amended) to such agreement before the date that is 6 months after the end of the period specified by the Commission in such Report and Order for such a party to come into compliance with such ownership limitations.

\*   \*   \*

**47 U.S.C. § 303**

**§ 303. Powers and duties of Commission**

Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

(a) Classify radio stations;

(b) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

(c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

(d) Determine the location of classes of stations or individual stations;

(e) Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein;

(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: *Provided, however*, That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with;

(g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

(h) Have authority to establish areas or zones to be served by any station;

(i) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

(j) Have authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable;

(k) Have authority to exclude from the requirements of any regulations in whole or in part any radio station upon railroad rolling stock, or to modify such regulations in its discretion;

(*l*)(1)   Have authority to prescribe the qualifications of station operators, to classify them according to the duties to be performed, to fix the forms of such licenses, and to issue them to persons who are found to be qualified by the Commission and who otherwise are legally eligible for employment in the United States, except that such requirement relating to eligibility for employment in the United States shall not apply in the case of licenses issued by the Commission to (A) persons holding United States pilot certificates; or (B) persons holding foreign aircraft pilot certificates which are valid in the United States, if the foreign government involved has entered into a reciprocal agreement under which such foreign government does not impose any similar requirement relating to eligibility for employment upon citizens of the United States;

(2) Notwithstanding paragraph (1) of this subsection, an individual to whom a radio station is licensed under the provisions of this chapter may be issued an operator's license to operate that station.

(3) In addition to amateur operator licenses which the Commission may issue to aliens pursuant to paragraph (2) of this subsection, and notwithstanding section 301 of this title and paragraph (1) of this subsection, the Commission may issue authorizations, under such conditions and terms as it may prescribe, to permit an alien licensed by his government as an amateur radio operator to operate his amateur radio station licensed by his government in the United States, its possessions, and the Commonwealth of Puerto Rico provided there is in effect a multilateral or bilateral agreement, to which the United States and the alien's government are parties, for such operation on a reciprocal basis by United States amateur radio operators. Other provisions of this chapter and of subchapter II of chapter 5, and chapter 7, of Title 5 shall not be applicable to any request or application for or modification, suspension, or cancellation of any such authorization.

(m)(1)  Have authority to suspend the license of any operator upon proof sufficient to satisfy the Commission that the licensee—

(A) has violated, or caused, aided, or abetted the violation of, any provision of any Act, treaty, or convention binding on the United States, which the Commission is authorized to administer, or any regulation made by the Commission under any such Act, treaty, or convention; or

(B) has failed to carry out a lawful order of the master or person lawfully in charge of the ship or aircraft on which he is employed; or

(C) has willfully damaged or permitted radio apparatus or installations to be damaged; or

(D) has transmitted superfluous radio communications or signals or communications containing profane or obscene words, language, or meaning, or has knowingly transmitted—

(1) false or deceptive signals or communications, or

(2) a call signal or letter which has not been assigned by proper authority to the station he is operating; or

(E) has willfully or maliciously interfered with any other radio communications or signals; or

(F) has obtained or attempted to obtain, or has assisted another to obtain or attempt to obtain, an operator's license by fraudulent means.

(2) No order of suspension of any operator's license shall take effect until fifteen days' notice in writing thereof, stating the cause for the proposed suspension, has been given to the operator licensee who may make written application to the Commission at any time within said fifteen days for a hearing upon such order. The notice to the operator licensee shall not be effective until actually received by him, and from that time he shall have fifteen days in which to mail the said application. In the event that physical conditions prevent mailing of the application at the expiration of the fifteen-day period, the application shall then be mailed as soon as possible thereafter, accompanied by a satisfactory explanation of the delay. Upon receipt by the Commission of such application for hearing, said order of suspension shall be held in abeyance until the conclusion of the hearing which shall be conducted under such rules as the Commission may prescribe. Upon the conclusion of said hearing the Commission may affirm, modify, or revoke said order of suspension.

(n) Have authority to inspect all radio installations associated with stations required to be licensed by any Act, or which the Commission by rule has authorized to operate without a license under section 307(e)(1) of this title, or which are subject to the provisions of any Act, treaty, or convention binding on the United States, to ascertain whether in construction, installation, and operation they conform to the requirements of the rules and regulations of the Commission, the provisions of any Act, the terms of any treaty or convention binding on the United States, and the conditions of the license or other instrument of authorization under which they are constructed, installed, or operated.

(*o*) Have authority to designate call letters of all stations;

(p) Have authority to cause to be published such call letters and such other announcements and data as in the judgment of the Commission may be required for

the efficient operation of radio stations subject to the jurisdiction of the United States and for the proper enforcement of this chapter;

(q) Have authority to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation. The permittee or licensee, and the tower owner in any case in which the owner is not the permittee or licensee, shall maintain the painting and/or illumination of the tower as prescribed by the Commission pursuant to this section. In the event that the tower ceases to be licensed by the Commission for the transmission of radio energy, the owner of the tower shall maintain the prescribed painting and/or illumination of such tower until it is dismantled, and the Commission may require the owner to dismantle and remove the tower when the Administrator of the Federal Aviation Agency determines that there is a reasonable possibility that it may constitute a menace to air navigation.

(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.

(s) Have authority to require that apparatus designed to receive television pictures broadcast simultaneously with sound be capable of adequately receiving all frequencies allocated by the Commission to television broadcasting when such apparatus is shipped in interstate commerce, or is imported from any foreign country into the United States, for sale or resale to the public.

(t) Notwithstanding the provisions of section 301(e) of this title, have authority, in any case in which an aircraft registered in the United States is operated (pursuant to a lease, charter, or similar arrangement) by an aircraft operator who is subject to regulation by the government of a foreign nation, to enter into an agreement with such government under which the Commission shall recognize and accept any radio station licenses and radio operator licenses issued by such government with respect to such aircraft.

(u) Require that, if technically feasible—

(1) apparatus designed to receive or play back video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States and uses a picture screen of any size—

Add. 7

(A) be equipped with built-in closed caption decoder circuitry or capability designed to display closed-captioned video programming;

(B) have the capability to decode and make available the transmission and delivery of video description services as required by regulations reinstated and modified pursuant to section 613(f) of this title; and

(C) have the capability to decode and make available emergency information (as that term is defined in section 79.2 of the Commission's regulations (47 CFR 79.2)) in a manner that is accessible to individuals who are blind or visually impaired; and

(2) notwithstanding paragraph (1) of this subsection—

(A) apparatus described in such paragraph that use a picture screen that is less than 13 inches in size meet the requirements of subparagraph (A), (B), or (C) of such paragraph only if the requirements of such subparagraphs are achievable (as defined in section 617 of this title);

(B) any apparatus or class of apparatus that are display-only video monitors with no playback capability are exempt from the requirements of such paragraph; and

(C) the Commission shall have the authority, on its own motion or in response to a petition by a manufacturer, to waive the requirements of this subsection for any apparatus or class of apparatus—

(i) primarily designed for activities other than receiving or playing back video programming transmitted simultaneously with sound; or

(ii) for equipment designed for multiple purposes, capable of receiving or playing video programming transmitted simultaneously with sound but whose essential utility is derived from other purposes.

(v) Have exclusive jurisdiction to regulate the provision of direct-to-home satellite services. As used in this subsection, the term "direct-to-home satellite services" means the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite.

(w) Omitted.

(x) Require, in the case of an apparatus designed to receive television signals that are shipped in interstate commerce or manufactured in the United States and that have a picture screen 13 inches or greater in size (measured diagonally), that such apparatus be equipped with a feature designed to enable viewers to block dis-

play of all programs with a common rating, except as otherwise permitted by regulations pursuant to section 330(c)(4) of this title.

(y) Have authority to allocate electromagnetic spectrum so as to provide flexibility of use, if—

(1) such use is consistent with international agreements to which the United States is a party; and

(2) the Commission finds, after notice and an opportunity for public comment, that—

(A) such an allocation would be in the public interest;

(B) such use would not deter investment in communications services and systems, or technology development; and

(C) such use would not result in harmful interference among users.

(z) Require that—

(1) if achievable (as defined in section 617 of this title), apparatus designed to record video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States, enable the rendering or the pass through of closed captions, video description signals, and emergency information (as that term is defined in section 79.2 of title 47, Code of Federal Regulations) such that viewers are able to activate and de-activate the closed captions and video description as the video programming is played back on a picture screen of any size; and

(2) interconnection mechanisms and standards for digital video source devices are available to carry from the source device to the consumer equipment the information necessary to permit or render the display of closed captions and to make encoded video description and emergency information audible.

(aa) Require—

(1) if achievable (as defined in section 617 of this title) that digital apparatus designed to receive or play back video programming transmitted in digital format simultaneously with sound, including apparatus designed to receive or display video programming transmitted in digital format using Internet protocol, be designed, developed, and fabricated so that control of appropriate built-in apparatus functions are accessible to and usable by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

(2) that if on-screen text menus or other visual indicators built in to the digital apparatus are used to access the functions of the apparatus described in paragraph (1), such functions shall be accompanied by audio output that is either integrated or peripheral to the apparatus, so that such menus or indicators are accessible to and usable by individuals who are blind or visually impaired in real-time;

(3) that for such apparatus equipped with the functions described in paragraphs (1) and (2) built in access to those closed captioning and video description features through a mechanism that is reasonably comparable to a button, key, or icon designated for activating the closed captioning or accessibility features; and

(4) that in applying this subsection the term "apparatus" does not include a navigation device, as such term is defined in section 76.1200 of the Commission's rules (47 CFR 76.1200).

(bb)  Require—

(1) if achievable (as defined in section 617 of this title), that the on-screen text menus and guides provided by navigation devices (as such term is defined in section 76.1200 of title 47, Code of Federal Regulations) for the display or selection of multichannel video programming are audibly accessible in real-time upon request by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

(2) for navigation devices with built-in closed captioning capability, that access to that capability through a mechanism is reasonably comparable to a button, key, or icon designated for activating the closed captioning, or accessibility features; and

(3) that, with respect to navigation device features and functions—

(A) delivered in software, the requirements set forth in this subsection shall apply to the manufacturer of such software; and

(B) delivered in hardware, the requirements set forth in this subsection shall apply to the manufacturer of such hardware.

**28 U.S.C. § 2112**

### § 2112.  Record on review and enforcement of agency orders.

(a) The rules prescribed under the authority of section 2072 of this title may provide for the time and manner of filing and the contents of the record in all proceedings instituted in the courts of appeals to enjoin, set aside, suspend, modify, or otherwise review or enforce orders of administrative agencies, boards, commissions, and officers.  Such rules may authorize the agency, board, commission, or officer to file in the court a certified list of the materials comprising the record and retain and hold for the court all such materials and transmit the same or any part thereof to the court, when and as required by it, at any time prior to the final determination of the proceeding, and such filing of such certified list of the materials comprising the record and such subsequent transmittal of any such materials when and as required shall be deemed full compliance with any provision of law requiring the filing of the record in the court. The record in such proceedings shall be certified and filed in or held for and transmitted to the court of appeals by the agency, board, commission, or officer concerned within the time and in the manner prescribed by such rules. If proceedings are instituted in two or more courts of appeals with respect to the same order, the following shall apply:

(1) If within ten days after issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the proceedings, the petition for review with respect to proceedings in at least two courts of appeals, the agency, board, commission, or officer shall proceed in accordance with paragraph (3) of this subsection. If within ten days after the issuance of the order the agency, board, commission, or officer concerned receives, from the persons instituting the proceedings, the petition for review with respect to proceedings in only one court of appeals, the agency, board, commission, or officer shall file the record in that court notwithstanding the institution in any other court of appeals of proceedings for review of that order. In all other cases in which proceedings have been instituted in two or more courts of appeals with respect to the same order, the agency, board, commission, or officer concerned shall file the record in the court in which proceedings with respect to the order were first instituted.

(2) For purposes of paragraph (1) of this subsection, a copy of the petition or other pleading which institutes proceedings in a court of appeals and which is stamped by the court with the date of filing shall constitute the petition for review. Each agency, board, commission, or officer, as the case may be, shall designate by rule the office and the officer who must receive petitions for review under paragraph (1).

(3) If an agency, board, commission, or officer receives two or more petitions for review of an order in accordance with the first sentence of paragraph (1) of this subsection, the agency, board, commission, or officer shall, promptly after the expiration of the ten-day period specified in that sentence, so notify the judicial panel on multidistrict litigation authorized by section 1407 of this title, in such form as that panel shall prescribe. The judicial panel on multidistrict litigation shall, by means of random selection, designate one court of appeals, from among the courts of appeals in which petitions for review have been filed and received within the ten-day period specified in the first sentence of paragraph (1), in which the record is to be filed, and shall issue an order consolidating the petitions for review in that court of appeals. The judicial panel on multidistrict litigation shall, after providing notice to the public and an opportunity for the submission of comments, prescribe rules with respect to the consolidation of proceedings under this paragraph. The agency, board, commission, or officer concerned shall file the record in the court of appeals designated pursuant to this paragraph.

(4) Any court of appeals in which proceedings with respect to an order of an agency, board, commission, or officer have been instituted may, to the extent authorized by law, stay the effective date of the order. Any such stay may thereafter be modified, revoked, or extended by a court of appeals designated pursuant to paragraph (3) with respect to that order or by any other court of appeals to which the proceedings are transferred.

(5) All courts in which proceedings are instituted with respect to the same order, other than the court in which the record is filed pursuant to this subsection, shall transfer those proceedings to the court in which the record is so filed. For the convenience of the parties in the interest of justice, the court in which the record is filed may thereafter transfer all the proceedings with respect to that order to any other court of appeals.

(b) The record to be filed in the court of appeals in such a proceeding shall consist of the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence, and proceedings before the agency, board, commission, or officer concerned, or such portions thereof (1) as the rules prescribed under the authority of section 2072 of this title may require to be included therein, or (2) as the agency, board, commission, or officer concerned, the petitioner for review or respondent in enforcement, as the case may be, and any intervenor in the court proceeding by written stipulation filed with the agency, board, commission, or officer concerned or in the court in any such proceeding may consistently with the rules prescribed under the authority of section 2072 of this title designate to be included therein, or (3) as the court upon motion of a party or, after

a prehearing conference, upon its own motion may by order in any such proceeding designate to be included therein. Such a stipulation or order may provide in an appropriate case that no record need be filed in the court of appeals. If, however, the correctness of a finding of fact by the agency, board, commission, or officer is in question all of the evidence before the agency, board, commission, or officer shall be included in the record except such as the agency, board, commission, or officer concerned, the petitioner for review or respondent in enforcement, as the case may be, and any intervenor in the court proceeding by written stipulation filed with the agency, board, commission, or officer concerned or in the court agree to omit as wholly immaterial to the questioned finding. If there is omitted from the record any portion of the proceedings before the agency, board, commission, or officer which the court subsequently determines to be proper for it to consider to enable it to review or enforce the order in question the court may direct that such additional portion of the proceedings be filed as a supplement to the record. The agency, board, commission, or officer concerned may, at its option and without regard to the foregoing provisions of this subsection, and if so requested by the petitioner for review or respondent in enforcement shall, file in the court the entire record of the proceedings before it without abbreviation.

(c) The agency, board, commission, or officer concerned may transmit to the court of appeals the original papers comprising the whole or any part of the record or any supplemental record, otherwise true copies of such papers certified by an authorized officer or deputy of the agency, board, commission, or officer concerned shall be transmitted. Any original papers thus transmitted to the court of appeals shall be returned to the agency, board, commission, or officer concerned upon the final determination of the review or enforcement proceeding. Pending such final determination any such papers may be returned by the court temporarily to the custody of the agency, board, commission, or officer concerned if needed for the transaction of the public business. Certified copies of any papers included in the record or any supplemental record may also be returned to the agency, board, commission, or officer concerned upon the final determination of review or enforcement proceedings.

(d) The provisions of this section are not applicable to proceedings to review decisions of the Tax Court of the United States or to proceedings to review or enforce those orders of administrative agencies, boards, commissions, or officers which are by law reviewable or enforceable by the district courts.

**47 C.F.R. § 73.3555**

**§ 73.3555 Multiple Ownership.**

(a)(1)  *Local radio ownership rule.*  A person or single entity (or entities under common control) may have a cognizable interest in licenses for AM or FM radio broadcast stations in accordance with the following limits:

(i)  In a radio market with 45 or more full-power, commercial and noncommercial radio stations, not more than 8 commercial radio stations in total and not more than 5 commercial stations in the same service (AM or FM);

(ii)  In a radio market with between 30 and 44 (inclusive) full-power, commercial and noncommercial radio stations, not more than 7 commercial radio stations in total and not more than 4 commercial stations in the same service (AM or FM);

(iii)  In a radio market with between 15 and 29 (inclusive) full-power, commercial and noncommercial radio stations, not more than 6 commercial radio stations in total and not more than 4 commercial stations in the same service (AM or FM); and

(iv)  In a radio market with 14 or fewer full-power, commercial and noncommercial radio stations, not more than 5 commercial radio stations in total and not more than 3 commercial stations in the same service (AM or FM); provided, however, that no person or single entity (or entities under common control) may have a cognizable interest in more than 50% of the full-power, commercial and noncommercial radio stations in such market unless the combination of stations comprises not more than one AM and one FM station.

(2)  Overlap between two stations in different services is permissible if neither of those two stations overlaps a third station in the same service.

(b)  *Local television multiple ownership rule.*  An entity may directly or indirectly own, operate, or control two television stations licensed in the same Designated Market Area (DMA) (as determined by Nielsen Media Research or any successor entity) only under one or more of the following conditions:

(1)  The Grade B contours of the stations (as determined by § 73.684) do not overlap; or

(i)  At the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top four stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service; and

(ii)  At least 8 independently owned and operating, full-power commercial and noncommercial TV stations would remain post-merger in the DMA in which the communities of license of the TV stations in question are located. Count only those stations the Grade B signal contours of which overlap with the Grade B signal contour of at least one of the stations in the proposed combination. In areas where there is no Nielsen DMA, count the TV stations present in an area that would be the functional equivalent of a TV market. Count only those TV stations the Grade B signal contours of which overlap with the Grade B signal contour of at least one of the stations in the proposed combination.

(2)  [Reserved]

(c)  *Radio-television cross-ownership rule.*—(1) *This rule is triggered when:* (i) The predicted or measured 1 mV/m contour of an existing or proposed FM station (computed in accordance with § 73.313) encompasses the entire community of license of an existing or proposed commonly owned TV broadcast station(s), or the Grade A contour(s) of the TV broadcast station(s) (computed in accordance with § 73.684) encompasses the entire community of license of the FM station; or

(ii)  The predicted or measured 2 mV/m groundwave contour of an existing or proposed AM station (computed in accordance with § 73.183 or § 73.386), encompasses the entire community of license of an existing or proposed commonly owned TV broadcast station(s), or the Grade A contour(s) of the TV broadcast station(s) (computed in accordance with § 73.684) encompass(es) the entire community of license of the AM station.

(2)  An entity may directly or indirectly own, operate, or control up to two commercial TV stations (if permitted by paragraph (b) of this section, the local television multiple ownership rule) and 1 commercial radio station situated as described in paragraph (c)(1) of this section.  An entity may not exceed these numbers, except as follows:

(i)  If at least 20 independently owned media voices would remain in the market post-merger, an entity can directly or indirectly own, operate, or control up to:

(A)  Two commercial TV and six commercial radio stations (to the extent permitted by paragraph (a) of this section, the local radio multiple ownership rule); or

(B)  One commercial TV and seven commercial radio stations (to the extent that an entity would be permitted to own two commercial TV and six commercial radio stations under paragraph (c)(2)(i)(A) of this section, and to the extent permitted by paragraph (a) of this section, the local radio multiple ownership rule).

(ii)  If at least 10 independently owned media voices would remain in the market post-merger, an entity can directly or indirectly own, operate, or control up to

two commercial TV and four commercial radio stations (to the extent permitted by paragraph (a) of this section, the local radio multiple ownership rule).

(3) To determine how many media voices would remain in the market, count the following:

(i) *TV stations:* independently owned and operating full-power broadcast TV stations within the DMA of the TV station's (or stations') community (or communities) of license that have Grade B signal contours that overlap with the Grade B signal contour(s) of the TV station(s) at issue;

(ii) *Radio stations:* (A)(*1*) Independently owned operating primary broadcast radio stations that are in the radio metro market (as defined by Arbitron or another nationally recognized audience rating service) of:

(*i*) The TV station's (or stations') community (or communities) of license; or

(*ii*) The radio station's (or stations') community (or communities) of license; and

(*2*) Independently owned out-of-market broadcast radio stations with a minimum share as reported by Arbitron or another nationally recognized audience rating service.

(B) When a proposed combination involves stations in different radio markets, the voice requirement must be met in each market; the radio stations of different radio metro markets may not be counted together.

(C) In areas where there is no radio metro market, count the radio stations present in an area that would be the functional equivalent of a radio market.

(iii) *Newspapers:* Newspapers that are published at least four days a week within the TV station's DMA in the dominant language of the market and that have a circulation exceeding 5% of the households in the DMA; and

(iv) One cable system: if cable television is generally available to households in the DMA. Cable television counts as only one voice in the DMA, regardless of how many individual cable systems operate in the DMA.

(d) *Daily newspaper cross-ownership rule.* (1) No license for an AM, FM or TV broadcast station shall be granted to any party (including all parties under common control) if such party directly or indirectly owns, operates or controls a daily newspaper and the grant of such license will result in:

(i) The predicted or measured 2 mV/m contour of an AM station, computed in accordance with § 73.183 or § 73.186, encompassing the entire community in which such newspaper is published; or

Add. 16

(ii)  The predicted 1 mV/m contour for an FM station, computed in accordance with § 73.313, encompassing the entire community in which such newspaper is published; or

(iii)  The Grade A contour of a TV station, computed in accordance with § 73.684, encompassing the entire community in which such newspaper is published.

(2)  Paragraph (d)(1) of this section shall not apply in cases where the Commission makes a finding pursuant to Section 310(d) of the Communications Act that the public interest, convenience, and necessity would be served by permitting an entity that owns, operates or controls a daily newspaper to own, operate or control an AM, FM, or TV broadcast station whose relevant contour encompasses the entire community in which such newspaper is published as set forth in paragraph (d)(1) of this section.

(3)  In making a finding under paragraph (d)(2) of this section, there shall be a presumption that it is not inconsistent with the public interest, convenience, and necessity for an entity to own, operate or control a daily newspaper in a top 20 Nielsen DMA and one commercial AM, FM or TV broadcast station whose relevant contour encompasses the entire community in which such newspaper is published as set forth in paragraph (d)(1) of this section, provided that, with respect to a combination including a commercial TV station,

(i)  The station is not ranked among the top four TV stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service; and

(ii)  At least 8 independently owned and operating major media voices would remain in the DMA in which the community of license of the TV station in question is located (for purposes of this provision major media voices include full-power TV broadcast stations and major newspapers).

(4)  In making a finding under paragraph (d)(2) of this section, there shall be a presumption that it is inconsistent with the public interest, convenience, and necessity for an entity to own, operate or control a daily newspaper and an AM, FM, or TV broadcast station whose relevant contour encompasses the entire community in which such newspaper is published as set forth in paragraph (d)(1) of this section in a DMA other than the top 20 Nielsen DMAs or in any circumstance not covered under paragraph (d)(3) of this section.

(5)  In making a finding under paragraph (d)(2) of this section, the Commission shall consider:

(i)  Whether the combined entity will significantly increase the amount of local news in the market;

(ii)  Whether the newspaper and the broadcast outlets each will continue to employ its own staff and each will exercise its own independent news judgment;

(iii)  The level of concentration in the Nielsen Designated Market Area (DMA); and

(iv)  The financial condition of the newspaper or broadcast station, and if the newspaper or broadcast station is in financial distress, the proposed owner's commitment to invest significantly in newsroom operations.

(6)  In order to overcome the negative presumption set forth in paragraph (d)(4) of this section with respect to the combination of a major newspaper and a television station, the applicant must show by clear and convincing evidence that the co-owned major newspaper and station will increase the diversity of independent news outlets and increase competition among independent news sources in the market, and the factors set forth above in paragraph (d)(5) of this section will inform this decision.

(7)  The negative presumption set forth in paragraph (d)(4) of this section shall be reversed under the following two circumstances:

(i)  The newspaper or broadcast station is failed or failing; or

(ii)  The combination is with a broadcast station that was not offering local newscasts prior to the combination, and the station will initiate at least seven hours per week of local news programming after the combination.

\*     \*     \*

**47 C.F.R. § 73.658**

**§ 73.658 Affiliation agreements and network program practices; territorial exclusivity in non-network program arrangements.**

\*    \*    \*

(g) *Dual network operation.*  A television broadcast station may affiliate with a person or entity that maintains two or more networks of television broadcast stations *unless* such dual or multiple networks are composed of two or more persons or entities that, on February 8, 1996, were "networks" as defined in § 73.3613(a)(1) of the Commission's regulations (that is, ABC, CBS, Fox, and NBC).

\*    \*    \*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 27, 2015, an electronic copy of the foregoing Final Brief for Broadcast Petitioners was filed with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system and was served electronically by the Notice of Docket Activity upon registered CM/ECF participants.

/s/ Helgi C. Walker
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500